05-45-R4130
DMW/jly

E-FILED
Thursday, 07 February, 2008  04:26:22 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANDRE HUNTER, R01100, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-3062-HAB-BGC |
| | ) | |
| DR. BEN AWADA, DR. GRACIELA | ) | |
| GRAMMER, DR. SETH OSAFA, DR. | ) | |
| WILLARD ELYEA, BARBARA HURT, | ) | |
| ROGER WALKER, TERRI ANDERSON, | ) | |
| SHERRY BENTON, KAREN HARPER, | ) | |
| DONALD HULICK, WEXFORD | ) | |
| HEALTH SOURCES, INC., and KEVIN | ) | |
| KIRKBRIDE, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, BEN AWADA, D.D.S., GRACIELA GRAMMER,

D.D.S., SETH OSAFO, M.D., KAREN HARPER, and WEXFORD HEALTH SOURCES,

INC., by their attorney, DAVID M. WALTER of HEYL, ROYSTER, VOELKER &

ALLEN, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule

CDIL-LR 7.1, hereby move the Court for summary judgment, stating as follows:

**Introduction**

The Plaintiff, a former state prisoner, filed a complaint seeking damages and

injunctive relief pursuant to 42 USC §1983, alleging that the Defendants violated his rights

under the Eighth Amendment to the United States Constitution from the year 2000 through

the present.  In its Text Order dated April 2, 2007, the Court found that the Plaintiff had

stated a claim for deliberate indifference to serious medical (dental) needs.

In 1998, while in high school, the Plaintiff had a root canal performed on his #19

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

tooth. As the last step of the root canal treatment, it would have been appropriate for a crown to have been placed on the tooth, but this was not done by Plaintiff's treating dentist. The Plaintiff later worked at a cinema, was employed at a restaurant, and then attended the University of Illinois, but he did not have a crown installed on his tooth then either. While a full-time student at the University of Illinois, the Plaintiff was arrested for armed robbery. The Plaintiff was convicted and sentenced to the Illinois Department of Corrections. While incarcerated at the Illinois River Correctional Center, the Plaintiff demanded a crown for his #19 tooth. Deputy Director Barbara A. Hurt wrote the Plaintiff a letter advising him that the Illinois Department of Corrections does not approve the placement of crowns. Nonetheless, Plaintiff filed this lawsuit accusing his dentists, their dental assistant, his medical doctor, and their employer of violating his right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution, because they did not give him a crown as he demanded.

## Material Facts Claimed To Be Undisputed

1.     Dr. Graciela Grammer is a doctor of dental surgery, licensed to practice dentistry in the State of Illinois. Affidavit of Dr. Grammer, par. 1.

2.     In addition to Dr. Grammer's doctor of dental surgery (D.D.S.) degree, she also has a Masters of Public Health. Affidavit of Dr. Grammer, par. 2.

3.     Dr. Grammer has been practicing as a dentist since 1976. Affidavit of Dr. Grammer, par. 3.

4.     Dr. Grammer was in private practice as a dentist for 25 years. Affidavit of Dr. Grammer, par. 4.

5.     Dr. Grammer enjoys being a dentist and helping people, however, so after her retirement from private practice, she continued to work part-time as a dentist providing

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05AF-R4150
DMW/

general dentistry services in the public sector.  Affidavit of Dr. Grammer, par. 5.

6.      Currently, Dr. Grammer works three days a week at the Cass County Health Department providing general dentistry services to underprivileged individuals in the Cass County area who might not otherwise have access to a dentist.  Affidavit of Dr. Grammer, par. 6.

7.      From approximately 2000 through 2005, Dr. Grammer worked as a part-time dentist at the Illinois River Correctional Center in Canton and the Western Illinois Correctional Center in Mount Sterling.  Affidavit of Dr. Grammer, par. 7.

8.      A prison dentist's patients are not always the easiest to treat.  Affidavit of Dr. Grammer, par. 8.

9.      For example, many enter prison with dental conditions that have been left untreated for years.  Affidavit of Dr. Grammer, par. 9.

10.     Often prisoners did not have access to dental services prior to entering prison. Affidavit of Dr. Grammer, par. 10.

11.     Others had access to dental care prior to their incarceration, but failed to properly care for their dental health due to alcohol or drug addiction.   Affidavit of Dr. Grammer, par. 11.

12.     Those who used methamphetamine prior to their incarceration frequently have severe dental problems that were caused by the use of methamphetamines.  Affidavit of Dr. Grammer, par. 12.

13.     Frequently, the prison dentist is the only dentist that individuals entering prison have seen in years.  Affidavit of Dr. Grammer, par. 13.

14.     While a part-time dentist at the Illinois River Correctional Center, Dr. Grammer provided general dentistry services, including examinations, instructions on proper

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05145-R4130
DMW/

dental hygiene, fillings, tooth extractions and other needed dental care.  Affidavit of Dr. Grammer, par. 14.

15.     While employed as a part-time dentist at Illinois River Correctional Center, one of Dr. Grammer's patients was Andre Hunter.  Affidavit of Dr. Grammer, par. 15.

16.     In approximately 1998, prior to his incarceration, the Plaintiff had a root canal performed on his #19 tooth.  Complaint at 2, paragraph 17.

17.     No crown was put on Plaintiff's tooth by his dentist at the time the root canal was performed.  Transcript of Plaintiff's deposition (Transcript) at 42, line 24, through 43, line 2.

18.     Two years later in the fall of 2000, the Plaintiff was a full-time student at the University of Illinois.  Transcript at 48, line 11, through 49, line 7.

19.     While attending the University of Illinois, the Plaintiff intended to major in engineering.  Transcript and 49, lines 9 to 11.

20.     The Plaintiff believes that the University of Illinois has a center called McKinley Health Center.  Transcript at 48, line 17, through 49, line 1.

21.     The Plaintiff did not, however, obtain any dental care for himself while a student at the University of Illinois.  Transcript at 49, lines 12-16.

22.     Before attending the University of Illinois, the Plaintiff worked at a movie theater and a restaurant.  Transcript at 46, lines 14-23.

23.     The Plaintiff did not have a crown installed while he was working during the summer between high school and college either.  Transcript of 48, lines 2-7.

24.     While a student at the University of Illinois, the Plaintiff was arrested.  Transcript at 48, lines 11-16.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

25.    The Plaintiff subsequently pled guilty to armed robbery and was sentenced to the Illinois Department of Corrections.  Transcript at 50-51.

26.    Dr. Grammer first treated Plaintiff on October 16, 2001, and she put a filling into Plaintiff's Number 19 tooth.  Affidavit of Dr. Grammer, par. 16; see Grammer Exh. A

27.    A filling was the appropriate treatment for Plaintiff's dental needs on October 16, 2001.  Affidavit of Dr. Grammer, par. 16; see Grammer Exh. A

28.    Dr. Grammer did not personally treat Plaintiff again until July 21, 2005.  Affidavit of Dr. Grammer, par. 17; see Grammer Exh. A.  And

29.    Dr. Ben Awada is also a Doctor of Dental Surgery (D.D.S.), licensed to practice dentistry in the State of Illinois.  Affidavit of Dr. Awada, par. 1.

30.    Dr. Awada received his dental degree from the University of Lille II (France) in 1990, and worked as a nurse while putting himself through school.  Affidavit of Dr. Awada, par. 2.

31.    After coming to the United States, Dr. Awada passed the American Dental Association Board, as well as two North East Regional Boards.  Affidavit of Dr. Awada, par. 3.

32.    Dr. Awada initially worked as a dentist in private practice.  During this time frame, he also placed dental sealants on underprivileged children's teeth. Affidavit of Dr. Awada, par. 4.

33.    In 1995, Dr. Awada began providing dental services to inmates within the Illinois Department of Corrections.  Affidavit of Dr. Awada, par. 5.

34.    In addition to caring for inmates' dental needs, Dr. Awada is also a priest and associate pastor at St. Sharbel Catholic Church in Peoria, Illinois.  Affidavit of Dr. Awada, par. 6.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

35.    Dr. Awada is currently the only dentist at the Illinois River Correctional Center.  He has been providing dental care to inmates at Illinois River Correctional Center for more than a decade.  Affidavit of Dr. Awada, par. 7.

36.    Five days a week, eight hours a day, Dr. Awada cares for the dental needs of the approximately 2000 inmates incarcerated at the Illinois River Correctional Center.  More than sixty percent of his dental patients at Illinois River Correctional Center entered prison with serious dental problems.  It is a full-time job.  Affidavit of Dr. Awada, par. 8.

37.    Dr. Awada provides general dentistry services including, for example, examinations, instructions on proper dental hygiene, fillings, tooth extractions and other needed dental care.  Affidavit of Dr. Awada, par. 9.

38.    Andre Hunter was also one of Dr. Awada's patients when he was incarcerated at the Illinois River Correctional Center.  Affidavit of Dr. Awada, par. 10.

39.    On April 13, 2004, Dr. Awada gave the Plaintiff his two-year dental examination.  Following Dr. Awada's examination, he made an appointment for the Plaintiff to return so that work could be performed on his Number 19 tooth. Affidavit of Dr. Awada, par. 11; see Awada Exh. A.

40.    Dr. Seth Osafo is a licensed physician.  Affidavit of Dr. Osafo, par. 1.

41.    Dr. Osafo is the Medical Director at the Illinois River Correctional Center in Canton, Illinois.  Affidavit of Dr. Osafo, par. 2.

42.    The Plaintiff cannot recall whether he ever spoke to Dr. Osafo personally about his #19 tooth.  Transcript at 33, lines 9-13, and at 34, lines 6-11.

43.    The Plaintiff does not believe he ever wrote Dr. Osafo about his #19 tooth either.  Transcript at 34, lines 12-14.

44.    Aside from Dr. Osafo's duties as medical director, the Plaintiff cannot think

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

of any reason why Dr. Osafo might know about Plaintiff's tooth. Transcript at 35, line 18, through 36, line 8.

45. Dr. Osafo is a trained medical doctor, not a dentist. Affidavit of Dr. Osafo, par. 11.

46. Dr. Osafo does not have any control or direction in the treatment of dental pains or problems other than merely as an auxiliary provider until the inmate or patient can be seen by a licensed dentist. Affidavit of Dr. Osafo, par. 12.

47. All treatment with regard to dental pain is controlled by the dental staff. Affidavit of Dr. Osafo, par. 13.

48. Dr. Osafo is not aware of any policy by IDOC, or Wexford Health Sources, Inc., which prohibits proper and necessary dental treatments to inmates. Affidavit of Dr. Osafo, par. 14

49. Moreover, Dr. Osafo did not personally examine Plaintiff with regard to pain in his #19 tooth, or any other tooth, during the relevant time period. Affidavit of Dr. Osafo, par. 4.

50. Dr. Osafo did, however, personally examine Plaintiff for a variety of other reasons and treated him accordingly. Plaintiff was advised to return as needed for his complaints. Affidavit of Dr. Osafo, par. 4.

51. For example, on April 19, 2004, Dr. Osafo personally saw the Plaintiff for a recurring infection caused by an ingrown nail on his left big toe. Dr. Osafo scheduled Plaintiff for a follow-up on April 21, 2004, to have the toenail extracted and prescribed 300 mg. of Cleocin to be taken three times a day for ten (10) days. Affidavit of Dr. Osafo, par. 5; Osafo Exh. A.

52. Dr. Osafo saw the Plaintiff again on April 21, 2004, for the elective extraction

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

of his infected ingrown left big toenail.  According to Dr. Osafo's procedure note, the extraction occurred without any obvious complications. Dr. Osafo then instructed Plaintiff on the proper care and dressing of the extraction site.  Affidavit of Dr. Osafo, par. 6; Osafo Exh. B.

53.    Dr. Osafo next saw the Plaintiff on April 28, 2004, to follow-up on the toenail extraction procedure.  Dr. Osafo's note in the medical records from that date states as follows:

> S.  (Subjective) 21 yobm (21-year-old black male) here for f/u (follow-up) (post left toenail extraction).  Doing okay.  No new complaints.
>
> O.  (Objective) Left big toe healing.  Left big toenail bed.  No discharge.  No erythema (inflammatory redness of the skin).
>
> A.  (Assessment) Healing left big toe.
>
> P.  (Plan) Re-assured.  See prn (as needed).

Affidavit of Dr. Osafo, par. 7; see Osafo Exh. C.

54.    On May 4, 2004, the Plaintiff returned to the dental clinic where x-rays were taken of his teeth.  Affidavit of Dr. Awada, par. 11; see Awada Exh. A.

55.    Dr. Awada advised the Plaintiff that he could either continue to get fillings or have the tooth extracted.  Complaint at 3, par. 26.

56.    Dr. Awada removed the old filling and decay from Plaintiff's #19 tooth and replaced the filling on May 4, 2004.  Affidavit of Dr. Awada, par. 11; see Awada Exh. A.

57.    In Dr. Awada's opinion as a doctor of dental surgery, the filling given to the Plaintiff on May 4, 2004, was the appropriate dental care for the Plaintiff's dental condition at that time.  Affidavit of Dr. Awada, par. 13.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

58.     Dr. Awada did not personally see Plaintiff again until August 5, 2005. Affidavit of Dr. Awada, par. 14; see Awada Exh. A.

59.     Dr. Osafo, however, saw the Plaintiff again on September 16, 2004.  At that time Plaintiff had returned for treatment because his left big toe was ingrown again.  Dr. Osafo prescribed an antibiotic and a pain reliever for treatment and scheduled a follow-up for one week.

Affidavit of Dr. Osafo, par. 8; see Osafo Exh. D.

60.     Later, on July 21, 2005, Dr. Grammer saw Mr. Hunter for complaints of pain to his #19 tooth.  Dr. Grammer determined that he needed another filling, and he was scheduled for a follow-up appointment to receive another filling in his number 19 tooth. Affidavit of Dr. Grammer, par. 17; see Grammer Exh. A.

61.     At the follow-up appointment on August 2, 2005, Dr. Grammer placed a new filling into Plaintiff's Number 19 tooth.  A filling was the appropriate dental treatment for Plaintiff's condition based upon the complaints he was having at that time as well.   Affidavit of Dr. Grammer, par. 18; see Grammer Exh. A.

62.     August 2, 2005 was the last time that Dr. Grammer treated Mr. Hunter. Affidavit of Dr. Grammer, par. 18.

63.     On August 5, 2005, the Plaintiff returned to the dental clinic because the filling which had been made by Dr. Grammer in his Number 19 tooth was slightly too high.  Dr. Awada re-shaped it.  Affidavit of Dr. Awada, par. 14; see Awada Exh. A.

64.     On October 31, 2005, Dr. Awada saw Plaintiff for pain and swelling between his Number 18 and Number 19 teeth.  Dr. Awada determined that he had an abscess, and treated him for the abscess.  See Awada Exh. A. Dr. Awada explained to the Plaintiff proper

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

dental care techniques, and attempted to impress upon him the importance of daily cleaning. Affidavit of Dr. Awada, par. 15.

65.     On November 2, 2005, Dr. Grammer made an entry in the notes that Plaintiff had put in a request to be seen, but was not seen on that date, because he had already been seen for his dental concerns by Dr. Awada on October 31, 2005. Affidavit of Dr. Grammer, par. 19; see Grammer Exh. A.

66.     Dr. Grammer did not have any personal involvement with Plaintiff after November 2, 2005. Affidavit of Dr. Grammer, par. 20.

67.     A crown is a permanent prosthetic that is not available as a treatment option within the Illinois Department of Corrections, per Department policy. Inmates within the Illinois Department of Corrections are provided other treatment options, however, such as extraction or a build up (filling). Affidavit of Dr. Grammer, par. 21.

68.     In Dr. Grammer's medical opinion, the treatment that Plaintiff received at the Illinois River Correctional Center was appropriate and no other dental treatment was necessary. Affidavit of Dr. Grammer, par. 22.

69.     Dr. Awada saw the Plaintiff again personally on November 15, 2005. Plaintiff was continuing to experience pain and swelling between his Number 18 and Number 19 teeth. Again, Dr. Awada treated the Plaintiff, and instructed him on proper cleaning techniques. Affidavit of Dr. Awada, par. 16; see Awada Exh. A.

70.     The Plaintiff was seen by medical staff for tooth pain on November 19, 2005. At that time, the Plaintiff stated that he had a toothache that had first started on the previous night. The Plaintiff was given Tylenol and referred to the dentist for treatment. Affidavit of Dr. Osafo, par. 10; see Osafo Exh. F.

71.     Dr. Awada saw the Plaintiff again on November 21, 2005, when he returned

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

to the dental clinic. Dr. Awada observed that the Plaintiff now had a different infection in a different location, and this time, with a pus discharge. Dr. Awada treated the Plaintiff with an antibiotic and Motrin for discomfort. The Plaintiff requested that his tooth #19 be extracted, and an extraction was scheduled by the office assistant. Affidavit of Dr. Awada, par. 17; see Awada Exh. A.

72.    On November 28, 2005, however, the Plaintiff refused the scheduled extraction of his Number 19 tooth, and signed the refusal of service form. Affidavit of Dr. Awada, par. 18; see Awada Exh. A and B.

73.    On December 30, 2005, the Plaintiff came back to the dental clinic and demanded that a crown be fabricated for his tooth. (a) Crowns are, generally, a treatment option for decayed or fractured teeth. (b) Crowns are not, however, the only treatment option for a decayed or fractured tooth. (c) Decayed or fractured teeth may be extracted, as had been scheduled for the Plaintiff. (d) A build up (filling) of the tooth, as was provided by the dentist who performed the root canal on the Plaintiff prior to his incarceration, is another treatment option. (e) Build ups were also provided to the Plaintiff several times while he was at Illinois River Correctional Center. (f) Although a crown would have been an appropriate treatment option when the root canal was originally performed on the Plaintiff prior to his incarceration, it was not an appropriate treatment option on December 30, 2005, due to the infection. (g) Dr. Awada also informed the Plaintiff that a crown was not available as a treatment option per Illinois Department of Correction's policy. Affidavit of Dr. Awada, par. 19.

74.    Dr. Awada saw the Plaintiff again personally on February 2, 2006. See Awada Exh. A. On February 2, 2006, Dr. Awada asked the Plaintiff to see him so that he could explain his dental chart to him, because he had filed a grievance expressing confusion. Dr.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

Awada explained to the Plaintiff that a crown was contraindicated at this time. Affidavit of Dr. Awada, par. 20.

75. On March 15, 2006, Illinois Department of Corrections Deputy Director Barbara Hurt wrote the Plaintiff a letter advising him that the Department does not approve the placement of crowns. Transcript at 74, line 8, through 75, line 18; Transcript Exhibit #1.

76. On March 24, 2006, Dr. Awada saw Plaintiff at his request because he had lost his filling in tooth number 19. Dr. Awada discussed Plaintiff's need to have the tooth extracted but Plaintiff refused extraction at that time. Affidavit of Dr. Awada, par. 21; see Awada Exh. C.

77. On April 7, 2006, the Plaintiff arrived at the dental clinic through a referral from the health clinic. As explained to him and noted in the dental chart, the only option at that time (other than the previously recommended extraction) was to have a filling build-up on his #19 tooth. Affidavit of Dr. Awada, par. 22; see Awada Exh. C.

78. The Plaintiff had his two-year dental examination on April 21, 2006. At that time, he arrived late, and was warned by Karen Harper that he would not be seen for his scheduled appointment if he was late the next time. Affidavit of Dr. Awada, par. 23; see Awada Exh. C.

79. Karen Harper is employed at the Illinois River Correctional Center as a dental assistant. Affidavit of Karen Harper, par. 1.

80. Karen Harper's position as dental assistant is to provide assistance to the dentist by providing chair-side assistance, keeping operating field clear, passing instruments, suctioning, scrubbing and sterilizing instruments, mixing restorative materials, assisting in taking intra-oral x-rays in accordance with proper radiological hygiene, developing and mounting x-ray films, maintaining the x-ray unit, processor, auto-conclave and dental unit

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

according to specifications, inventorying supplies and equipment to maintain adequate levels,

ordering supplies and equipment as needed, generally maintaining cleanliness and sanitation

of the dental clinic, and performing various other tasks to assist the dentist and insure efficient

functioning of the clinic.    Affidavit of Karen Harper, par. 2.

81.    In addition to Karen Harper's dental duties, she also maintains the dental

charts, records dental findings, schedules patients for dental appointments, and prepares a

patient's schedule for an escort officer.    Affidavit of Karen Harper, par. 3.

82.    The Plaintiff contends that Karen Harper knew about the condition of his #19

tooth and did nothing to prevent it.  Transcript at 38, lines 4- 11.

83.    The Plaintiff does not know, however, whether it was within dental assistant

Karen Harper's power to do anything.  Transcript at 40, lines 4-12.

84.    As a dental assistant, Karen Harper does not make any decisions with regard

to patient care, nor can she affect, contradict, or change the care provided by the licensed

dentists.    Affidavit of Karen Harper, par. 4.

85.    Karen Harper cannot, nor has she ever, treated the Plaintiff for any medical

ailments or problems for which he has complained.    Affidavit of Karen Harper, par. 5.

86.    As a dental assistant, Karen Harper is CPR certified, skilled in recognizing the

symptoms of shock and fainting, and she is generally prepared to provide necessary aid as

directed during emergency procedures.  However, such direction must come from a dentist

or physician who is trained in directing emergency procedures.    Affidavit of Karen Harper,

par. 6.

87.    Dr. Awada examined Plaintiff and x-rayed his teeth on April 21, 2006.  Dr.

Awada told Plaintiff that tooth #19 was badly decayed with a bifurcation problem.  This

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

tooth needed to be extracted. A crown would not have been an appropriate treatment. Affidavit of Dr. Awada, par. 23; see Awada Exh. C

88.     On May 13, 2006, Plaintiff failed to arrive for a scheduled appointment to have the number 19 tooth filled and to have his dental charts explained to him. Plaintiff was more than one hour late for his appointment and, when called, he signed a refusal of dental services form. Affidavit of Dr. Awada, par. 24; see Awada Exh. C.

89.     The Plaintiff's next appointment was on May 26, 2006. Dr. Awada explained to Plaintiff the substance of his dental charts and he again requested extraction of his Number 19 tooth. Affidavit of Dr. Awada, par. 25; see Awada Exh. C.

90.     An extraction was scheduled and, on June 12, 2006, Plaintiff's Number 19 tooth was extracted. Affidavit of Dr. Awada, par. 26; see Awada Exh. C.

91.     At no point during Dr. Awada's treatment of Plaintiff, was a crown a necessary medical treatment for his tooth number 19, nor, due to the bifurcation problem of the tooth, would a crown have preserved the tooth from extraction. Affidavit of Dr. Awada, par. 27.

92.     Moreover, at all times during Dr. Awada's treatment of Plaintiff, a crown was an elective procedure which is not authorized by the Illinois Department of Corrections. Affidavit of Dr. Awada, par. 28.

93.     At no point during Dr. Awada's treatment of Plaintiff was Dr. Awada indifferent to Plaintiff's dental needs. Plaintiff disagreed with Dr. Awada's recommended treatment for his dental needs. Dr. Awada advised Plaintiff that the tooth needed to be extracted, but Plaintiff declined. Affidavit of Dr. Awada, par. 29.

94.     Plaintiff had no serious medical need for a crown instead of extraction, or while it was feasible, a tooth build up (fillings). Affidavit of Dr. Awada, par. 30.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

95.    The Plaintiff has no medical training other than CPR.  Transcript at 52, line 14, through 53, line 4.

96.    The Plaintiff has no dentist or other expert witness to testify in support of his claims, and Plaintiff only intends to call himself as a witness.  Transcript at 57, lines 5-12.

97.    At all times during Dr. Awada's treatment of Plaintiff, he based his decisions upon his knowledge and training as a dentist, the information that he was provided by Plaintiff, and the resources available to him.  Affidavit of Dr. Awada, par. 31.

98.    In Dr. Awada's medical opinion, the treatment received by Plaintiff was appropriate.  Affidavit of Dr. Awada, par. 32.

99.    Plaintiff's condition did not require any other treatment than what he was provided.  Affidavit of Dr. Awada, par. 33.

100.    Plaintiff is no longer incarcerated.  Transcript at 78, lines 11-12.

101.    The Plaintiff can afford to pay $65 a month for a cellular phone (Transcript at 25, lines 10-16), but claims that he cannot pay to see a dentist (Transcript at 78, lines 13-15).

## Analysis

### A.    Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether or not to there is a genuine need for a trial.  If Defendants meet their burden in showing there is an absence of evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986). In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B.     The Plaintiff Cannot Meet His Burden of Proof on the Merits of His Claim**

The Plaintiff's action was brought pursuant to 42 U.S.C. §1983. To state a claim under Section 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 49 (1988). The traditional definition of acting under color of state law requires that the defendant in a Section 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). The United States Supreme Court has recognized that a contractual medical provider acts under color of state law when (1) performing an affirmative obligation of the State that (2) has been delegated to the contractual medical provider and (3) the contractual medical provider has voluntarily assumed that obligation by contract. *West v. Atkins*, 487 U.S. 42, 56 (1988).

The Supreme Court has also recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the 8th Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, (1976). In order to prevail on a claim of deliberate indifference, a plaintiff must show that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F. 3d 645, 652-653 (7th Cir. 2005). With respect to the first requirement, a "serious medical need" is one that has been diagnosed by a physician as

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

mandating treatment or one that is so obvious that even a lay person could easily recognize the necessity for medical treatment by a doctor. *Foelker v. Outagamie County*, 394 F. 3d 510, 512-513 (7th Cir. 2005). With respect to the second requirement, *i.e.*, the culpable state of mind, a Plaintiff must demonstrate that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official actually drew that inference. *Greeno v. Daley*, 414 F. 3d 645, 653 (7th Cir. 2005).

"Medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an 8th Amendment claim." *Gutierrez v. Peters*, 111 F. 3d 1364, 1374 (7th Cir. 1997). In other words, medical malpractice does not become a constitutional violation merely because the victim is an inmate, and a complaint that a physician has been negligent in diagnosing or treating a medical condition of an inmate does not state a valid claim under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). As a result, courts must distinguish between (1) deliberate indifference to the serious medical needs of an inmate and (2) negligence in the diagnosis or treatment of the inmate's medical condition. *Gutierrez v. Peters*, 111 F. 3d 1364, 1374 (7th Cir. 1997). "Mere negligence or even gross negligence does not constitute deliberate indifference." *Snipes v. DeTella*, 95 F. 3d 586, 590 (7th Cir. 1996). Applying these standards to the facts of this case, Defendants Wexford, Osafo, Awada, Grammer and Harper are entitled to summary judgment as a matter of law.

**(1)    There is no evidence of personal involvement by Dr. Osafo.**

When bringing a claim against a prison official under Section 1983, a Plaintiff must also show that the official was "personally responsible for the constitutional deprivation." *J. H. and J. D. v Johnson*, 346 F. 3d 788, 793 (7th Cir. 2003). Thus, in order to be held liable under Section 1983, a supervisor must have "had some personal involvement in the

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

constitutional deprivation, essentially directing or consenting to the challenged conduct." *Id.*

> Section 1983 does not recognize a doctrine of superiors (liability). Such a doctrine would be analogous to *respondeat superior*, which makes the employer, as distinct from a superior employee, liable for an employee's tort – and which is also unavailable in suits under Section 1983.

*Duckworth v. Franzen*, 780 F. 2d 645, 650 (7th Cir. 1985).

> [S]upervisors who are merely negligent in failing to detect and prevent subordinant's misconduct are not liable, because negligence is no longer culpable under Section 1983.

*Jones v. Chicago*, 856 F. 2d 985, 992 (7th Cir. 1988).  See also *Crowder v. Lash*, 687 F. 2d 996, 1006 (7th Cir. 1997); *Johnson v. Snyder*, 444 F. 3d 579, 584 (7th Cir. 2006) (summary judgment for department of corrections director warranted where there was no evidence that the director personally read any of the Plaintiff's communications or had any subjective awareness of the Plaintiff's condition).

Here, there is no evidence that Dr. Osafo was personally involved in the alleged constitutional deprivation.  Plaintiff's claims against Dr. Osafo are based upon his job title and supervisory duties as Medical Director at Illinois River Correctional Center.  There is no evidence the Dr. Osafo was "personally responsible for the constitutional deprivation" alleged and he is entitled to summary judgment as a matter of law.  Similarly, there is no evidence that Wexford caused the complained of events.

**(2)    There is no evidence that Wexford caused the alleged constitutional deprivation.**

In order to set forth a viable claim against a corporate defendant like Wexford, the Plaintiff must demonstrate that a constitutional deprivation occurred as a result of an express policy or custom of that agency.  *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760 (7th Cir. 2002).  Other situations in which a corporate defendant may violate the constitutional rights

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

of another as a result of its policies include the following:

> (1) An express policy that reenforced a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and so well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person of final policy-making authority.

*Baxter v. Bible County Sch. Corp.*, 26 F.3d 728 (7th Cir. 1994); *see also, Woodward v. Corr. Medical Serv. Of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)(medical provider may be held liable under deliberate indifference for plaintiff's serious medical need "only when it has a policy that creates conditions that infringe upon an inmate's constitutional rights").

In this case, however, there is no evidence that an express policy of Wexford caused the Plaintiff to be deprived of a constitutional right. The Plaintiff has no evidence that either 1) an express policy existed that caused the alleged deprivation, or 2) that Wexford had a widespread practice that was so permanent and well-settled as to constitute a custom or usage with the force of law that caused the alleged deprivation, or 3) that a person of final decision making authority for Wexford caused Plaintiff's alleged constitutional deprivation. Moreover, although it would have been appropriate for a crown to have been installed at the time in the Plaintiff had the root canal in 1998, a crown would not have saved Plaintiff's tooth from extraction when Dr. Awada saw the Plaintiff beginning in April 13, 2004. Pursuant to the Illinois Department of Corrections' policy, a crown was not available as a treatment option anyway. In other words, providing a crown would not have saved Plaintiff's tooth from extraction; the policy of which the Plaintiff complains was a policy of the Department; and the Department's policy provided for appropriate treatment options, including extraction and a tooth build up, which Plaintiff received.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

**(3)    Defendants had no duty to give Plaintiff with the demanded crown**

The State bears an affirmative obligation to provide for the serious medical needs of prisoners in its custody, and contracting out for medical and dental care does not relieve the State of its constitutional duties. *West v. Atkins*, 487 U.S. 42, 56 (1988). The Department has entered into a contract with Wexford Health Sources, Inc., whereby Wexford voluntarily agreed to undertake certain duties, including the provision of general dentistry services like those that were undisputedly provided to the Plaintiff by Dr. Awada, Dr. Grammer, and Karen Harper, as well as medical services like those that were undisputedly provided by Dr. Osafo. Neither Wexford nor Dr. Osafo, Dr. Awada, Dr. Grammer, and Karen Harper had any duty, however, to provide dental services that the State did not contract with Wexford to perform and which Wexford did not agree to voluntarily undertake. "A duty assumed because of a voluntary undertaking must be strictly limited to the scope of that undertaking." *Gaines v. Ill. Central R.R. Co.*, 23 F.3d 1170, 1172 (7th Cir. 1994). There is no evidence here that Wexford, Dr. Osafo, Dr. Awada, Dr. Grammer, or Karen Harper agreed to place crowns on the teeth of inmates in the Departments' custody. Instead, the evidence is that crowns were not available per Department policy.

As noted above, the United States Supreme Court has recognized that a contractual medical provider acts under color of state law when (1) performing an affirmative obligation of the State that (2) has been delegated to the contractual medical provider and (3) the contractual medical provider has voluntarily assumed that obligation by contract. *West v. Atkins*, 487 U.S. 42, 56 (1988). Defendants are aware of no case law, however, holding that a contractual medical provider acts under color of state law by *not performing affirmative obligations of the State* that have *not been delegated* to the medical provider and that the medical provider has *not agreed to voluntarily undertake*. The complained of policy is a

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

policy of the Department and Wexford Health Sources Inc., Dr. Osafo, Dr. Awada, Dr.

Grammer, and Karen Harper are entitled to summary judgment as a matter of law. Moreover,

the Plaintiff's tooth was properly treated with fillings and extraction, and the crown Plaintiff

demanded would not have saved the Plaintiff's tooth anyway.

    **(4)    Plaintiff's disagreement with his treatment is not deliberate indifference**

    The Constitution does not guarantee prisoners a specific medical treatment or

complete freedom from symptoms after treatment. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th

Cir. 1996) (noting that it would be nice if pain would immediately cease after appropriate

medical attention, but life is not so accommodating and those with the best treatment can still

experience pain). The Constitution protects prisoners from deliberate indifference to serious

medical needs. *Id.* Disagreement with a doctor's deliberate decision to treat a medical need

in a particular way is not a question of constitutional law. *Snipes v. DeTella*, 95 F3d 586, 591

(7th Cir. 1996).

    The Plaintiff's claimed need for different treatment than what he was provided for his

#19 tooth is not an objectively serious medical need. When analyzing a claim of deliberate

indifference to a medical need, the "need" to which "indifference" is claimed must be

objectively serious, meaning one that (1) a doctor says is required, or (2) is so obvious that

even someone who is not a doctor would recognize as required. *Foelker v. Outagenic*

*County*, 394 F.3d 510, 512-513 (7th Cir. 2005), *cited in* 7th Cir. Pattern Jury Instruction 7.13.

The Plaintiff cannot meet his burden of proof under either theory. The evidence from the

dentists is that the dental fillings and later extraction provided to the Plaintiff were the

appropriate treatment for Plaintiff's dental condition. Notably, the Plaintiff's own dentist

prior to his incarceration did not provide him with the demanded crown either. The

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

DMW/jly

evaluation and treatment of dental needs is not within the realm of knowledge of the lay person.

With respect to the second requirement, *i.e.*, the culpable state of mind, the Plaintiff must demonstrate that the Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that they *actually drew* that inference. *Greeno v. Daley*, 414 F. 3d 645, 653 (7th Cir. 2005). "Medical malpractice in the form of an incorrect diagnosis or improper treatment" does not state a claim under the United States Constitution." See *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). The Plaintiff must establish that the decision to treat his tooth in this manner was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition" (*Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)) or was "equivalent of criminal recklessness" (*Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006)). Proving deliberate indifference requires more than a showing of negligent or even grossly negligent behavior. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Medical malpractice does not become a constitutional violation merely because the victim is in prison, and a complaint that a physician has been negligent in diagnosing or treating a medical condition of a detainee does not state a valid claim under the United States Constitution. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The Plaintiff cannot establish the subjective component of a deliberate indifference claim either. First of all, the outside dentist who performed the root canal treated the tooth with fillings and did not install a crown either. The Plaintiff has no medical training and no dental training. Thus, there is no evidence that there was ever a substantial risk of serious harm to the Plaintiff from not installing a crown. The Plaintiff was given the option of continuing to fill the tooth or to have it extracted. Plaintiff chose the fillings. When Plaintiff

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

finally requested to have the tooth extracted Dr. Awada extracted it. There is simply no evidence that any of the Defendants drew the inference that a substantial risk of serious harm to the Plaintiff existed.

Moreover, it would be unrealistic to expect Karen Harper to override the dentists' treatment decisions. Karen Harper could quite reasonably choose not to question the dentists' determinations regarding the proper dental treatment for the Plaintiff. *Allen v. Rockford*, 349 F.3d 1015, 1020 (7th Cir. 2003) (summary judgment proper where police allowed licensed physician to exercise his judgment and did not interfere with respect to proper treatment of woman in their custody). *See also, Brownell v. Figel*, 950 F.2d 1285, 1291 (7th Cir. 1991) ("it would be unrealistic to expect a layman – in all but extreme cases-- to question whether a doctor had employed proper procedures in examining an accident victim"); *Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (noting that a prison official's reasonable reliance on a medical professional's opinion is not deliberate indifference). The Plaintiff's claim of deliberate indifference is simply not supported by the evidence and the Defendants are entitled to judgment as a matter of law.

**C.      If the Court were to find that a constitutional violation exists based upon the facts in this case, then the doctrine of qualified immunity bars the Plaintiff's claim for damages.**

The Plaintiff's claims were brought pursuant to §1983(42 U.S.C. §1983), which provides a mechanism for vindicating constitutional rights. *City of Monterey v. Del Monte Dunes in Monterey*, 526 U.S. 687, 709 (1999). "Just as common law tort actions provide redress for interference with protected personal or property interests, §1983 provides relief for invasions of rights protected under Federal Law." *Id.* Nevertheless, qualified immunity is a defense available to government officials when defending an action brought pursuant to §1983. *Rakovich v. Wade*, 850 F.2d 1180, 1205 (7th Cir. 1988). The defense of qualified

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

immunity is designed to protect government agents "from liability for civil damages in so far

as their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known." *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003).

Qualified immunity protects public officials from personal liability unless it should

have been clear to a reasonable public official that his conduct was unlawful in the situation

he confronted. *Hosty v. Carter*, 412 F.3d 731, 738 (7th Cir. 2005).

> Qualified immunity shields an official from suit [for damages]
> when she makes a decision that, even if constitutionally
> deficient, reasonably misapprehends the law regarding the
> circumstances she confronted.
>
> ***
>
> Public officials need not predict, at their financial peril, how
> constitutional uncertainties will be resolved.

*Hosty v. Carter*, 412 F.3d 731, 739 (2005) (reversing denial of Defendant's Motion for

Summary Judgment based on Qualified Immunity).

It is the Plaintiff's burden to show that his constitutional rights were violated and that

those rights were clearly established. *Borello v. Allison*, 446 F.3d 742, 749-750 (7th Cir.

2006). Furthermore, the inquiry into whether a right is clearly established "must be

undertaken in light of the specific context of the case, not as a broad general proposition."

*Borello v. Allison*, 446 F.3d 742, 750 (7th Cir. 2006). There is currently no caselaw holding

that contractual medical providers must assume affirmative obligations of the State that have

*not* been delegated to them and that they have *not* agreed to voluntarily undertake. If the

Court now finds that such a duty exists, then the individual medical defendants are, at a

minimum, entitled to qualified immunity.

**D.    The limitations period has expired for claims that the Plaintiff knew or should
have known of more than two years prior to the filing of his Complaint.**

As noted above, the Plaintiff's Complaint was brought pursuant to 42 U.S.C. §1983.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

Section 1983 does not contain an express statute of limitations. *Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001). As a result, federal courts adopt the forum state statute of limitations for personal injury claims. *Id.* In Illinois, the limitations period for section 1983 actions is two years. *Id.* The Plaintiff's Complaint was filed in April 2007. Nonetheless, the Plaintiff complains of events that occurred as long ago as the year 2000. Plaintiff's claims that date back prior to 2005 are barred by the applicable two-year statute of limitations. Wherefore, Defendants ask that they be granted summary judgment as a matter of law with respect to all such time-barred claims.

**E.     Plaintiff's tooth has been extracted, he has been released from prison, and there is no continuing violation**.

The Plaintiff's Complaint seeks, *inter alia*, injunctive relief. Complaint at 7. Nonetheless, Plaintiff's tooth has been extracted, he has been released from prison, and there is no continuing violation. "When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers." *Al-Alamin* v. *Gramley*, 926 F.2d 680, 685 (7th Cir. 1991); *see also*, *Verizon MD, Inc. v. Public Serv. Comm'n of Maryland*, 535 US 635, 645 (2002) ("a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"). Here, because the Plaintiff has been released from prison and his tooth has been extracted, injunctive relief is not available to him. Wherefore, Defendants asked the court grant them summary judgment with respect to Plaintiff's request for injunctive relief.

### Conclusion

Dr. Awada, Dr. Grammer, Dr. Osafo, Karen Harper, and Wexford Health Sources Inc. are entitled to summary judgment as a matter of law. There is no evidence of any personal involvement by Dr. Osafo. It is also not reasonable to expect Karen Harper, a dental assistant, to contradict the treatment decisions of licensed dentists. Besides, Dr. Awada and

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

25

DMW/jly

Dr. Grammer provided the Plaintiff with appropriate treatment for his dental condition by building up the tooth and extracting it after a buildup was no longer a viable treatment option, and providing the Plaintiff with a crown during the timeframe at issue would not have saved his tooth from extraction. To the extent that the Plaintiff claims that he should have been provided with a crown prior to 2005, his claim is barred by the applicable two-year statute of limitations.

Moreover, the Plaintiff's private dentist who performed the root canal on his tooth #19 did not place a crown on the tooth, and the Department does not approve the placement of crowns on inmates in its custody. Furthermore, under existing caselaw, neither Wexford Health Sources Inc., nor its employees, Dr. Osafo, Dr. Awada, Dr. Grammer, and Karen Harper, can be held liable under section 1983 for *not* performing affirmative obligations of the State that have *not* been delegated to them and that they have *not* agreed to voluntarily undertake. If the Court expands the scope of the Eighth Amendment and finds that Dr. Osafo, Dr. Awada, Dr. Grammer, and Karen Harper had a duty to assume affirmative obligations of the State that have *not* been delegated to them and that they have *not* agreed to voluntarily undertake, then they are, at a minimum, entitled to qualified immunity. Finally, the Plaintiff has been released from prison and his tooth has been extracted, so injunctive relief is not available to him.

WHEREFORE, Defendants BEN AWADA, D.D.S., GRACIELA GRAMMER, D.D.S., SETH OSAFO, M.D., KAREN HARPER, and WEXFORD HEALTH SOURCES, INC., pray that this Court will grant summary judgment in their favor and against the Plaintiff.

Respectfully submitted,

BEN AWADA, D.,D.S, GRACIELA GRAMMER, D.D.S., SETH OSAFO, M.D.,

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

26

KAREN HARPER, and WEXFORD HEALTH
SOURCES, INC., Defendants,

HEYL, ROYSTER, VOELKER & ALLEN,
Attorneys for Defendants,

BY:    /s/David M. Walter
       David M. Walter, #6244907
       Theresa M. Powell, #6230402
       HEYL, ROYSTER, VOELKER & ALLEN
       Suite 575, National City Center
       P. O. Box 1687
       Springfield, IL  62705
       Phone: (217) 522-8822
       Fax:    (217) 523-3902
       E-mail: dwalter@hrva.com
                tpowell@hrva.com

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2008, I electronically filed a **Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system which will send notification of such filings(s) to the following:

Jacob H. Smith
jsmith@atg.state.il.us

and I hereby certify that on February 7, 2008, I mailed by United States Postal Service, the document(s) to the following non-registered participants:

Mr. Andre Hunter
c/o Cynthia Exum
2125 B Melrose Drive
Champaign, IL 61821

/s/David M. Walter
_____

David M. Walter, #6244907
Theresa M. Powell, #6230402
HEYL, ROYSTER, VOELKER & ALLEN
Suite 575, National City Center
P. O. Box 1687
Springfield, IL 62705
Phone: (217) 522-8822
Fax:    (217) 523-3902
E-mail: dwalter@hrva.com
            tpowell@hrva.com

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

**E-FILED**
Thursday, 07 February, 2008  04:26:55 PM
Clerk, U.S. District Court, ILCD

05415-R4150
DMW/CTP/llw

| STATE OF ILLINOIS | ) | |
|---|---|---|
| | ) | SS. |
| COUNTY OF CASS | ) | |

## AFFIDAVIT

I, GRACIELA GRAMMER, D.D.S., being first duly sworn upon my oath, depose and state as follows:

1.    I am a doctor of dental surgery, licensed to practice dentistry in the State of Illinois.

2.    In addition to my doctor of dental surgery (D.D.S.) degree, I also have a Masters of Public Health.

3.    I have been practicing as a dentist since 1976.

4.    I was in private practice as a dentist for 25 years.

5.    I enjoy being a dentist and helping people. Thus, after my retirement from private practice, I continued to work part-time as a dentist providing general dentistry services in the public sector.

6.    Currently, I work three days a week at the Cass County Health Department providing general dentistry services to underprivileged individuals in the Cass County area who might not otherwise have access to a dentist.

7.    From approximately 2000 through 2005, I worked as a part-time dentist at the Illinois River Correctional Center in Canton and the Western Illinois Correctional Center in Mount Sterling.

8.    A prison dentist's patients are in prison because they have committed offenses against society and a Court has sentenced them to time behind bars; such patients are not always the easiest to treat.

05415-R4150
DMW/CTP/llw

9.      For example, many enter prison with dental conditions that have been left untreated for years.

10.     Often prisoners did not have access to dental services prior to entering prison.

11.     Others had access to dental care prior to their incarceration, but failed to properly care for their dental health due to alcohol or drug addiction.

12.     Those who used methamphetamine prior to their incarceration frequently have severe dental problems that were caused by the use of methamphetamines.

13.     Frequently, the prison dentist is the only dentist that individuals entering prison have seen in years.

14.     While a part-time dentist at the Illinois River Correctional Center, I provided general dentistry services, including examinations, instructions on proper dental hygiene, fillings, tooth extractions and other needed dental care.

15.     While employed as a part-time dentist at Illinois River Correctional Center, one of my patients was Andre Hunter.

16.     I first treated Mr. Hunter on October 16, 2001, and I put a filling into Mr. Hunter's Number 19 tooth. A filling was the appropriate treatment for Mr. Hunter's dental needs at that time. See Grammar Exh. A

17.     I did not personally treat Mr. Hunter again until July 21, 2005. At that time, I saw Mr. Hunter and evaluated his complaints of pain to his Number 19 tooth. I determined that he needed another filling, and he was scheduled for a follow-up appointment to receive another filling in his number 19 tooth. See Grammar Exh. A.

2

05415-R4150
DMW/CTP/llw

18.    At the follow-up appointment on August 2, 2005, I placed a new filling into Mr. Hunter's Number 19 tooth. A filling was the appropriate dental treatment for Mr. Hunter's condition based upon the complaints he was having at the time as well.  August 2, 2005 was the last time that I treated Mr. Hunter.  See Grammar Exh. A.

19.    On November 2, 2005, I did, however, make an entry in the notes that Mr. Hunter had put in a request to be seen, but was not seen on that date, because he had already been seen for his dental concerns by another dentist named Dr. Awada on October 31, 2005.  See Grammar Exh. A.

20.    I did not have any personal involvement with Mr. Hunter after November 2, 2005.

21.    A crown is a permanent prosthetic that is not available as a treatment option within the Illinois Department of Corrections, per Department policy.  Inmates within the Illinois Department of Corrections are provided other treatment options, however, such as extraction or a build up (filling).

22.    In my medical opinion, the treatment that Andre Hunter received at the Illinois River Correctional Center was appropriate and no other dental treatment was necessary.

23.    I make this Affidavit based upon my own personal knowledge, education, training, and my review of Andre Hunter's medical records.

24.    This Affidavit has been prepared in support of my Motion For Summary Judgment.

25.    If called to testify, I am competent to testify regarding the matters set forth herein.

26.    Attached to my Affidavit are copies of medical and dental records which were made in the ordinary course of business.  I relied upon these records in my care and treatment of Mr. Hunter.

3

| Date | Service Rendered | D.D.S. Signature | Date | Service Rendered | D.D.S. Signature |
|---|---|---|---|---|---|
| 11-21-00 | + Amy exam not due | *[illegible]* | 9-31-05 | 1 - Rt screen w/ panorex | *[illegible]* |
| 9-20-01 | + Exam due | *[illegible]* | (new) | - Re obt right temp | *[illegible]* |
| 10-16-01 | *[illegible]* 7:30 am | *[illegible]* | N.C. | - T.C. w/ mother | *[illegible]* |
| 7:30 am | *[illegible]* | *[illegible]* | 11-7-05 1:30 pm | *[illegible]* tooth *[illegible]* | *[illegible]* |
| 12-10-01 | *[illegible]* | *[illegible]* | 11-15-05 | *[illegible]* | *[illegible]* |
| 12-16-02 | *[illegible]* | *[illegible]* | 9:00 | *[illegible]* | *[illegible]* |
| 12-3-03 | *[illegible]* | *[illegible]* | 11-21-05 13:10 | *[illegible]* | *[illegible]* |
| 9-15-04 | Our Dental Exam | *[illegible]* | N.C. | *[illegible]* | *[illegible]* |
| 5/4/04 | *[illegible]* | *[illegible]* | | A - *[illegible]* | *[illegible]* |
| 7/12/05 | *[illegible]* | *[illegible]* | | 2 - *[illegible]* tooth *[illegible]* | *[illegible]* |
| 6-19-05 | *[illegible]* | *[illegible]* | 11-28-05 | *[illegible]* | *[illegible]* |
| 7/21/05 | *[illegible]* | *[illegible]* | 11-20-05 | *[illegible]* | *[illegible]* |
| 10-24-05 | *[illegible]* | *[illegible]* | 9:30 | *[illegible]* | *[illegible]* |
| 2-05 | *[illegible]* | *[illegible]* | N.C. | *[illegible]* | *[illegible]* |
| 7:15 am | *[illegible]* | *[illegible]* | | *[illegible]* | *[illegible]* |
| 9-15-05 | *[illegible]* | *[illegible]* | 2-2-06 19:15 | *[illegible]* | *[illegible]* |
| 9:50 | *[illegible]* | *[illegible]* | | *[illegible]* | *[illegible]* |
| 10-31-05 7:25 | *[illegible]* | *[illegible]* | N.C. | *[illegible]* | *[illegible]* |

DC 7126 (Rev. 10/87)
IL 426-0018

ATE LEGAL® DEFENDANT'S EXHIBIT
ATE LEGAL® DEFENDANT'S EXHIBIT AWADA

ILLINOIS DEPARTMENT OF CORRECTIONS

**Medical Services Refusal**

IL RIVER CORRECTIONAL Center

☐ **Employee**
☑ **Offender**

Date: 11 / 28 / 05
Time: 10 : 00
☐ a.m.
☑ p.m.

**Patient Information:**

Hunter                    Andre
Last Name                First Name        MI

ID#: R01100

☑ **Refusal of Services**

I refuse to authorize the performance upon myself or _____
Name of Patient

of the following treatment  Ext #19
State nature and extent of treatment.

☐ **Discharge Demand**

I further demand DISCHARGE of myself or _____
Name of Patient

from _____ against the advise of Dr. _____
Name of Medical Facility                                    Name of Doctor

Dr. AwADa has explained the risks to me, possible complications and probable
Name of Doctor

consequences of refusing treatment or demanding discharge from this medical facility or both.

I hereby release the Attending Physician, the  IRCC _____, the Facility, and
Name of Medical Facility

the Department of Corrections from all liability for damages or any injuries including to my health caused by or arising out of this

refusal whether foreseen or unforeseen.

I certify that I have read and fully understand the above REFUSAL OF TREATMENT OR DISCHARGE DEMAND FROM

MEDICAL FACILITIES RELEASE OR BOTH, that the explanations therein referred to were made, and that all blanks or statements

requiring insertion or completion were filled in and inapplicable paragraphs, if any, were stricken before I signed.

ANDRÉ HUNTER
Print Name of Patient

Andre Hut
Signature of Patient

11 , 28 , 05
Date

When patient is a Minor or Incompetent to give consent:

DEFENDANT'S EXHIBIT
GRAMMAR B
ALL-STATE LEGAL®

DEFENDANT'S EXHIBIT
An/DA B
ALL-STATE LEGAL®

_____
Print Name of Person Authorized to Consent

_____
Signature of Person Authorized to consent

_____
Date

Hansel R
Print Name of Witness

Hansel R.
Signature of Witness

11/28/05
Date

Distribution:    Patient's Medical Record or File

DOC 0083 (Eff. 9/2002)
(Replaces DC 7128-A)

1B23

ILLINOIS DEPARTMENT OF CORRECTIONS

**Medical Services Refusal**

IL RIVER CORRECTIONAL Center

☐ Employee
☑ Offender

Date: 5, 10, 06
Time: 08:30    ☑ a.m.  ☐ p.m.

Patient Information:
Hunter          Andre          M   ID#: R01100
Last Name       First Name     MI

☐ **Refusal of Services**

I refuse to authorize the performance upon myself or _Myself_
Name of Patient

of the following treatment _Per Request Appointment_
State nature and extent of treatment.

☐ **Discharge Demand**

I further demand DISCHARGE of myself or _____
Name of Patient

from _____ against the advise of Dr. _____
Name of Medical Facility                          Name of Doctor

Dr. _AWADA_ has explained the risks to me, possible complications and probable
Name of Doctor

consequences of refusing treatment or demanding discharge from this medical facility or both.

I hereby release the Attending Physician, the _Bree / Med / Dental_ , the Facility, and
Name of Medical Facility

the Department of Corrections from all liability for damages or any injuries including to my health caused by or arising out of this

refusal whether foreseen or unforeseen.

I certify that I have read and fully understand the above REFUSAL OF TREATMENT OR DISCHARGE DEMAND FROM

MEDICAL FACILITIES RELEASE OR BOTH, that the explanations therein referred to were made, and that all blanks or statements

requiring insertion or completion were filled in and inapplicable paragraphs, if any, were stricken before I signed.

X _ANDRE HUNTER_          _signature_          5, 10, 06
Print Name of Patient     Signature of Patient     Date

When patient is a Minor or Incompetent to give consent:

_____          _____          / /
Print Name of Person Authorized to Consent    Signature of Person Authorized to consent    Date

Dr. B. AWADA          _signature_          5, 10, 06
Print Name of Witness     Signature of Witness     Date

Distribution:   Patient's Medical Record or File

DOC 0063 (Eff. 9/2002)
(Replaces DC 7128-A)

ILLINOIS DEPARTMENT OF CORRECTIONS

## Consent for Medical Treatment

IL RIVER CORRECTIONAL Center

Date: 6/12/06

Time: 13:00   ☐ a.m.  ☒ p.m.

Patient Information: Hunter     Andre     ID#: 120110
Last Name     First Name     MI

---

☐ I authorize the performance upon _____ Myself _____ of the following treatment:
Myself or Name of Patient

_____ Extraction #19 _____
state the nature and extent of treatment

to be performed by Dr. _____ Awada _____ or whomever he or she may designate
Name of Physician

as his or her assistants.

☐ The nature and extent of the intended treatment has been explained to me in detail, including its risk, possible complications, and probable consequences by Dr. _____ Awada _____.
Name of Physician

I acknowledge that no guarantee or assurance has been made as to the results that may be obtained.

☐ I certify that I have read and fully understand the above Consent to Treatment, that the EXPLANATIONS therein referred to were made, and that all blanks or statements requiring insertion or completion were filled in.

ANDRE HUNTER _____     Andre West _____     6/12/06
Print Name of Patient     Signature of Patient     Date

When patient is a Minor or Incompetent to give consent:

_____     _____     /     /
Print Name of Person Authorized to Consent     Signature of Person Authorized to Consent     Date

M Werlul _____     M Wehl _____     6/12/06
Print Name of Witness     Signature of Witness     Date

Distribution:   Patient's Medical Record

DOC 0094 (Eff. 9/2002)

| Date | Service Rendered | D.D.S. Signature | Date | Service Rendered | D.D.S. Signature |
|---|---|---|---|---|---|

DC 7126 (Rev. 10/87)
IL 426-0018

STATE LEGAL® DEFENDANT'S EXHIBIT GRAMMAR

STATE LEGAL® DEFENDANT'S EXHIBIT AWADA

05415-R4150
DMW/CTP/llw

FURTHER AFFIANT SAYETH NOT.


_Graciela Grammer, DDS_
GRACIELA GRAMMER, D.D.S.


Subscribed and sworn to before me this
_____ 7th day of _February_, 2008.

_Angela D. Rodefer_
NOTARY PUBLIC

OFFICIAL SEAL
ANGELA D. RODEFER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 2-16-2010

4

05415-R4150
DMW/CTP/llw

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS. |
| COUNTY OF FULTON | ) |

### AFFIDAVIT

I, BEN AWADA, D.D.S., being first duly sworn upon my oath, depose and state as follows:

1.    I am a Doctor of Dental Surgery (D.D.S.), licensed to practice dentistry in the State of Illinois.

2.    I received my dental degree from the University of Lille II (France) in 1990, and worked as a nurse while putting myself through school.

3.    After coming to the United States, I passed the American Dental Association Board, as well as two North East Regional Boards.

4.    I initially worked as a dentist in private practice. During this time frame, I also placed dental sealants on underprivileged children's teeth.

5.    In 1995, I began providing dental services to inmates within the Illinois Department of Corrections.

6.    In addition to caring for inmates' dental needs, I am also a priest and associate pastor at St. Sharbel Catholic Church in Peoria, Illinois.

7.    I am currently the only dentist at the Illinois River Correctional Center. I have been providing dental care to inmates at Illinois River Correctional Center for more than a decade now.

8.    Five days a week, eight hours a day, I care for the dental needs of the approximately 2000 inmates incarcerated at the Illinois River Correctional Center. More than sixty percent of my dental patients at Illinois River Correctional Center entered prison with serious dental problems. It

05415-R4150
DMW/CTP/llw

is a full-time job.

9.      I provide general dentistry services including, for example, examinations, instructions on proper dental hygiene, fillings, tooth extractions and other needed dental care.

10.      Andre Hunter was one of my patients when he was incarcerated at the Illinois River Correctional Center.

11.      On April 13, 2004, I gave Mr. Hunter his two-year dental examination.  Following my examination, I made an appointment for Mr. Hunter to return so that work could be performed on his Number 19 tooth.  See Awada Exh. A.

12.      On May 4, 2004, Mr. Hunter returned to the dental clinic where x-rays were taken of his teeth, and I removed the old filling and decay from his Number 19 tooth.  I then replaced the filling.  See Awada Exh. A.

13.      In my opinion as a doctor of dental surgery, the filling given to Mr. Hunter on May 4, 2004, was the appropriate dental care for Mr. Hunter's dental condition at that time.

14.      I did not see Mr. Hunter again personally until August 5, 2005.  He had returned to the dental clinic because a recent filling which had been made by Dr. Grammer in his Number 19 tooth was slightly too high, so I re-shaped it.
See Awada Exh. A.

15.      On October 31, 2005, I saw Mr. Hunter for pain and swelling between his Number 18 and Number 19 teeth.  I determined that he had an abscess, and treated him for the abscess.  See Awada Exh. A.  I explained to Mr. Hunter proper dental care techniques, and attempted to impress upon him the importance of daily cleaning.

2

05415-R4150
DMW/CTP/llw

16.    I saw Mr. Hunter again personally on November 15, 2005.  He was continuing to experience pain and swelling between his Number 18 and Number 19 teeth.  Again, I treated Mr. Hunter, and instructed him on proper cleaning techniques.  See Awada Exh. A.

17.    I saw Mr. Hunter again on November 21, 2005, when he returned to the dental clinic. I observed that Mr. Hunter now had a different infection in a different location, and this time, with a pus discharge.  I treated Mr. Hunter with an antibiotic and Motrin for discomfort.  Mr. Hunter also requested that his tooth number 19 be extracted, and an extraction was scheduled by the office assistant.  See Awada Exh. A.

18.    On November 28, 2005, however, the Plaintiff refused the scheduled extraction of his Number 19 tooth, and signed the refusal of service form.  See Awada Exh. A and B.

19.    On December 30, 2005, the Plaintiff came back to the dental clinic and demanded that a crown be fabricated for his tooth.  Crowns are, generally, a treatment option for decayed or fractured teeth.  Crowns are not, however, the only treatment option for a decayed or fractured tooth. Decayed or fractured teeth may be extracted, as had been scheduled for Mr. Hunter.  A build up (filling) of the tooth, as was provided by the dentist who performed the root canal on Mr. Hunter prior to his incarceration, is another treatment option.  Build ups were also provided to Mr. Hunter several times while he was at Illinois River Correctional Center.  Although a crown would have been an appropriate treatment option when the root canal was originally performed on the Mr. Hunter prior to his incarceration, it was not an appropriate treatment option on December 30, 2005, due to the infection.  I also informed Mr. Hunter that a crown was not available as a treatment option per Illinois Department of Correction's policy.

05415-R4150
DMW/CTP/llw

20.    I saw Mr. Hunter again personally on February 2, 2006.  See Awada Exh. A.  On February 2, 2006, I asked Mr. Hunter to see me so that I could explain his dental chart to him, because he had filed a grievance expressing confusion.  I explained to Mr. Hunter that a crown was contraindicated at this time.

21.    On March 24, 2006, I saw Mr. Hunter at his request because he had lost his filling in tooth number 19.  We discussed his need to have the tooth extracted but Mr. Hunter refused extraction at that time.  See Awada Exh. C.

22.    On April 7, 2006, the Plaintiff arrived at the dental clinic through a referral from the health clinic.  As explained to him and noted in the dental chart, the only option at that time (other than the previously recommended extraction) was to have a filling build-up on his Number 19 tooth.  See Awada Exh. C.

23.    The Plaintiff had his two-year dental examination on April 21, 2006.  At that time, he arrived late, and was warned by Karen Harper that he would not been seen for his scheduled appointment if he was late next time.  I examined Mr. Hunter and x-rayed his teeth.  I told Mr. Hunter that tooth number 19 was badly decayed with a bifurcation problem.  This tooth needed to be extracted.  A crown would not have been an appropriate treatment.  See Awada Exh. C.

24.    On May 13, 2006, Mr. Hunter failed to arrive for a scheduled appointment to have the number 19 tooth filled and to have his dental charts explained to him.  Mr. Hunter was more than one hour late for his appointment and, when called, he signed a refusal of dental services form.  See Awada Exh. C.

25.    The Plaintiff's next appointment was on May 26, 2006.  I explained to Mr. Hunter

4

3:07-cv-03062-HAB-BGC     # 51-3     Page 5 of 6

05415-R4150
DMW/CTP/llw

the substance of his dental charts and he again requested extraction of his Number 19 tooth.  See Awada Exh. C.

26.     An extraction was scheduled and, on June 12, 2006, Mr. Hunter's Number 19 tooth was extracted.  See Awada Exh. C.

27.     At no point during my treatment of Mr. Hunter, was a crown a necessary medical treatment for his tooth number 19, nor, due to the bifurcation problem of the tooth, would a crown have preserved the tooth from extraction.

28.     Moreover, at all times during my treatment of Mr. Hunter, a crown was an elective procedure which is not authorized by the Illinois Department of Corrections.

29.     At no point during my treatment of Mr. Hunter was I indifferent to his dental needs. He disagreed with my recommended treatment for his dental needs.  I advised Mr. Hunter that the tooth needed to be extracted, but he declined.

30.     Mr. Hunter had no serious medical need for a crown instead of extraction, or while it was feasible, a tooth build up (fillings).

31.     At all times during my treatment of Mr. Hunter, I based my decisions upon my knowledge and training as a dentist, the information that I was provided by Mr. Hunter, and the

05415-R4150
DMW/CTP/llw

resources available to me.

32.    In my medical opinion, the treatment received by Mr. Hunter was appropriate.

33.    Mr. Hunter's condition did not require any other treatment than what he was provided.

34.    I make this Affidavit based upon my own personal knowledge, education, training, and my review Andre Hunter's medical records.

35.    This Affidavit has been prepared in support of my Motion For Summary Judgment.

36.    If called to testify, I am competent to testify regarding the matters set forth herein.

37.    Attached to my Affidavit are copies of medical and dental records which were made in the ordinary course of business.  I relied upon these records in my care and treatment of Mr. Hunter.

FURTHER AFFIANT SAYETH NOT.

BEN AWADA, D.D.S.

Subscribed and sworn to before me this
4th day of February ,2008.

NOTARY PUBLIC



"OFFICIAL SEAL"
DAVID EARL PETERSON
COMMISSION EXPIRES 03/10/10

6

05415-R4150
DMW/CTP/llw

STATE OF ILLINOIS          )
                           )  SS.
COUNTY OF FULTON           )

### AFFIDAVIT

I, SETH OSAFO, M. D., being first duly sworn upon my oath, depose and state as follows:

1.      I am a licensed physician.

2.      I am Medical Director at the Illinois River Correctional Center in Canton, Illinois.

3.      I was the Medical Director at the Illinois River Correctional Center for all dates referenced in the Plaintiff's Complaint.

4.      In my role as Medical Director at the Illinois River Correctional Center, I did not personally examine Andre Hunter with regard to pain in his Number 19 tooth, or any other tooth, during the relevant time period. I did, however, personally examine Andre Hunter for a variety of other reasons and treated him accordingly. He was advised to return as needed for his complaints.

5.      On April 19, 2004, I personally saw the Plaintiff, Andre Hunter, for a re-occurring infection caused an ingrown nail on his left big toe. I scheduled Mr. Hunter for a follow-up on April 21, 2004, to have the toenail extracted and prescribed 300 mg. of Cleocin to be taken three times a day for ten (10) days.
See Osafo Exh. A.

6.      I next saw the Plaintiff, Andre Hunter, on April 21, 2004, for the elective extraction of his infected ingrown left big toenail. According to my procedure note, the extraction occurred without any obvious complications. I then instructed Mr. Hunter on the proper care and dressing of the extraction site.

05415-R4150
DMW/CTP/llw

See Osafo Exh. B.

7.      I next saw the Plaintiff, Andre Hunter, on April 28, 2004, to follow-up on the

extraction procedure.  My note in the medical records from that date states as follows:

> S.  (Subjective) 21 yobm (21-year-old black male)
> here for f/u (follow-up) (post left toenail extraction).
> Doing okay.  No new complaints.
>
> O.  (Objective) Left big toe healing.  Left big toenail
> bed.  No discharge.  No erythema (inflammatory
> redness of the skin).
>
> A.  (Assessment) Healing left big toe.
>
> P.  (Plan) Re-assured.  See prn (as needed).

See Osafo Exh. C.

8.      I did not personally see Andre Hunter again until September 16, 2004.  At that time

he had returned for treatment because his left big toe was ingrown again.  I prescribed an antibotic

and a pain reliever for treatment and scheduled a follow-up for one week.

See Osafo Exh. D.

9.      I did not personally examine the Plaintiff, Andre Hunter, again until January 3, 2007.

See Osafo Exh. E.

10.     By reviewing the Plaintiff's medical records, I am able to determine that he was seen

for tooth pain on November 19, 2005.  At that time, the Plaintiff stated that he had a toothache that

had first started on the previous night.  He told the examining nurse that his last dental work had been

in 1998, when he received a filling and root canal.  He also informed the nurse that he was currently

being treated for an abscess and a large cavity with a crack.  The Plaintiff was given Tylenol and

2

05415-R4150
DMW/CTP/llw

referred to the dentist for treatment.

See Osafo Exh. F.

      11.    I am a trained medical doctor, not a dentist.

      12.    I do not have any control or direction in the treatment of dental pains or problems other than merely as an auxiliary provider until the inmate or patient can be seen by a licensed dentist.

      13.    All treatment with regard to dental pain is controlled by the dental staff.

      14.    I am not aware of any policy by IDOC, or Wexford Health Sources, Inc., which prohibits proper and necessary dental treatments to inmates.

      15.    As a medical doctor, not a dentist, I am unable to give an opinion as to whether or not Mr. Hunter's tooth problem constituted a serious medical need.

      16.    I make this Affidavit based upon my own personal knowledge, education, training, and my review of Andre Hunter's medical records in my capacity as the Medical Director at the Illinois River Correctional Center for visits occurring during the relevant time period outlined in the Plaintiff's Complaint.

      17.    This Affidavit is being prepared in support of my Motion For Summary Judgment as to Mr. Hunter's claims against me.

      18.    If called to testify, I am competent to testify regarding the matters set forth herein.

      19.    Attached to my Affidavit are copies of the relevant medical records which were made in the ordinary course of business. I relied upon these medical records in my care and treatment of Mr. Hunter.

3

→ Spr Recept    ☑002/002

05415-R4150
TMP/llw

FURTHER AFFIANT SAYETH NOT.

_____
SETH OSAFO, M.D.

Subscribed and sworn to before me this
31st day of January , 2008.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Christina G Smith
Notary Public, State of Illinois
Commission Expires 4/26/2011

4

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

Illinois River Correctional Center

| Offender Information: | | | |
|---|---|---|---|
| *Hunter* | *Andre* | | ID#: *R01100* |
| Last Name | First Name | MI | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 4/19/04 1055 | Upon note MOSC @ get urgent cera O- 96⁸ 70 16 108/60 72.2# | OK tg |
| | M.S. Note | — F/u 4/21/04 |
| | S, 21 Yo Bm w/o recurrent Infection for (L) Bigtoe Nail | |
| | (L) Bigtoe Nail we for Fu. | Keflex |
| | (O, (L) Foot (Bigtoe) | — cleocin 300 |
| | area of ingrowing to lateral edge | TWX 10 days |
| | edge c erythema and tenderness. | |
| | (A) — Infected Ingrowing | |
| | (L) Big toe Nail | Seth Osafo |
| | | Seth K. Osafo, M.D. |
| | | Medical Director |

DEFENDANT'S EXHIBIT

OSAFO

A

IRCC

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Offender Information:

_Hunter_ _Andre_ ___ ID#: _R01100_
Last Name / First Name / MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 4-21-06 | IM/nst | |
| | (R) bigtoe nail extraction | |
| | wt 173.8 BP 110/78 98° - 68.20 | _[signature]_ |
| | MDSC not | |
| | 8/21 yo RM here for elective | — Daily T2o |
| | extraction infected Ingrowing | Dressing Change |
| | (R) Big toe Nail | ×7 days |
| | O, (L) Foot | — motrin 800 |
| | Unchanged | TID × 7 d's /s |
| | | fu 1 wk |
| | (A) — (L) Infected Ingrowing | 4/28/ |
| | (L) Big toe Nail. | |
| | Procedure Note | |
| | After digital block c̄ 3cc 1% Lido- | Noted 1/5 |
| | caine c̄ out epi, the (L) Big toe Nail | 4/21/06 |
| | was extracted + Hemostasis secured | [illegible signature] |
| | and nail bed obliterated c̄ Liquid Phenol | |
| | and alcohol wipes. Pt. proc- well | |
| | + obvious complication noted | |

Distribution: Offender's Medical Record

DEFENDANT'S EXHIBIT
OSAFO

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

IRCC

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Offender Information:

Hunter _____ Andre _____ Rolled _____
Last Name            First Name         MI        ID#:

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 4/28/04 | RN Note - WDSC - 7v toe | |
| | 97.6, 68, 16  118/68 ——— 173² | |
| | M.D. Note: | |
| | Mrg. Note | — Reassured |
| | S: 2140 Bm here for f/u (post ① | — see plan |
| | Big toe Nail extraction). Doing Okay. | |
| | ⊘ new complaint | |
| | O: ① Big toe | |
| | Healing ① Big toe Nail bed. | |
| | O: d/c ⊘ symptoms | |
| | | Note ① 1730 |
| | | 4-28-04 |
| | A: ——— ① Healing ① Big Toe | |
| | | ___ M.D. |
| | | Medical Director |

Printed on Recycled Paper

DEFENDANT'S
EXHIBIT
OSAFO

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

IRCC

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Offender Information:

Last Name: Hunter    First Name: Andre    MI:    ID#: RO1100

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 9-16-04 1300 | lpn note - MDSC | |
| 173# | O: infected lt great toe | J Neuendorf lpn |
| 120/80 | M.D. Nok | — cleocin 300 7 |
| 9-84-5674 | S: 22 yo BM c/o ⓇBig toe ingrown | TIX 10 days |
| | ninp nail x 1 wk. | — Advil 400 7 |
| | O: ⓇRoot (Big toe Nail) | TIX 7 days |
| | Area of ingrowing to left of edge | — Acuily Betadin |
| | ē d/c. | Foot soaks x 1 wk |
| | | — Fu 1 wk |
| | A: ——— ⓇInfected Ⓡ Big toe | 9/22/04 |
| | ingrowing nail | |
| | | Seth K. Osafo, M.D |
| | | Medical Director |

IL-STATE LEGAL® DEFENDANT'S EXHIBIT OSAFO D

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

IRCC

**ILLINOIS DEPARTMENT OF CORRECTIONS**

**Offender Infirmary Progress Notes**

Offender Information:

_Winter_ _Andre_ MI _20110U_
Last Name / First Name / MI / ID#

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 1/3/07 09.30 | M.D. ADMISSION NOTE ADMITTED BY: (CIRCLE ONE) M.D., D.D.S., P.A., PSYCHOLOGIST, NURSE PRACTITIONER, OR SOCIAL WORKER. S: BRIEF HISTORY: 24 yo Bm admitted for 23° observation 2° N/V associated c̄ fever and HA's. Odiarrhea Stated he is feeling much better. No Back pain Odysuria Ohematuria. | P: Admit Inf. VITALS: Q Shift DIET: clear liquids, advance to solid as Tolerated ACTIVITY: As Tolerated MEDICATION ORDERS: —see orders |
| Tc - 99.9 72 20 120 70 | O: PHYSICAL EXAMINATION: Eyes — Anicteric Sclerae Neck — Supple ⊖ LN Lungs — CTA Bil. Heart — RR̄S̄ Abd — Benign. CNS — Non ⊖ focal | I.V. ORDERS: ∅ OTHER ORDERS: |
| | A: ADMITTING DIAGNOSES: (1) Viral Illness | o — √ CBC, CMP, Amylase/Lipase, UA 1-3-07 1030A MD Osco Seth Osco |

DEFENDANT'S EXHIBIT 03AF0

DOC 0085 (Eff. 9/2002)
(Replaces DC 7147)

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

Illinois River Correctional Center

Offender Information:

| Last Name | First Name | MI | ID#: |
|---|---|---|---|
| Hunter | Andre | | R01100 |

Toothache (Dental Care)           Page 1 of

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 0830 11-19-05 | S: C/O Toothache | P: ✓ Refer to Dentist ASAP for: |
| | Problem started when: last moc | ___ Fever <br> ✓ Swollen gums and/or jaw |
| | It is made worse by: "pressure" | ___ Severe redness isolated with pain/fever |
| | What, if anything, helps? Ibuprofen | ___ Post extraction site pain <br> ___ Tooth pain following accident |
| | Past dental work performed: filling/ canal route | ___ Severe tooth pain that is not relieved by Tylenol |
| | When: 1998? | ✓ Tooth pain accompanying fractured teeth |
| | Any complications post dental work being performed: | ___ Pain and swelling affect patient's ability to move mouth or jaw |
| | Ø Hx of heart murmur   Ø Hx of rheumatic fever <br> Ø Hx of valvular prolapse   Ø Hx of endocarditis | |
| | Other pertinent hx: "Tooth cracked last moc." | ___ No Dentist referral |
| | O: T 97⁸ P 76 R 14 B/P 116/76 WT: 198 | ✓ Tylenol 325 mg, 2 tabs, po, qid prn #10 |
| | Appearance of gums/jaw near toothache: Swollen, red | ___ Instruct patient to send request to Dental |
| | Being treated for abcess <br> Appearance of tooth/teeth: Lg cavity c̄ crack | Ø 2.00 ro-ya |
| | | **DEFENDANT'S EXHIBIT** <br> OSAFO <br> F |
| A: Alteration in comfort r/t dental pain | | *(signature)* |

**E-FILED**
Thursday, 07 February, 2008  04:28:07 PM
Clerk, U.S. District Court, ILCD

05415-R4150
TMP/llw

STATE OF ILLINOIS          )
                           )  SS.
COUNTY OF _____        )

### AFFIDAVIT

I, KAREN HARPER, being first duly sworn upon my oath, depose and state as follows:

1.     I am employed at the Illinois River Correctional Center as a dental assistant, and have been employed there at all times relevant to the current cause of action.

2.     My position as dental assistant is to provide assistance to the dentist by providing chair-side assistance, keeping operating field clear, passing instruments, suctioning, scrubbing and sterilizing instruments, mixing restorative materials, assisting in taking intra-oral x-rays in accordance with proper radiological hygiene, developing and mounting x-ray films, maintaining the x-ray unit, processor, auto-conclave and dental unit according to specifications, inventorying supplies and equipment to maintain adequate levels, ordering supplies and equipment as needed, generally maintaining cleanliness and sanitation of the dental clinic, and performing various other tasks to assist the dentist and insure efficient functioning of the clinic.

3.     In addition to my dental duties, I also maintain the dental charts, record dental findings, schedule patients for dental appointments, and prepare a patient's schedule for an escort officer.

4.     As a dental assistant, I do not make any decisions with regard to patient care, nor can I affect, contradict, or change the care provided by the licensed dentists.

5.     I cannot, nor have I ever, treated the Plaintiff, Andre Hunter for any medical ailments or problems for which he has complained.

05415-R4150
TMP/llw

6.      As a dental assistant, I am CPR certified, skilled in recognizing the symptoms of shock and fainting, and I am generally prepared to provide necessary aid as directed during emergency procedures.  However, such direction must come from a dentist or physician who is trained in directing emergency procedures.

7.      I am unable to give an opinion as to whether or not any of the conditions complained of by the Plaintiff, Andre Hunter, would constitute a serious medical need because I am neither a dentist nor a physician.

8.      I make this Affidavit based upon my own personal knowledge, education, training, and experience as a dental assistant at the Illinois River Correctional Center.

9.      This Affidavit is in support of my Motion For Summary Judgment.

10.     If called to testify, I am competent to testify regarding the matters set forth herein.

FURTHER AFFIANT SAYETH NOT.

_KAREN HARPER_

Subscribed and sworn to before me this ___ day of _February_, 2008.

_NOTARY PUBLIC_

"OFFICIAL SEAL"
DAVID EARL PETERSON
COMMISSION EXPIRES 03/10/10

2

E-FILED
Thursday, 07 February, 2008 04:28:35 PM
Clerk, U.S. District Court, ILCD

1

<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE CENTRAL DISTRICT OF ILLINOIS
 2
     ANDRE HUNTER, RO1100,          )
 3                                  )
                    Plaintiff,      )
 4                                  )
     vs.                            )   No. 07-3062-HAB-BGC
 5                                  )
     DR. BEN AWADA, DR. GRACIELA    )
 6   GRAMMER, DR. SETH OSAFA,       )
     DR. WILLARD ELYEA, BARBARA     )
 7   HURT, ROGER WALKER, TERRI      )
     ANDERSON, SHERRY BENTON,       )
 8   KAREN HARPER, DONALD HULICK,)
     WEXFORD HEALTH SOURCES,        )
 9   INC., and KEVIN KIRKBRIDE,     )
                                    )
10                  Defendants.     )

11                         DEPOSITION

12        The deposition of ANDRE HUNTER, a citizen of
     the State of Illinois, a witness of lawful age;
13   produced, sworn and examined upon his corporeal
     oath, on January 22, 2008, at Heyl, Royster,
14   Voelker & Allen, 102 East Main Street, Urbana,
     Illinois, before Mary Pat Murray, Certified
15   Shorthand Reporter, CSR License No. 084-002063, as
     a witness in a certain suit and matter now pending
16   and undetermined in the United States District
     Court for the Central District of Illinois.

17
          APPEARANCES:
18
                    HEYL, ROYSTER, VOELKER & ALLEN
19                  National City Center, Suite 575
                    1 N. Old Capitol Plaza
20                  Springfield, Illinois 62705
                    BY:  Mr. David M. Walter
21                  Appearing for the Defendants
                     Ben Awada, D.D.S., Graciela
22                   Grammer, D.D.S., Seth Osafo, M.D.,
                     Karen Harper, and Wexford Health
23                   Sources, Inc.

24
</pre>

ORIGINAL

2

```
 1          APPEARANCES CONTINUED:

 2              LISA MADIGAN
                ILLINOIS ATTORNEY GENERAL
 3              500 South Second Street
                Springfield, Illinois 62706
 4              BY:  Mr. Jacob Smith
                Assistant Attorney General
 5              Appearing for the Defendants
                 Willard Elyea, M.D. Barbara Hurt,
 6               Roger Walker, Terri Anderson,
                 Sherry Benton, Donald Hulick
 7               and Kevin Kirkbride

 8

                ********************************
 9
                       I N D E X
10

11     ANDRE HUNTER                          PAGE

12     Examination by MR. WALTER.................   3
       Examination by MR. SMITH.................  64
13     Further Examination by MR. WALTER..........  78

14                  E X H I B I T S

15                                            PAGE

16     Hunter Exhibit No. 1.......................  74
       Hunter Exhibit No. 2.......................  80
17

18

19

20

21

22

23

24
```

3

1              (Commencing at 10:15 a.m.)

2                    ANDRE HUNTER,

3     the deponent herein, called as a witness, after

4     having been first duly sworn, was examined and

5     testified as follows:

6                    EXAMINATION

7     BY MR. WALTER:

8          Q.     Would you please state your name for the

9     record?

10         A.     Andre Hunter.

11         Q.     Would you spell your first name, please?

12         A.     A-N-D-R-E.

13         Q.     And spell your last name.

14         A.     H-U-N-T-E-R.

15         Q.     Have you ever been deposed before,

16    Mr. Hunter?

17         A.     I have not.

18         Q.     Since you've never been deposed before,

19    I'm going to go through with you a little bit of

20    information about the process so you kind of

21    understand some of the ground rules that will make

22    the court reporter's job easier and make the

23    transcript easier to read.

24              First of all, you understand that your

4

1    testimony's important today and it could have the

2    same force and effect as if we were at a trial

3    with a judge and jury present?

4         A.    I understand it's important.

5         Q.    You understand it's important to answer

6    truthfully and accurately today?

7         A.    I understand that.

8         Q.    We'll ask that you answer verbally and

9    avoid gestures such as nodding your head or

10   shaking your head because that's difficult for the

11   court reporter to take down, okay?

12        A.    I'll try to remember that.

13        Q.    Also, if you would, please answer with

14   words and avoid phrases such as uh-huh or huh-uh

15   because sometimes it's difficult to interpret that

16   so, if you would, just use words whenever you

17   answer, okay?

18        A.    I'll try my best.

19        Q.    If I ask you a question and you don't

20   understand, and sometimes I ask questions that

21   just don't come out right, don't make any sense,

22   so if I ask a question you don't understand, ask

23   me to clarify, okay?

24        A.    Yes.

1          Q.    And you're a little bit soft spoken so,

2     if you would, speak up just a little bit so that

3     the court reporter can hear you.

4          A.    Yes, sir.

5          Q.    One other thing, I don't think it will

6     be a problem with you, but she is taking down all

7     of your testimony, if we're both talking at the

8     same time it's difficult for her to take down the

9     testimony, so if you would wait until I finish the

10    question and then answer and I, likewise, will try

11    to wait until you've finished answering before I

12    start in on my next question so we're not both

13    talking at the same time, okay?

14         A.    Yes, sir.

15         Q.    At the end of the deposition process

16    you'll have an opportunity to review the

17    transcript and make any changes or corrections

18    that you'd like.  Now, you can't change your

19    testimony, you know, you can't say one thing today

20    and then when you change it, change your testimony

21    to something completely different.  But what

22    you're looking for is any errors.  If you use a

23    doctor's name, for example, and it gets taken down

24    wrong, spelled wrong, those kinds of things, you

6

1    can make those sorts of changes.  So at the end of

2    the deposition we'll give you an opportunity to

3    decide whether or not you want to reserve

4    signature, which means that you want to look

5    through the transcript, or if you want to waive

6    signature, which just means that you trust the

7    court reporter to take it down correctly, but it

8    is important because you can't change your

9    testimony that you testify truthfully and

10   accurately today, okay?

11        A.    One question, you said at the end of the

12   deposition if I reserve signature, that means I

13   want to go over the transcript?

14        Q.    Uh-huh.

15        A.    And that would happen immediately after

16   the deposition or would I have to wait to get one

17   in the mail?

18        Q.    Actually the way it would work, she's

19   got to take this back and then she'll prepare a

20   typewritten transcript based on the shorthand that

21   she's taking down today.  It will probably be a

22   couple weeks before the transcript is ready.  When

23   the transcript is ready, we can make it available

24   to you here for you to sit and review it if you

7

 1    want to review it, but you won't get a free copy,

 2    you can purchase a copy from the court reporter,

 3    just like Mr. Smith and I will have to purchase a

 4    copy from the court reporter, but in light of your

 5    financial situation we'll make arrangements for

 6    you to be able to sit and look through it and fill

 7    out the errata sheet if you so desire.

 8         A.    What would be the cost of the

 9    transcript, depending on the number of pages?

10         Q.    Yeah, exactly, it's based on the number

11    of pages.  They're usual $150 and more, I mean,

12    they can go 600-plus dollars.  I don't know how

13    long this one's going to take, so I can't tell you

14    how much it's going to cost, okay?

15         A.    Alright, I understand.

16         Q.    Now, is there anything that would

17    prevent you from testifying truthfully and

18    accurately today, such as a loved one's recently

19    died, that you're taking psychotropic medications,

20    that you're ill, anything along those lines that

21    would prevent you from testifying truthfully and

22    accurately today?

23         A.    I haven't had any close family members

24    die recently.  I'm a little ill, I'm a little

8

1     sick, but I don't believe it would affect my

2     testimony.

3          Q.    Okay.  Just feeling a little under the

4     weather today?

5          A.    I am, yeah.

6          Q.    Okay.  But you think you can testify

7     truthfully and accurately today?

8          A.    Yeah, I don't think that me being ill

9     would force me to, you know, lie.

10          Q.    And you can remember the events that

11     occurred that you've alleged in your complaint?

12          A.     It happened sometime ago, but to the

13     best of my knowledge.  That's why I was asking

14     about the documents, I should have asked about

15     bringing in the complaint so I didn't cite that,

16     but I'm sure you have copies.

17          Q.    Yeah, I've got a copy of your complaint

18     so if you need to refer to that to refresh your

19     memory, that would be fine.  I've also got a copy

20     of the medical records that you can look at if you

21     need to refresh your memory.

22          A.    Yeah, well, I may need to do that but,

23     you know, I do believe that those facts are true,

24     everything I stated in the complaint.

9

```
 1          Q.    So you don't believe you'll have any
 2    trouble testifying truthfully and accurately
 3    today?
 4          A.    I don't believe so.
 5          Q.    Okay.  If at any time because you're not
 6    feeling well you start to feel like you can't
 7    continue, please let us know, okay?
 8          A.    I will.
 9          Q.    If you need to take a break, feel free
10    to ask to take a break.
11          A.    I will.
12          Q.    We've got restrooms here in the
13    building, there's coffee and water here today,
14    okay?
15          A.    Yes, sir.
16          Q.    Now, I represent Dr. Awada, Dr. Osafo,
17    Dr. Grammer, Karen Harper, and Wexford Health
18    Services, Incorporated, and you filed a complaint
19    in the federal court against those individuals, as
20    well as some individuals who are represented by
21    Mr. Smith, correct?
22          A.    Yes, sir.
23          Q.    Your complaint is relatively detailed,
24    correct?
```

1          A.    Yes, sir.

2          Q.    And you filed that back in October of

3     2006 it looks like, is that right -- I'm sorry, is

4     that when you sent it to the court?

5          A.    I can't remember the exact date that I

6     filed.

7          Q.    Well, take a look at it.

8                    (Document tendered.)

9          A.    I thought it was around April.

10         Q.    Well, April is the date that's stamped

11    on the top with the court, right?

12         A.    Right.

13         Q.    April of 2007?

14         A.    Correct.

15         Q.    What date did you write this complaint

16    though?

17         A.    It wasn't one day, it took me months.

18         Q.    Do you have a date at the end of the

19    complaint?

20         A.    I think that was -- I must have finished

21    it around October I think.  I believe, let me see.

22         Q.    Yeah, look and see.

23         A.    October 30th.

24         Q.    So you would have actually finished

1   drafting this on October 30th, 2006?

2        A.    Yes, sir.

3        Q.    And then you didn't file it for several

4   months until April of 2007; is that right?

5        A.    Yes, sir.

6        Q.    Why did you wait to file it, do you

7   know?

8        A.    I'm not a -- I was trying to make myself

9   familiar with the civil procedure as far as the

10  steps in filing and things I would have to do

11  after filing and things like that, and when I

12  finished the complaint I didn't feel like I was

13  verse enough with civil procedure to file at that

14  time.

15       Q.    So you did some research?

16       A.    I knew upon filing there's a certain

17  time -- there's a time frame you're working with,

18  so I wanted to be prepared before I filed it.

19       Q.    Okay.  Now, this complaint is

20  typewritten, correct?

21       A.    Yes, sir.

22       Q.    Did you type that yourself?

23       A.    Yes, sir.

24       Q.    Did you have anyone help you when you

1    prepared this?

2         A.    You mean help type?

3         Q.    No, just help you in terms of how to put

4    it together.

5         A.    Well, I had -- there are -- in the

6    prison law library, there are -- I don't know what

7    you'd call them.  They call them clerks.

8         Q.    Okay.

9         A.    And their job is to help people, to

10   assist them when they, you know, file proceedings

11   with the court.  But most of the help I got was

12   like direction as to what book to find and I

13   purchased some books about how to write these.

14        Q.    What books did you purchase?

15        A.    The names of the books, I don't want to

16   lie, I can't think of the names offhand.

17        Q.    Can you tell me what they were about, I

18   mean, try to give me some description of the

19   books?

20        A.    Tell the prisoners what their civil

21   right are and helping a prisoner to figure out if

22   his civil rights have been violated and to, you

23   know, make him clear so that's he's not, you know,

24   just filing a -- what do you call it? -- frivolous

1    lawsuit, to make sure that, you know, his rights

2    really have been violated and to give him like

3    a -- like direction as to procedure, you know, how

4    you file and those types of things.

5        Q.    Now, I notice you have here with you

6    today a copy of the Federal Rules of Civil

7    Procedure 2006-2007 edition it looks like; is that

8    right?

9        A.    Yes, sir, it's an educational file.

10       Q.    Okay.  Did you have that one when you

11   were in prison?

12       A.    No, sir.

13       Q.    Okay.  Is that your copy or did you get

14   it from the school?

15       A.    I actually borrowed it from someone.

16       Q.    Okay.  And you would not have had that

17   then when you were preparing your complaint in

18   this case?

19       A.    No, sir.

20       Q.    Did you have a copy of the Federal Rules

21   of Civil Procedure?

22       A.    No, sir.

23       Q.    Did you have access to one in the

24   library?

1    A.    I don't believe I did, but I can't

2    recall, I don't remember.

3    Q.    You mentioned earlier that you waited to

4    file your complaint as you familiarized yourself

5    with the Federal Rules of Civil Procedure, do you

6    recall that?

7    A.    (Witness nodded.)

8    Q.    You've got to answer out loud.

9    A.    Yes, I'm sorry, yes.

10    Q.    How did you do that, how did you go

11    about familiarizing yourself with the rules?

12    A.    Well, they have -- there's documents and

13    they have like versions that aren't really like

14    the complete Federal Rules of Procedure, but they

15    have like excerpts, and I found as many documents

16    as I could find with those and looked at, you

17    know, how I felt they were stated to get an

18    understanding.

19    Q.    So you would go to the law library and

20    you would consult with the law clerks, they'd tell

21    you different books that you might want to look

22    at?

23    A.    Yes, sir.

24    Q.    You'd go look at those books then?

1          A.     Yes, sir.

2          Q.     And then based on that you drafted a

3     complaint?

4          A.     Yes, sir.

5          Q.     And then you filed it in federal court?

6          A.     Yes, sir.

7          Q.     Now, you have some college education,

8     correct?

9          A.     Yes, sir.

10          Q.     How many years of college education do

11     you have?

12          A.     About -- perhaps three.

13          Q.     Okay.  And you were attending the

14     University of Illinois prior to your

15     incarceration?

16          A.     Only for a couple weeks, yes, I was.

17          Q.     But you had been admitted and were

18     attending classes?

19          A.     Yes, sir.

20          Q.     Where did you go to high school?

21          A.     Centennial High School in Champaign,

22     Illinois.

23          Q.     And you graduated from high school?

24          A.     Yes, sir.

E-FILED
Thursday, 07 February, 2008  04:29:03 PM
Clerk, U.S. District Court, ILCD

16

1        Q.    What was your grade point average?

2        A.    I can't recall.

3        Q.    Anyway, good enough to get into the

4   University of Illinois?

5        A.    I think my ACT score helped me a bit.

6        Q.    You had a pretty high ACT score?

7        A.    It was high for the time, yeah, 29.  I

8   don't know what the standards are now.

9        Q.    Have you ever filed any other lawsuits

10  besides this one, Mr. Hunter?

11       A.    No, sir.

12       Q.    Now, in this lawsuit you've also engaged

13  in some litigation activities, correct?

14       A.    When you say litigation activities, what

15  do you mean?

16       Q.    Yeah, I'll explain what I mean by that.

17  You've been able to draft up written discovery

18  requests?

19       A.    Yes, sir.

20       Q.    And you served those on the defendants?

21       A.    Yes, sir.

22       Q.    You served interrogatories on the

23  defendants?

24       A.    Yes, sir.

17

```
 1          Q.    You served requests for production on

 2     the defendants?

 3          A.    Yes, sir.

 4          Q.    You filed motions in the court?

 5          A.    Yes, sir.

 6          Q.    I'm including a motion for a protective

 7     order?

 8          A.    Actually, the motion was to order a

 9     deposition by telephone, it was interpreted as a

10     protective order by Judge Baker, but yes.

11          Q.    The motion was related to where your

12     deposition would be held, correct?

13          A.    Yes, sir.

14          Q.    You had concerns that if you were

15     required to go to Springfield about costs?

16                Let me rephrase that question, it didn't

17     come out very well, did it?  You had concerns

18     about cost if you were required to go to

19     Springfield?

20          A.    My concern was about getting there and I

21     didn't think that the cost would allow me to get

22     there.

23          Q.    And so you filed a motion asking that

24     you be allowed to testify by telephone, correct?
```

1      A.      Yes, sir.

2      Q.      And then you called the Court and

3  expressed concern that the deposition was set for

4  later that day and the Court had not yet ruled on

5  your motion?

6      A.      Yes, sir.

7      Q.      Judge Baker then directed defense

8  counsel to come to Champaign to take your

9  deposition, correct?

10      A.      Yes, sir.

11      Q.      And you were successful in your motion,

12  you didn't have to go to Springfield?

13      A.      No, sir, I did not.

14      Q.      Now, did you ever look -- prior to you

15  calling the Court, did you ever look to see how

16  much it would cost to take a bus from Champaign to

17  Springfield?

18      A.      When I talked to you, you suggested I

19  get on the Greyhound website to look at it, I did

20  look.

21      Q.      And what was the cost to go from

22  Champaign to Springfield?

23      A.      For a nonrefundable ticket it was $38,

24  and for a regular ticket it was $67, and the bus I

1    would have taken would have been leaving Champaign

2    at 9:15, arrive in Springfield around 11:15, and

3    the bus coming home would have been leaving

4    Springfield I believe at right around 6:00 and it

5    would have been getting to Champaign a little

6    after 9:00.

7        Q.    Now, did you not have the $38 to go to

8    Springfield?

9        A.    No, sir, I didn't at the time.

10        Q.    Are you working currently, Andre?

11        A.    I'm not.

12        Q.    When did you get released from prison?

13        A.    August 31st.

14        Q.    Of this year -- I'm sorry, 2007?

15        A.    Yes, sir.

16        Q.    Have you worked at any time since August

17    of 2007 and the present?

18        A.    Yes, sir, I have.

19        Q.    And where did you work?

20        A.    At Haynes Construction.

21        Q.    What kind of construction do they do?

22        A.    Residential construction.

23        Q.    Were you a -- what were your job

24    responsibilities at Haynes Construction?

1          A.     They were -- I mean, they varied

2     immensely.  Getting the job, I didn't have any

3     experience in the field, so a lot of the work I

4     did was -- I forget the term.  I guess you could

5     say grunt work, I mean, moving things, hauling

6     things up, just assistance, general assistance.

7          Q.     Did your skills develop as you worked

8     there?

9          A.     Somewhat.

10          Q.     How long did you work for Haynes

11     Construction?

12          A.     About three months.

13          Q.     How many hours a week were you working?

14          A.     In between 10 and 40, sometimes weather

15     wouldn't permit you to work and my boss sometimes

16     would tell me that he didn't have, you know, work

17     for me that particular day.

18          Q.     Were you salaried or hourly wage?

19          A.     Hourly.

20          Q.     What was your hourly wage at Haynes

21     Construction?

22          A.     $10 an hour.

23          Q.     And who was your boss there at Haynes

24     Construction?

1        A.    His name was Jeff Haynes.

2        Q.    Okay.  That's here in Champaign, Haynes

3    Construction?

4        A.    It is.

5        Q.    Do you know the phone number for Haynes

6    construction?

7        A.    Off the top of my head I don't.  You can

8    look in the phonebook and find it.

9        Q.    Okay.

10        A.    May I ask why that's of importance to

11    this case?

12        Q.    Well, I really don't have to tell you

13    why, but I'll explain to you if you're objecting,

14    I'll interpret your statement as an objection to

15    relevance. Basically what we do in the deposition

16    process is we ask questions that lead to relevant

17    evidence or information that's likely to lead to

18    relevant evidence and so that type of information

19    may lead to relevant evidence, Mr. Haynes may have

20    information that can assist us in this case, so

21    that's why I'm exploring that area.

22             Now, have you worked any other jobs

23    besides the one for Haynes Construction?

24        A.    No, sir.

1        Q.    You're currently going to school?

2        A.    I am.

3        Q.    When did you start going to school?

4        A.    January 14th, 2008.

5        Q.    And where are you attending school?

6        A.    Parkland College, Champaign, Illinois.

7        Q.    That's Parkland?

8        A.    Parkland, P-A-R-K-L-A-N-D.

9        Q.    Okay.  And what are you studying there?

10        A.    I'm doing a curriculum that will enable

11   me to transfer to the engineering program at the

12   U of I, and there's transfer requirements, some

13   humanities and some natural sciences, I forget

14   what they call them, but for the most part the

15   core is science classes; chemistry, physics and

16   calculus.

17        Q.    How many hours do you attend at Parkland

18   per week?

19        A.    I'm a 12-hour student at Parkland.

20        Q.    Is that considered full-time or

21   part-time?

22        A.    It is considered full-time.

23        Q.    Now, when was your last day working for

24   Haynes Construction?

23

1          A.    I can't remember off the top of my head,

2    it was in December.

3          Q.    Was it before Christmas or after

4    Christmas?

5          A.    It may have been a day after Christmas.

6          Q.    Okay.  So have you worked anywhere since

7    that last day at Haynes and when you started

8    school on January 14th?

9          A.    No, sir.

10         Q.    You don't have any part-time jobs?

11         A.    No, sir, I'm currently looking.

12         Q.    Where do you currently live?

13         A.    2125-B Melrose Drive, Champaign,

14    Illinois.

15         Q.    Do you rent at that location or how do

16    you pay for where you live or are you just living

17    with someone else?

18         A.    I live with my mother, but I do -- when

19    I have it I help with the rent and bills because

20    it's more expensive than she can afford.

21         Q.    Does she work?

22         A.    She does, she works part-time.

23         Q.    How are you paying for school, Andre?

24         A.    Federal student aid, and I also secured

24

1       a loan to help because with the work situation, a

2       student loan to help with living expenses and

3       buying books and things and paying for rent until

4       I can find a job.

5               Q.    Are you looking for a job?

6               A.    Yes, sir.

7               Q.    Now, do you own a car?

8               A.    No, sir.

9               Q.    Do you have a driver's license?

10              A.    I do.

11              Q.    Does your mother have a car?

12              A.    She does.

13              Q.    Does she require her car for work?

14              A.    Does she require her car for work, sir?

15              Q.    Yeah.

16              A.    I don't understand.

17              Q.    Well, does she work here in Champaign?

18              A.    She does.

19              Q.    Does her job require her to use her

20      personal car to travel?

21              A.    I'm sorry, yes, sir, it does.

22              Q.    Does she have to have a car then every

23      day when she's working?

24              A.    For the most part, yes, sir.

25

1          Q.     Do you have any other family members

2     that have automobiles?

3          A.     In...?

4          Q.     In the Champaign area?

5          A.     No, sir.

6          Q.     Now, I notice you're wearing a Carhart

7     jacket today, where did you get that at, did you

8     get that after you got out of prison?

9          A.     Yes, sir.

10          Q.     Do you have a cell phone?

11          A.     Yes, sir.

12          Q.     And do you have a monthly bill for your

13     cell phone?

14          A.     I do.

15          Q.     How much does that run per month?

16          A.     About $65.

17          Q.     Do you have any other monthly bills

18     besides the cell phone bill and the money that you

19     pay your mother to help with rent?

20          A.     Well, it's not just rent I help with, I

21     help with the phone bill, and I give her money for

22     gas and groceries, I buy groceries.

23          Q.     Does she sometimes take you places?

24          A.     Sometimes, yes, it's that or the bus.

1          Q.    Are you currently on parole?

2          A.    Yes, sir.

3          Q.    Do you have to report to the parole

4     agent then if you leave Champaign County?

5          A.    Yes, sir.

6          Q.    And have you left Champaign County since

7     you were released from prison in August of 2007?

8          A.    No, sir.

9          Q.    So if we talk to your parole agent, he

10    would be able to verify that you haven't left

11    Champaign County?

12         A.    Yes, sir, he would.

13         Q.    Have you seen any dentists since you've

14    been released from prison?

15         A.    No, sir.

16         Q.    Have you been treated by any doctors

17    since you've been released from prison?

18         A.    I don't believe so, no, sir.  I don't

19    have any insurance.

20         Q.    Have you gone to the emergency room?

21         A.    No, sir.

22         Q.    Prompt Care?

23         A.    What is Prompt Care?

24         Q.    Kind of like the emergency room, there's

1    some clinics that have Prompt Care which is for

2    people that don't have an acute injury but have an

3    injury that requires immediate attention?

4        A.    No, I haven't been there.

5        Q.    Have you sought any kind of medical help

6    since you've been out?

7        A.    I believe there's a toll-free line that

8    you can call to ask about illnesses, I think I

9    called that a couple times, I can't remember the

10    number, my mother suggested it.

11        Q.    Did you call that number?

12        A.    I called it before.

13        Q.    And when was that?

14        A.    Maybe two months ago.

15        Q.    Where did you locate the number?

16        A.    My mother gave it to me.

17        Q.    Now, you previously provided us with a

18    phone number, is that your mother's phone number?

19        A.    It is.

20        Q.    When you called this 800 number, what

21    did you discuss with them?

22        A.    I can't recall that particular ailment.

23    I believe I was -- I had flu-like symptoms I

24    think, I can't remember exactly what it was.

1          Q.    It didn't have anything to do with your

2     tooth #19 which has been extracted?

3          A.    No, sir, it didn't.

4          Q.    Did it have anything to do with this

5     lawsuit at all?

6          A.    No, sir.

7          Q.    Okay.  Have you been seen by any medical

8     personnel or talked to any medical personnel about

9     any condition related to this lawsuit since you've

10    been released?

11         A.    I don't believe so, sir.

12         Q.    Okay.  Now, as I understand your claim

13    against my defendants, Dr. Awada, Dr. Osafo, Karen

14    Harper, Dr. Grammer, and Wexford Health Sources,

15    Incorporated, they all concern the tooth #19; is

16    that accurate?

17         A.    Yes, sir.

18         Q.    And the time frame of your allegations

19    is from sometime in 2000 through October 30,

20    2006; is that right?

21         A.    I believe so, that's about right.

22         Q.    Now, in June of 2006, Dr. Awada

23    extracted the tooth; is that correct?

24         A.    I believe that's the date.  It's in the

1    complaint.

2        Q.    But it was Dr. Awada that extracted the

3    tooth, correct?

4        A.    Yes, sir.

5        Q.    Now, in your complaint you have a lot of

6    detail with respect to Dr. Awada, Dr. Osafo -- I'm

7    sorry, Dr. Grammer and Dr. Awada and then there's

8    some detail with respect to Dr. Osafo and Karen

9    Harper, you typed that up yourself, correct?

10       A.    Yes, sir.

11       Q.    And you typed that up in October of

12   2006, when your memory of the events was fresher

13   than it is today?

14       A.    What do you mean by that?

15       Q.    Well, it was closer in time to the

16   events than we are today, correct?

17       A.    I believe that's reasonable to assume

18   that.  I didn't just sit down and type the

19   complaint entirely from memory on October 30th, I

20   had a draft that I had written and I typed, you

21   know, on that date.

22       Q.    Do you still have a copy of that draft?

23       A.    I may, sir, I have to look in my

24   documents, I may have a copy of the draft -- the

30

```
 1      written draft?

 2          Q.      Yeah.

 3          A.      I may have a copy.

 4          Q.      Okay.  As far as the information,

 5      though, is the information in the complaint

 6      accurate?

 7          A.      To the best of my knowledge.

 8          Q.      Is there anything in the complaint to

 9      your knowledge that is inaccurate?

10          A.      Not to my knowledge, sir.

11          Q.      You knew that this was going to be filed

12      in federal court, this complaint?

13          A.      Yes, sir.

14          Q.      And so you knew it was important for

15      your statements to be accurate, correct?

16          A.      Yes, sir.

17          Q.      Did you do a signed -- I don't remember,

18      a signed statement as to the -- actually, yeah, it

19      looks like you did.  In fact, you wrote that

20      pursuant to 28 USC Section 1746, I declare and

21      verify under penalty of perjury under the laws of

22      the United States of America that the above-stated

23      facts are true to the best of my knowledge, with

24      respect to the facts you had alleged in your
```

31

1      complaint, correct?

2          A.    Yes, sir, I signed that.

3          Q.    And you swore under oath under penalty

4      of perjury that those facts were correct?

5          A.    To the best of my knowledge, yes, sir.

6          Q.    And as you sit here today, there's

7      nothing that you can think of in that complaint

8      that is inaccurate?

9          A.    Not that I can think of, no, sir.

10         Q.    Now, I think I understand from your

11     complaint your claims against Dr. Awada and

12     Dr. Grammer, is there anything else that is not in

13     your complaint about your claims against those two

14     individuals?

15         A.    Not that I can think of at this moment.

16         Q.    Is there anything that would refresh

17     your memory as to, you know, what your claim is

18     about them?

19         A.    What do you mean is there anything that

20     would refresh my memory about the claim?

21         Q.    Well, you said you don't know at this

22     moment if there's anything else, is there anything

23     that would prompt you to say, oh yeah, you know

24     what, I omitted this date whenever I saw

1    Dr. Awada?

2        A.    Not anything I can think of right now.

3        Q.    But are there any documents that you

4    could look at that would help you recall what it

5    is you allege Dr. Awada did that was wrong?

6        A.    I mean, are you asking if there's

7    documents that would make me remember something

8    new that's not included in the complaint that he

9    did wrong?

10       Q.    These are your claims against Dr. Awada,

11   right, what's in your complaint?

12       A.    Yes, sir.

13       Q.    Okay.  You don't have anything else that

14   you're claiming Dr. Awada did wrong other than

15   what you have in your complaint?

16       A.    Not at this time, no, sir.

17       Q.    Okay.  And the same with Dr. Grammer,

18   right?

19       A.    Not at this time, no, sir.

20       Q.    There's nothing else other than what

21   you've alleged in your complaint?

22       A.    Not at this time, no, sir.

23       Q.    Now, can you tell me -- and feel free to

24   refresh your memory by looking at your complaint

1    if you'd like to -- what is it that Dr. Osafo did,

2    what's your claim against Dr. Osafo?

3         A.    That he was guilty of deliberate

4    indifference, that he knew what was going on with

5    my condition and did nothing to prevent it.

6         Q.    Did you ever actually see Dr. Osafo?

7         A.    Concerning my tooth or just concerning

8    health care period?

9         Q.    Well, let's start with concerning your

10   tooth, did you ever see Dr. Osafo concerning your

11   tooth?

12        A.    I can't recall if I ever spoke to him

13   personally about the #19 tooth.

14        Q.    Did you see him for any other

15   conditions, medical conditions?

16        A.    I had seen Dr. Osafo a number of times

17   over the years for other conditions.

18        Q.    Did he treat you for those conditions?

19        A.    Yes, sir, he pulled out a toenail one

20   time and I believe there was some other things.

21        Q.    So your claims are not related to the

22   other times that he treated you for medical

23   conditions, are they?

24        A.    Not in the complaint, no, sir.

1        Q.     Your claim against Dr. Osafo in the

2    complaint is that he was deliberately indifferent

3    to your #19 tooth?

4        A.     The condition of it, yes, sir, he did

5    nothing to help, yes, sir.

6        Q.     But you don't recall whether you

7    actually saw Dr. Osafo with respect to your #19

8    tooth?

9        A.     I can't recall if I ever spoke to him

10   and told him that my #19 tooth was hurting me, no,

11   sir.

12       Q.     Did you ever write Dr. Osafo about your

13   #19 tooth?

14       A.     I don't believe I did.

15       Q.     It looks like from your complaint your

16   claim against Dr. Osafo is based upon a statement

17   that Dr. Elyea had made that he had discussed your

18   case with Dr. Osafo, is that what your claim's

19   about?

20       A.     Well, I think -- I don't know about the

21   statement to which you refer, but I believe he

22   said in a letter that he spoke with --

23       Q.     Who's he, you said I believe he said,

24   and I'm not sure who he is?

1          A.    Elyea said in a letter he spoke with

2     a -- I can't recall the title he used, but I

3     thought that the title he used was Dr. Osafo at

4     the time.

5          Q.    Why do you believe that Dr. Osafo was

6     aware of your #19 tooth condition?

7          A.    Because of his title at the Illinois

8     River Health Care Unit.

9          Q.    Because he was the medical director?

10          A.    His title and his job, yes, sir, his

11     duties.

12          Q.    And what are his duties or what were his

13     duties from 2000 through 2006, as you understand

14     them?

15          A.    I can't recall, I mean, exactly what his

16     duties are.  I mean, I have the actual terms at

17     home but I can't recall off the top of my head.

18          Q.    So your claim is that because

19     Dr. Osafo's duties and title made him a supervisor

20     you felt he was deliberately indifferent to your

21     tooth; is that right?

22          A.    My claim is that I feel that because of

23     his duties he was -- he knew of my condition and

24     he did nothing to prevent it or help in any way, I

1    believe that makes him deliberately indifferent.

2        Q.    But you have no reason to believe that

3    he knew other than the fact that he was the

4    medical director and because of his duties as

5    medical director?

6        A.    Aside from his duties, I can't think of

7    any reason why I would have that he would know

8    about it.

9        Q.    You don't remember whether you ever

10    talked to him?

11        A.    I don't recall ever talking to him and

12    telling him that my #19 tooth hurt me.

13        Q.    You didn't ever write him either, did

14    you?

15        A.    I don't remember writing him, sir.

16        Q.    Okay.  Did anybody tell you that they

17    talked to Dr. Osafo other than that one

18    correspondence from Dr. Elyea that you interpreted

19    that way?

20        A.    I can't recall if anybody ever told me

21    they spoke with him, sir.

22        Q.    Is there anything that would refresh

23    your memory as to whether anyone spoke to you

24    about Dr. Osafo?

1       A.    I don't know if there's anything that

2    would refresh my memory or not.

3       Q.    Did you have a log of events, a calendar

4    or something that you wrote on and made notes on?

5       A.    Well, I had papers I used to write on

6    about what happened like in the health care upon

7    certain visits.

8       Q.    And do you still have those papers?

9       A.    I may have them, I have to check my

10    documents.

11       Q.    Now, we previously gave you some

12    requests to produce and those aren't things you

13    provided to us in response to those, correct?

14       A.    I provided you with -- I think the

15    answers to most of your questions in the request

16    for production were in the complaint I believe.

17       Q.    Will you send me copies of those pages

18    if you find them?

19       A.    If I find them, yes, sir.

20       Q.    And then earlier you mentioned a draft

21    of your complaint, will you also send me a copy of

22    that if you find it?

23       A.    The handwritten?

24       Q.    Right.

38

1         A.     If I have it, yes, sir.  I mean, I don't

2    believe I do, I threw away a lot of things, but I

3    will look for it, sir.

4         Q.     Okay, good, fair enough.  Now, Karen

5    Harper, what is it that Karen Harper did that you

6    allege wronged you?

7         A.     Karen Harper also knew the condition of

8    my #19 tooth and she did nothing to prevent it.

9         Q.     What was her position?

10       A.     She was a -- I believe her title was

11   dental assistant.

12       Q.     When did you see Karen Harper?

13       A.     I saw her on numerous occasions in the

14   dental department.

15       Q.     Do you remember what dates you saw her

16   on?

17       A.     I can't recall off the top of my head,

18   sir.

19       Q.     Do you have those dates in your

20   complaint?

21       A.     The dates I saw her?

22       Q.     Yeah.

23       A.     There may be dates in the -- in one of

24   the exhibits, the dates I saw her.  I don't know

39

1    that I included all the dates that I saw her in

2    the complaint.

3         Q.    If we wanted to find out what dates you

4    saw Karen Harper, how would we go about doing

5    that?

6         A.    There were some dates I believe in the

7    medical records, I mean, in one of the exhibits,

8    the times I saw her.

9         Q.    So if we wanted to know what dates Karen

10   Harper saw you, we'd want to look at the medical

11   record; is that correct?

12        A.    You can ask Karen Harper, that's another

13   way.

14        Q.    You personally don't remember when you

15   saw her?

16        A.    I can't recall, I mean, just off the top

17   of my head right now specific days that I saw her,

18   but I do remember occurrences, instances of seeing

19   her and speaking with her.

20        Q.    And is there something about those

21   instances whenever you saw her that you claim she

22   should have done something differently on?

23        A.    I'm not -- I'm not entirely sure that

24   her job title would have enabled her to do

1    something, but I don't know that it stopped her,

2    so that's why she was included because I didn't

3    know.  If she was able to help, she didn't.

4        Q.    You weren't sure if she would be able to

5    or not but you included her just to make sure that

6    she was in there if she was able; is that right?

7        A.    If there's a chance that she could have

8    done something, then she was wrong for not doing

9    something and that's why she's in there.

10        Q.    But you don't know if she was actually

11    able to do something or not?

12        A.    I don't know if it was in her power.

13        Q.    Now, Wexford Health Sources,

14    Incorporated employs these four individuals or did

15    employ these four individuals at the time, and

16    that's your claim against them, right?

17        A.    They employed Grammer, Harper, Osafo and

18    Awada, is that what you're saying?

19        Q.    Yeah, isn't that basically your claim

20    against them, that because they were their

21    employer, they were deliberately indifferent?

22        A.    I believe that's who employed them and

23    yes, sir.

24        Q.    Now --

1         A.     Actually, are you asking me why I

2    believe Wexford was deliberately indifferent?

3         Q.     Yeah, I mean, other than the fact that

4    they employed these individuals, what did Wexford

5    do?

6         A.     Well, Wexford -- I believe that the

7    contract that Wexford has with the state and the

8    policy that they get together and discuss and

9    uphold, I believe there's a policy that prevents

10   someone from getting a particular type of

11   treatment that would help them and prevent pain,

12   and Wexford had a hand in that policy I believe,

13   and I let them know that, you know, there's a pain

14   there and there's a treatment, and they still

15   refused to give that treatment, I believe that

16   makes them deliberately indifferent.

17        Q.     You understand that Wexford has a

18   contract with the Illinois Department of

19   Corrections to provide specific types of medical

20   care, dental care --

21        A.     I do understand that.

22        Q.     -- (continuing) to inmates within the

23   Illinois Department of Corrections?

24        A.     I do understand that.

1      Q.    Do you know whether Wexford Health

2    Sources' contract requires them to provide crowns

3    on teeth?

4      A.    Do I know if they require them to

5    provide that?

6      Q.    Yeah.

7      A.    Well now if -- I think that the terms

8    perhaps in my case may be subject to

9    interpretation, and they don't speak -- I don't

10    believe they speak -- they say the actual word

11    crown, but they talk about certain types of

12    treatment and they talk about restorative care in

13    that contract.

14      Q.    Whenever you worked for the carpentry

15    firm, they would have contracts with homeowners to

16    build houses, right?

17      A.    I don't know about what my boss did, he

18    had all the paperwork, I just worked.

19      Q.    You mention in your complaint that you

20    had a root canal in 1998, do you recall that?

21      A.    I can't recall the exact date.

22      Q.    Now, who performed that root canal?

23      A.    I can't recall the doctor's name.

24      Q.    And did they put a cap or a crown on

43

1          your tooth after the root canal?

2               A.    No, sir.

3               Q.    Where was that root canal performed?

4               A.    It was in Champaign, I can't recall the

5          address, sir.

6               Q.    Do you remember where it was at?

7               A.    I'm sorry, you asked me where it was, I

8          said I didn't recall.

9               Q.    Right, you said you couldn't recall the

10         address, but do you know where it's at, I mean,

11         could you drive there?

12              A.    No, sir, I don't believe I could.

13              Q.    Have you lived in Champaign your whole

14         life?

15              A.    No, sir.

16              Q.    How many years have you lived in

17         Champaign?

18              A.    If I had to say, I'd say about 12 maybe.

19              Q.    If we divided Champaign into four

20         quadrants, can you tell me which quadrant of

21         Champaign the dental office was that you went to,

22         was it in the northeast quadrant, northwest

23         quadrant, southeast quadrant, southwest quadrant?

24              A.    I couldn't tell you that, sir.

44

```
 1        Q.    Could you tell me what it was near?
 2        A.    I'm sorry, sir, I can't, I went there
 3   one time, you know.
 4        Q.    Who paid for the root canal?
 5        A.    I believe DCFS paid for it, Department
 6   of Children and Family Services.
 7        Q.    And did they make arrangements for you
 8   to go to the dentist that day?
 9        A.    The arrangements were made, it was a
10   combination between DCFS and the caseworker and
11   the foster parents.
12        Q.    Who was your foster parent at that time?
13        A.    I believe it was Lisa Sanders.
14        Q.    Does she live here in Champaign?
15        A.    I don't know, sir.
16        Q.    Did she live in Champaign at the time?
17        A.    Yes, sir, she did.
18        Q.    Do you remember who your caseworker was?
19        A.    I don't off the top of my head, sir.
20        Q.    Was it the Champaign DCFS office that
21   you dealt with?
22        A.    Are there other offices, is there an
23   Urbana DCFS office?
24        Q.    I don't know, I'm just asking, do you
```

45

1    know where the office was that you went to?

2        A.    I believe the name of the place that I

3    dealt with was CHASI, Children's Home and Aid

4    Society, I believe I had some dealings with

5    Cunningham Children's Home.

6        Q.    Between 1998, whenever you had the root

7    canal performed, and the year 2000, when you were

8    enrolled at the University of Illinois, did you

9    see any dentists?

10        A.    I can't recall, sir.

11        Q.    Is it possible that you did and you

12    don't remember?

13        A.    I may have seen a dentist.

14        Q.    Did anyone tell you that you needed to

15    have a cap or a crown put on your tooth #19?

16        A.    No, sir.

17        Q.    Did the doctor who saw you in 1998 tell

18    you that you needed to have a cap or a crown put

19    on your tooth #19?

20        A.    I can't recall, sir.

21        Q.    And the root canal in 1998 was on tooth

22    #19, correct?

23        A.    Yes, sir.

24        Q.    In 1998, when you had the root canal

46

1    performed, you were, what, 16?

2         A.    I believe I was, sir.  And, I'm sorry,

3    I'll state for the record again that I believe the

4    root canal was performed around 1998, but I can't

5    recall the exact date, but you keep on saying 1998

6    like it's certain, but I'm not exactly certain.

7         Q.    Was it possibly before 1998?

8         A.    I don't believe there's a chance it

9    was -- it could have been before, it may have been

10   after, I can't really recall, sir.

11        Q.    Were you still in high school whenever

12   you had the root canal performed?

13        A.    Yes, sir.

14        Q.    Did you work any jobs while you were in

15   high school?

16        A.    Yes, sir.

17        Q.    Where did you work?

18        A.    Country Fair Cinemas, it's not in

19   business anymore, it's not there.

20        Q.    You say cinemas, a movie theater?

21        A.    Yes, sir.  Where else did I work?  I

22   worked at a fast food restaurant, Arby's, I worked

23   there.  I detasseled corn for about four days --

24   or I may have been in eighth grade when that

1    happened, I don't know if I was in high school

2    yet.  I think I might have been in high school, I

3    might have been in between freshman and sophomore

4    year, I can't recall.  But the theater, I remember

5    working there when I was in high school, and

6    Arby's, I remember working there when I was in

7    high school.

8        Q.    Now, did you take the summer off between

9    graduating from high school and starting college?

10        A.    As far as work?

11        Q.    Well, I mean, you didn't go to summer

12    school, did you, right out of high school?

13        A.    No, sir.

14        Q.    So you had a few months off; is that

15    right?

16        A.    Yes, sir.

17        Q.    Between high school and college?

18        A.    Yes, sir.

19        Q.    Did you work during that summer?

20        A.    I believe I worked at Arby's during the

21    summer, but I can't recall.

22        Q.    At any time when you were working during

23    that summer between high school and college did

24    you go see a dentist?

48

1        A.    I can't recall, sir.

2        Q.    It's fair to say you didn't have any

3   crowns or caps installed during that summer when

4   you were working at Arby's between high school and

5   college?

6        A.    I can say I didn't have any crowns or

7   caps installed on #19 tooth during that span.

8        Q.    Did you have any crowns or caps

9   installed on any other tooth during that span?

10       A.    I don't believe so.

11       Q.    And in the fall of 2000, you started at

12   University of Illinois; is that right?

13       A.    August of 2000, yes, sir.

14       Q.    And you attended for a couple of weeks

15   prior to your arrest?

16       A.    About two weeks, yes, sir.

17       Q.    Did you go to the health department at

18   the University of Illinois during that two-week

19   time period?

20       A.    I can't recall.

21       Q.    Do you remember whether or not you had

22   any sort of medical services as part of being a

23   student at the University of Illinois?

24       A.    I can't recall.  I believe they have a

49

1    center called McKinley Health Center I believe.

2    I'm not familiar with who can or can't go, if you

3    you have to pay for insurance or if it's part of

4    your tuition, I'm not familiar with that.

5        Q.    Were you a full-time student during that

6    two-week period of time?

7        A.    Yes, sir.

8        Q.    What was your major?

9        A.    Well, I intended on majoring in I

10   believe electrical engineering at the time, it was

11   some sort of engineer.

12       Q.    Fair to say that you didn't get any

13   dental care for yourself during the two weeks that

14   you were enrolled as a student at the University

15   of Illinois?

16       A.    I think it's fair to say that, yes, sir.

17       Q.    Fair to say you didn't receive any

18   medical care during the two weeks that you were

19   enrolled as a student at the University of

20   Illinois?

21       A.    From the University or just period?

22       Q.    Just period.

23       A.    I can't really recall.  I want to say

24   no.  I can't recall.

1      Q.     Is it fair to say you didn't receive any

2      medical care with respect to your #19 tooth during

3      the two weeks you were enrolled at the University

4      Illinois?

5      A.     I think that's fair to say, sir.

6      Q.     Okay.  Now I want to ask you just

7      briefly about your criminal history.  Again, for

8      the same reasons as I previously stated, we can

9      explore areas that are not only relevant but that

10     may lead to relevant evidence.  I'm aware of one

11     felony conviction for armed robbery, do you have

12     any other felony convictions?

13     A.     I don't believe so.

14     Q.     And you're currently on parole for that

15     armed robbery conviction?

16     A.     Yes, sir.

17     Q.     And you were convicted in what year?

18     A.     I believe it was 2000.  So am I to

19     understand that you believe that my criminal

20     history could lead you to relevant facts about the

21     civil suit that I filed?

22     Q.     It might, and I'll ask you a few more

23     questions and maybe it will be a little more

24     clear, okay?  You were convicted right across the

1        street here at Champaign County Courthouse,

2        correct?

3            A.      I believe so, yes, sir.

4            Q.      Did you actually testify and go through

5        a trial or was there some sort of a settlement or

6        a plea, rather, made?

7            A.      There was a guilty plea made.

8            Q.      So you didn't actually have a trial?

9            A.      No, sir, not by jury, no, sir.

10           Q.      Did you have a witness statement that

11       you made?  After you made your plea at sentencing

12       did you make a statement to the Court?

13           A.      I can't recall.

14           Q.      Now, in the last ten years -- we talked

15       about felonies, in the last ten years have you had

16       any convictions for something that was not a

17       felony but involved dishonesty, fraud or the like,

18       writing bad checks, that kind of thing?

19           A.      Not that I can recall, sir.

20           Q.      Besides this one conviction, do you have

21       any other convictions?

22           A.      I don't believe so.

23           Q.      Have you ever testified in court?

24           A.      Not that I can recall.  Is that criminal

1    court or court period?

2        Q.    Just any court, and I realize that

3    perhaps in some juvenile proceedings or something

4    you may have testified, so that would include

5    that.   I don't need to know the details, I just

6    want to know whether or not you've ever testified

7    in court.

8        A.    There were times when I had to go before

9    a judge for DCFS hearings, and I can't recall if I

10   was ever asked anything under oath in those

11   proceedings.

12       Q.    Okay.  You were young at the time?

13       A.    I was young, yes, sir.

14       Q.    Do you have any medical training?

15       A.    Medical training?

16       Q.    Yeah.

17       A.    As far as...?

18       Q.    CPR, have you ever been trained in CPR?

19       A.    I took a class in high school, they

20   taught us CPR.

21       Q.    Beyond learning CPR, do you have any

22   medical training; for example, are you an

23   emergency medical technician, a nurse, anything

24   like that?

1          A.    No, sir, I'm not.

2          Q.    Is it fair to say the only medical

3     training you have is in CPR?

4          A.    Yes, sir.

5          Q.    Do you have any dental training?

6          A.    I've never been instructed, no, sir, as

7     far as teeth are concerned.

8          Q.    Now, you said you get federal aid to go

9     to school, right?

10         A.    Yes, sir.

11         Q.    How much do you get per semester in

12    federal aid?

13         A.    It depends.  I believe -- it depends on

14    the college you go to first off, and they have a

15    term, what they call the -- I can't recall what

16    the exact term is, it's something similar to cost

17    of education, and the college will determine --

18    they'll get with the government and determine what

19    is an appropriate amount to give you to cover, you

20    know, your education, and you can get up to that

21    amount or less.

22         Q.    How much -- you go to Parkland, right,

23    how much do you get per semester, I mean, do they

24    give you a check for the semester or how does that

54

1    work?

2        A.    Well, what happens is you get -- you get

3    your federal student aid which goes to Parkland

4    and any loan money that you have goes to the

5    school as well and they take out your tuition and

6    your cost for books and they issue a refund check.

7        Q.    And how much did you get in refund for

8    this semester?

9        A.    I haven't received a refund check yet,

10    sir.

11        Q.    And you don't know what that will be yet

12    because you haven't received it?

13        A.    Correct.

14        Q.    This is your first semester back to

15    school?

16        A.    Yes, sir -- well, I mean, since -- I

17    went to school when I was in prison, Illinois

18    Central College, but this is my first semester

19    going to school out here since 2000.

20        Q.    How were you damaged by Dr. Awada's

21    action or inactions?

22        A.    I believe that's in the complaint.

23        Q.    Nothing to add other than what you've

24    already stated in the complaint?

1          A.      Nothing I can recall right now, sir.

2          Q.      What about Dr. Osafo, how were you

3     damaged by Dr. Osafo's action?

4          A.      I believe that's in the complaint as

5     well, sir.

6          Q.      You don't have anything to add in terms

7     of how you were damaged?

8          A.      Not that I can recall right now, sir.

9          Q.      Is there anything that would refresh

10    your memory as to how you were damaged by

11    Dr. Osafo's actions?

12         A.      Not that I can think of right now.

13         Q.      What about Karen Harper, how were you

14    damaged by Karen Harper's actions or inactions?

15         A.      I believe that's in the complaint as

16    well, sir.

17         Q.      And, again, you don't have anything to

18    add in terms of how you claim to have been

19    damaged?

20         A.      Not at this time, sir.

21         Q.      Is there anything that would refresh

22    your memory as to how you were damaged by Karen

23    Harper?

24         A.      Not anything I can think of at this

1        time, sir.

2            Q.     What about Dr. Grammer, how were you

3        damaged by Dr. Grammer's action or inactions?

4            A.     I believe that's in the complaint, sir.

5            Q.     You don't have anything to add?

6            A.     Not at this time, sir.

7            Q.     Anything that would refresh your memory?

8            A.     Not that I can think of at this time,

9        sir.

10           Q.     And what about Wexford Health Sources,

11       Incorporated, how were you damaged by its action

12       or inaction?

13           A.     I believe that's in the complaint, sir.

14           Q.     Nothing to add with respect to how you

15       claim to have been damaged?

16           A.     Not at this time, sir.

17           Q.     Have you consulted with any dentists

18       about being an expert witness for you in this

19       case?

20           A.     No, sir, I have not.

21           Q.     Fair to say that you don't have any

22       expert witness in this case at this time?

23           A.     Not at this time, sir.  Well, can you

24       please define expert witness for me?

57

1       Q.    Well, it would be a dentist or doctor,

2    someone who has expertise --

3       A.    In the particular field?

4       Q.    -- (continuing) relevant to this case?

5       A.    Oh, okay.  Not at this time, sir, I

6    don't believe I have an expert witness.

7       Q.    Besides yourself, who are your witnesses

8    in this case that you're aware of at this time,

9    people who you think you may call as witnesses in

10    this case?

11       A.    I can't think of any witnesses at this

12    time, sir.

13       Q.    Is there anything that would refresh

14    your memory as to people who you think you would

15    call as a witness?

16       A.    I can't think of anything that would

17    refresh my memory at this time, sir.

18       Q.    Would looking at your complaint and the

19    exhibits attached to the complaint help you out

20    and refresh your memory?

21       A.    I don't believe so at this time, sir.

22       Q.    Would looking at any of the files you

23    have back home help you out and refresh your

24    memory?

1          A.    I couldn't say at this time.

2          Q.    I think we've covered this briefly, but

3     with respect to Dr. Awada, have you written down

4     the various times you met with Dr. Awada in your

5     complaint or are there other times that you've met

6     with Dr. Awada?

7          A.    I believe that the majority of the times

8     I saw him with respect to my #19 tooth, I believe

9     the majority of those are in the complaint.

10         Q.    And if they're not in the complaint,

11    they'd be in your medical records?

12         A.    I believe they would be, I can't say for

13    sure though, sir.

14         Q.    Same with Dr. Osafo and the times --

15    well, you didn't meet with Dr. Osafo.  We talked

16    about Karen Harper.  Dr. Grammer, you've listed

17    times that you met with her in your complaint,

18    right?

19         A.    I believe I did, sir.

20         Q.    Is that all the times you met with

21    Dr. Grammer?

22         A.    I can't recall, sir, there may have been

23    other times I saw her.

24         Q.    And would those other times be in the

59

1    medical records?

2         A.    I believe they would be, but I can't say

3    for certain because I didn't take those records.

4         Q.    Is there anything that would refresh

5    your memory beyond looking at the complaint and

6    looking at the medical records as to when you saw

7    Dr. Grammer?

8         A.    I can't say at this time if there's

9    anything that would refresh my memory, there may

10   be something else.

11        Q.    What kinds of things do you think there

12   are that might help you remember when you met with

13   Dr. Grammer?

14        A.    I can't think of anything at this time,

15   but there may be something.

16        Q.    But to the best of your knowledge, all

17   the contacts with Dr. Grammer are either in the

18   complaint or in the medical records?

19        A.    I believe that's fair to say at this

20   time, sir.

21        Q.    Now, let's talk a little bit about the

22   grievances that you filed, attached to your

23   complaint there are two grievances, both dated

24   January 3rd, 2006, does that sound right?

1          A.      I believe the date is on those, yeah.

2          Q.      Do you want to look at them?

3          A.      To see the date?

4          Q.      Yeah, just look at them and kind of

5     refresh your memory about them.  Take a look, I

6     think that's the first one.

7          A.      Yeah, the 3rd, they're both dated the

8     3rd.

9          Q.      Are those the only two grievances that

10    you filed with respect to your allegations in the

11    complaint?

12         A.      I believe so, sir, with respect to --

13    yes, I believe so.

14         Q.      You mention in your complaint 2000, did

15    you file any grievance back in the year 2000?

16         A.      Related to #19 tooth?

17         Q.      Yeah.

18         A.      No, sir, I don't believe I did.

19         Q.      Okay.  So the first time you would have

20    filed a grievance would have been in January of

21    '06?

22         A.      I believe --

23         Q.      About your #19 tooth?

24         A.      I believe so, sir.

61

1          Q.     I'm sorry, I started talking while you

2     were still answering, let me ask the question

3     again just so I make sure we get it clear for the

4     record.   The only grievances that you would have

5     filed with respect to your #19 tooth began in

6     January of 2006?

7          A.     I believe that's correct, sir.

8          Q.     Is it also correct that the only

9     grievances you filed about Dr. Awada would have

10    been in January of 2006?

11         A.     I can't recall if that's the case.   I

12    had filed other grievances while I was

13    incarcerated but I can't recall if there was

14    anything else dealing with Awada.   I don't believe

15    there was anything else concerning my #19 tooth,

16    but I can't say if there's anything else. I

17    believe there's records in the prison though,

18    so...

19         Q.     Do you remember whether you filed any

20    other grievances besides these two dated January

21    3rd, 2006 that dealt with Dr. Osafo?

22         A.     I can't recall.   I believe the prison

23    would have a record of it though.

24         Q.     What about Karen Harper, are there any

1    grievances other than these two dated January 3rd,

2    2006 that deal with Karen Harper?

3         A.    I can't recall.

4         Q.    Dr. Grammer, are there any grievances

5    besides the two dated January 3rd, 2006 that

6    concern Dr. Grammer?

7         A.    I can't recall at this time.

8         Q.    And what about with Wexford Health

9    Sources, Incorporated, are there any grievances

10   other than the two dated January 3rd, 2006 that

11   deal with Wexford Health Source, Incorporated?

12        A.    I can't recall, I don't believe so at

13   this time.

14        Q.    Is there anything other than the

15   prison's grievance records that would refresh your

16   memory as to grievances that you filed?

17        A.    I could look through my documents at

18   home, I don't believe there's anything there but I

19   can look again.

20        Q.    Yeah, if you find any other grievances,

21   you'll send those to me as well, right?

22        A.    Do you have to request them or do you

23   want me --

24        Q.    Well, I've already sent you a request

1     for production, I believe they'd be responsive to

2     those requests, so I'd just ask that you send me a

3     copy if you would.

4         A.    That's fine.

5         Q.    Now, do you remember whether you

6     actually mentioned Dr. Awada, Dr. Osafo, Karen

7     Harper, Dr. Grammer, or Wexford Health Sources in

8     either of these two grievances dated January 3rd,

9     2006?

10         A.    I believe I mentioned Dr. Awada, I can't

11    recall.  I think you have it there, don't you?

12        Q.    But if we wanted to see what grievances

13    you filed about these individuals, we'd need to

14    look either at the two that you have attached to

15    your complaint or the prison's grievance records,

16    correct?

17        A.    Yes, sir.

18        Q.    Okay.  You don't have any independent

19    recollection of grievances that you filed about

20    these individuals?

21        A.    Not at this time, sir.

22        Q.    I don't have any additional questions at

23    this time, I'll let Mr. Smith ask some questions,

24    and then if something occurs to me after he's done

64

1          I may have a few more questions for you.

2          A.    Yes, sir.

3                              EXAMINATION

4     BY MR. SMITH:

5          Q.    Mr. Hunter, my name is Jacob Smith, I

6     represent the remaining defendants in this case.

7     A couple of things to clarify, talking about

8     education background, you said you went to

9     Illinois Central College?

10         A.    While I was incarcerated, yes, sir.

11         Q.    That's while you were incarcerated.  You

12    said you had about three years of college credit,

13    is that what you said?

14         A.    I believe so.  I mean, I went like off

15    and on over a number of years, over more than

16    three years, but I was just trying to give you

17    a -- like a number of semesters.  I can't recall

18    exactly, I have transcripts though, and I can give

19    you a copy of those if you'd like them.

20         Q.    That's okay.  When did you graduate high

21    school?

22         A.    In the year 2000.

23         Q.    You started U of I in the fall of 2000?

24         A.    Yes, sir.

1       Q.    Were you going to live on campus or live

2  off campus?

3       A.    I was in a dorm, living in a dorm.

4       Q.    Which one?

5       A.    I believe it was Oglesby Hall, it's at

6  the corner of Lincoln and Kirby, I believe.

7       Q.    On Florida Avenue?

8       A.    Yes, I believe that's where Kirby turns

9  into Florida over at Lincoln.

10      Q.    And you were sentenced to how many

11  years?

12      A.    15.

13      Q.    Which institution did you go to first?

14      A.    I left Champaign County and went to

15  Joliet Correctional Center, which I believe was

16  the processing point at that time.

17      Q.    Where did you go from there?

18      A.    I went from Joliet Correctional Center

19  to Illinois River Correctional Center.

20      Q.    Were you there the rest of the time?

21      A.    Yes, sir.

22      Q.    And that's where this incident arises

23  out of?

24      A.    Illinois River Correctional Center, yes,

66

1      sir.

2          Q.    When is your MSR sentence over?

3          A.    MSR, supervisory release, I believe

4      that's in 2010.

5          Q.    Mr. Walter talked you a little bit about

6      your root canal you had prior to being

7      incarcerated and I want to try to get a little

8      more if you can, did you have a regular dentist

9      you went to at all while you lived in Champaign?

10         A.    I don't believe so.  There may have been

11     a dentist I saw on more than one occasion, but I

12     wouldn't -- I don't believe there's any that I

13     would say were regular dentists of mine.

14         Q.    So you lived in Champaign for about 12

15     years, is that from now working backwards?

16         A.    No, sir, I was -- I don't consider

17     living in Canton living in Champaign so...

18         Q.    So from 2000, so you moved here in about

19     '88, is that what you'd said?

20         A.    Around '88, yes, sir, I believe so.

21         Q.    So between 1988 and 2000, about how many

22     times would you see a dentist, can you give an

23     estimate at all?

24         A.    No, sir, I don't know that I can give an

1      accurate estimate at all.

2           Q.    Did you ever see the same dentist more

3      than once?

4           A.    I believe I did.

5           Q.    What's his name?

6           A.    I can't recall his name.

7           Q.    Do you remember where his office is?

8           A.    I'm sorry, I can't recall, it was years

9      ago.

10          Q.    It was in Champaign, it wasn't in

11     Urbana?

12          A.    I believe it was in Champaign.

13          Q.    Would it be on the south side of town

14     like south of Neil or would it have been north of

15     Neil?

16          A.    I want to say it was --

17          Q.    Or not Neil, but Springfield Avenue,

18     that's east-west, would it have been north of

19     Springfield or south of Springfield?

20          A.    North is this direction?

21          Q.    Yeah.

22          A.    I believe it was north of Springfield.

23     I can't think of anything by the office though, it

24     was many years ago.

1        Q.    And you haven't been to a dentist since

2    you've been released; is that correct?

3        A.    That is correct.

4        Q.    Do you remember going to see -- I know

5    you've answered this question, but just to make

6    sure, did you see a dentist prior to having the

7    root canal?

8        A.    I believe I had seen a dentist before

9    having the root canal around 1998, I believe I had

10   seen a dentist before then.

11       Q.    Do you know why you got the root canal?

12       A.    I believe there was -- I can't recall

13   the exact reason why you get a root canal, I

14   believe it has something to do with the root

15   perhaps going bad or something so they take it out

16   and hence the name.

17       Q.    Did you ever smoke?

18       A.    I did smoke.

19       Q.    About how much?

20       A.    Maybe at the most I would say six or

21   seven cigarettes a day.

22       Q.    How long did you do that?

23       A.    For -- off and on for about -- I would

24   say off and on for about two years perhaps.

1          Q.     So you only smoked for two years?

2          A.     Well, I had smoked before then but not

3     anywhere close to six, seven cigarettes a day.   I

4     think I smoked regularly off and on for about two

5     years.

6          Q.     Did you ever have chewing tobacco or

7     anything like that?

8          A.     About four times.

9          Q.     Do you drink coffee pretty regularly

10    too?

11         A.     Did I or do I?

12         Q.     Either one.

13         A.     I drink about four cups a week now, I

14    used to drink about five cups a week.

15         Q.     Prior to when you were in high school,

16    and you said you thought you had seen a dentist,

17    you can't really remember for sure, did someone

18    have dental insurance or did you have dental

19    insurance?

20         A.     I believe any time I got medical care I

21    believe it was paid for through DCFS somehow.   I

22    know it was paid by someone because I received

23    medical care but I can't recall how it was paid

24    for.

1          Q.     Is that in terms of like getting

2     fillings or did you have fillings done?

3          A.     I've had fillings done.

4          Q.     About how many?

5          A.     Do you mean prior to incarceration or

6     during?

7          Q.     Yeah, prior to incarceration?

8          A.     Prior to incarceration, perhaps -- I can

9     count if you have a mirror, maybe four or five.

10         Q.     Turning your attention to Illinois

11    River, were you seen by a dentist at Illinois

12    River?

13         A.     Was I seen by a dentist at Illinois

14    River, yes, sir, I was.

15         Q.     About how many times if you had to

16    guess?

17         A.     I'm not real comfortable making a guess

18    because I don't want to be --

19         Q.     Was it more than five?

20         A.     Yes sir.

21         Q.     Was it more than 10?

22         A.     Yes, sir.

23         Q.     Was it more than 15?

24         A.     I can't recall.

1          Q.    Did you see the same dentist every time?

2          A.    No, sir, I don't believe I saw the same

3     dentist every time at Illinois River.  But when

4     you go in, in the office there's -- whenever

5     there's two dentists there, sometimes they confer

6     with each other about the problem that you have

7     sometimes, so there's a chance I could have gone

8     in to see one dentist and the other dentist had

9     knowledge of what was going on, while I didn't see

10    them personally, they knew about my condition.

11         Q.    How do you know that?

12         A.    How do I know that?

13         Q.    Yeah, could you hear them confer?

14         A.    Yes, sir, I've heard them confer before.

15         Q.    What were the dentists' names that you

16    saw while in Illinois River?

17         A.    I saw Dr. Grammer, I saw Dr. Awada, and

18    if there were any other dentists I can't recall

19    their names, but I can't say I didn't see any

20    other dentists.

21         Q.    Do you remember, if there were any other

22    ones that you saw, what they looked like, if you

23    can't remember their names?

24         A.    Well, I remember there being more, more

72

1    faces in the dental department than just Grammer

2    and Awada, but I can't recall names.

3        Q.    So just to kind of go through each of

4    these defendants, kind of get a better idea why

5    each of those are included in your lawsuit, start

6    with Kevin Kirkbride, who's Kevin Kirkbride?

7        A.    Kevin was a grievance officer at

8    Illinois River Correctional Center.

9        Q.    What did he do to be named in this suit?

10        A.    He denied the grievance that I filed

11    concerning my #19 tooth.

12        Q.    Did he respond to your grievance?

13        A.    I believe he responded to it, yes.

14        Q.    Do you know if Mr. Kirkbride is a dental

15    professional?

16        A.    What constitutes a dental professional?

17        Q.    Do you think that Mr. Kirkbride is

18    comfortable making dental assessments?

19        A.    I don't know that he is.  I can't say if

20    he is or not.  He may have mentioned it, is there

21    an exhibit to the complaint, his response?

22            (Document tendered.)

23        A.    Thank you.  Mr. Kirkbride, I don't

24    believe he mentioned anywhere where he feels

1    comfortable about making dental assessments.

2        Q.    While you're looking there, does he

3    state in his response that he asked a dental

4    professional what their response would have been

5    to your grievance?

6        A.    Does Dr. Awada constitute a dental

7    professional?

8        Q.    Since you said he was a dentist, I would

9    say yes.

10       A.    Well, he asked Dr. Awada about my

11   grievance.

12       Q.    So is it safe to assume that he relied

13   on Dr. Awada's testimony in responding to your

14   grievance?

15       A.    It says here he based his decision upon

16   total review of all available information and a

17   compliance check of the procedural due process

18   safeguards outlined in departmental rule 504.

19       Q.    Okay.  What about Barbara Hurt, why is

20   she in the lawsuit?

21       A.    I believe she was the deputy director

22   for my -- the district that Illinois River was

23   located in at the time.

24       Q.    So what exactly did she do?

1          A.    She knew about my condition and didn't

2    take any steps to give me the treatment that I was

3    requesting.

4          Q.    How did she know about the steps?

5          A.    She received notification by mail I

6    believe.

7          Q.    Did she respond to it?

8          A.    She sent me one letter.

9          Q.    What did she say in the letter?

10         A.    I can't recall exactly, I believe it's

11    an exhibit.  Would you like me to find the exhibit

12    and read the letter?

13         Q.    Sure.

14               MR. WALTERS:  Here it is, I was going to

15    make it an exhibit, so let's go ahead and mark it.

16    I'm going to mark this for identification purposes

17    as Hunter Exhibit No. 1.

18               (WHEREUPON, Hunter Exhibit No. 1 was

19    marked for identification.)

20         A.    Is this the same letter?

21    BY MR. SMITH:

22         Q.    Yes.

23         A.    Can I ask why you marked this an exhibit

24    here, is this for the deposition hearing?

1          MR. WALTER:  Yeah, it will be attached

2     to your deposition transcript, I'm going to ask

3     you some questions about it when Mr. Smith is done

4     so since he's going to ask you about it, I figure

5     we may as well mark it now and stick it in the

6     record.

7          A.    Okay.

8     BY MR. SMITH:

9          Q.    So this is the response to your letter?

10         A.    This is the only response I received

11    from Miss Hurt, yes, sir.

12         Q.    And what did you learn from her letter?

13         A.    Miss Hurt said the Illinois Department

14    of Corrections does not approve placement of a

15    permanent prosthesis, she believes that dental

16    crowns fall into this category, and at the end she

17    says my only recourse is to have the tooth

18    extracted.  Do you want me to continue reading?

19         Q.    No, that's fine.  And Terri Anderson and

20    Sherry Benton, are they in it as far as the

21    grievance procedure as well, is that why they're

22    named in the lawsuit?

23         A.    I believe they work for the

24    Administrative Review Board and that's who my

E-FILED
Thursday, 07 February, 2008  04:30:53 PM
Clerk, U.S. District Court, ILCD

76

1    grievance went in front of.

2         Q.    So you sued them because they upheld the

3    denial of your grievance?

4         A.    That's why they're in there, yes, sir.

5         Q.    Same with Roger walker?

6         A.    Yes, sir.

7         Q.    Why is Donald Hulick in this lawsuit?

8         A.    Donald Hulick did not deem that my

9    grievance was of an emergency nature and he also

10   agreed with the denial.

11        Q.    And Dr. Elyea, why is he in this

12   lawsuit?

13        A.    I can't recall his exact title, he is --

14   or he was at the time agency medical director and

15   he knew of my condition.

16        Q.    Spell that out a little clearer for me,

17   what are you talking about, what were the things

18   that he did in order to constitute being in this

19   lawsuit?

20        A.    Dr. Elyea knew of my condition and did

21   nothing to -- he took no steps, took no action to

22   get me into treatment that I needed.

23        Q.    And what treatment did you think you

24   needed?

77

1          A.    A crown on my #19 tooth.

2          Q.    Do you know if any inmates get crowns?

3          A.    I don't.

4          Q.    And their response is they would give

5      you fillings, is that what you said in your

6      complaint?

7          A.    I don't recall what section that is.  I

8      believe that they said that my course of action

9      was extraction or another filling, I believe those

10     were the choices I was given.

11         Q.    Do you know why you didn't get a crown

12     after you got the root canal?

13         A.    I don't.

14         Q.    When did it start hurting?

15         A.    I believe it was early on in the

16     sentence as I was doing time.  I think it's in the

17     complaint though, I think I mentioned that.

18         Q.    Feel free to look at your complaint to

19     tell me the incident.

20         A.    Would you like me to find it?

21         Q.    Sure.

22               MR. WALTER:  While you're looking for

23     that, let's take a short break.

24               (WHEREUPON, a break was taken and the

1        deposition resumed as follows:)

2        A.    Okay.  In the complaint, number 24, it

3    says on 7/20/2001, Plaintiff told Dr. Grammer that

4    #19 tooth bothers him sometimes.   Upon examination

5    Dr. Grammer noted that plaintiff had root canal

6    treatment on #19 tooth and scheduled an operation

7    to replace deteriorated filling.

8              MR. SMITH:  That's all I have right now.

9                    FURTHER EXAMINATION

10   BY MR. WALTER:

11       Q.    You're no longer incarcerated, right?

12       A.    No, sir.

13       Q.    You can go see any dentist that you

14   want?

15       A.    Well, I can't pay any dentist.

16       Q.    The Department of Corrections doesn't

17   determine whether you can go see a dentist, right?

18       A.    If I had the money, are you asking if

19   they would prevent me from going to a dentist?

20       Q.    Right.

21       A.    I don't believe they would.

22       Q.    For example, if you wanted to

23   discontinue your cellular phone service and save

24   the $65 per month that you pay for cellular phone

1    services, you can take that money and apply it

2    towards a dentist, right?

3         A.    I could, yes, sir.  May I ask you

4    something, that's assuming I would have $65 a

5    month to save had the phone got cut off, but go

6    ahead.

7         Q.    Okay.  You probably entered into a

8    contract with your phone company, right, so it

9    wouldn't necessarily be that easy to discontinue

10   your phone service, is that what you're saying?

11        A.    What I'm saying, it can't be

12   discontinued and I really wouldn't have a choice

13   if I don't have the money to pay for it.

14        Q.    But currently you're able to pay for

15   your phone service each month, right?

16        A.    Well, at this point.  I paid for it last

17   month, so next month we'll see.

18        Q.    Do you have like a two-year agreement

19   with the phone company?

20        A.    I believe it's a two-year contract.

21        Q.    Now, going back to Illinois River

22   Correctional Center, Dr. Awada recommended that

23   your tooth be extracted prior to him ultimately

24   extracting it in 2006?

1          A.    Did he recommend it?

2          Q.    Yes.

3          A.    I believe that was his recommended

4     course of action.

5          Q.    And, in fact, in November of 2005, he

6     recommended that your tooth be extracted and you

7     signed a refusal of services form refusing to

8     allow the extraction, do you recall that?

9          A.    I do recall signing the refusal, I do.

10         Q.    And in that refusal you released

11    Dr. Awada, the Illinois River Correctional Center,

12    the facility, and the Department of Corrections

13    for all liability for damages or any injuries

14    including to your health caused by or arising out

15    of your refusal to allow the extraction, do you

16    recall that?

17         A.    Do I recall that part of the refusal?

18         Q.    Yes.

19         A.    I can't recall that part, but if it says

20    it on there.

21         Q.    I'm going to show what you I'll mark for

22    identification purposes as Hunter Exhibit No. 2.

23               (WHEREUPON, Hunter Exhibit No. 2 was

24    marked for identification.)

1          A.    Do you mind if I look through this

2     complaint right now?

3          Q.    Yeah, I do actually because I'd like to

4     ask you my questions and then I'll gave it back to

5     Mr. Smith, at that point if you want to look

6     through your complaint to deal with whatever

7     questions he has, that's fine.

8          A.    All I'm saying is if the answers to some

9     of your questions lie in here, is it okay if I

10    cite them from this?

11         Q.    Yeah, if I ask you a question and you

12    need to look at your complaint, that's fine.

13         A.    Okay.

14         Q.    But right now I'm going to have you look

15    at this and see if this refreshes your

16    recollection as to what you stated in your refusal

17    that you signed.

18         A.    Okay.

19         Q.    That's a refusal dated November the

20    28th, 2005?

21         A.    Yes, sir.

22         Q.    And that's your signature down at the

23    bottom, correct?

24         A.    Yes, sir, it is.

1      Q.    And in that statement you released the

2   doctor and the facility and all those other people

3   I mentioned, correct?

4      A.    Yes, sir.  I was required to sign this,

5   I didn't have a choice.

6      Q.    Who required you to sign it?

7      A.    I believe Miss Harper told me either I

8   sign this or they take disciplinary action and

9   arrive at what they call disciplinary referral, so

10  those were my two choices.

11     Q.    You did refuse to have the extraction,

12  correct?

13     A.    I refused the extraction, yes.

14     Q.    You told them that you didn't want it

15  done?

16     A.    I didn't want the extraction done at

17  that time, no, sir.

18     Q.    You also refused treatment in May of

19  2006, correct?

20     A.    I signed this refusal, yes, sir, I was

21  forced to sign that as well.

22     Q.    And in May of 2006, you refused the

23  treatment that Dr. Awada had recommended?

24     A.    May I ask what was the treatment he

1    recommended in May of 2006?

2         Q.    Well, that's what I'm asking you, I

3    wasn't there.

4         A.    Oh, I'm sorry.  Well, I can't recall the

5    exact circumstances surrounding the signing of

6    this refusal -- is this a refusal?  Okay, I can't

7    recall the circumstances surrounding that, but I

8    know that I was told either I sign it or they

9    would take disciplinary action against me.

10         Q.    But you did refuse services on that

11    date, correct, prior to being asked to sign the

12    form?

13         A.    I can't recall the exact circumstances

14    surrounding me signing this, sir, at this time.

15         Q.    Did you refuse services in May of 2006?

16         A.    I'm sorry, let me think about what went

17    on this day, I'm going to try to remember exactly

18    what went on.

19         Q.    Okay.

20         A.    Can I look in the complaint this time?

21         Q.    Sure.

22         A.    Okay, this particular day I believe I

23    had an appointment to go see the dentist, and I

24    believe I was late for the appointment and the

1    dentist refused to see me, and the officer made

2    me -- he forced me to sign this refusal.  He gave

3    me a choice between this refusal or disciplinary

4    report and that was it.

5         Q.    So even though you signed the refusal,

6    your testimony today is that you did not actually

7    refuse services on May the 10th of 2006?

8         A.    My testimony is that I did not refuse

9    services on that day, yes, sir, I was forced to

10   sign this.

11        Q.    And that's your signature on the form

12   though, correct?

13        A.    It is.

14        Q.    Do you remember who the officer was that

15   forced you to sign this form allegedly?

16        A.    If the incident I'm recalling is

17   correct, I believe his name was Hand, Officer

18   Hand.

19        Q.    What did Officer Hand look like?

20        A.    I think he had glasses, I believe his

21   hair was reddish maybe.

22        Q.    How old was he approximately?

23        A.    Maybe around in between 40 and 50.

24        Q.    And you're six foot, what, how tall are

1    you?

2        A.    I'm six-foot-five.

3        Q.    Was he taller than you or shorter than

4    you?

5        A.    He was shorter than me.

6        Q.    Approximately where would he have come

7    to, on your shoulders or higher than that?

8        A.    I can't recall.  I was -- I didn't have

9    too many opportunities to stand next to him so I

10   wouldn't know.

11       Q.    How much would you guess he weighed if

12   you had to make an estimate?

13       A.    Maybe 200 pounds, maybe more.

14       Q.    Was he muscular or was he obese?

15       A.    I wouldn't say -- he had a stomach that

16   was pretty large but the rest of his body I

17   wouldn't say was obese.

18       Q.    Did he have any facial hair, beard,

19   mustache?

20       A.    I can't recall if he had a beard.

21       Q.    Now, on June the 12th of 2006, you did

22   consent for Dr. Awada to extract your tooth #19,

23   correct?

24       A.    I believe that's the day he extracted

1      it, yes, sir.

2           Q.     And you signed a form authorizing him to

3      extract your tooth?

4           A.     Yes, sir.

5           Q.     Earlier we talked a little bit about

6      Dr. Osafo, was one of the times that he saw you

7      after you had twisted your ankle playing

8      basketball?

9           A.     I can't recall.

10          Q.     I'm going to show you this page from the

11     medical records and see if that refreshes your

12     memory.

13          A.     What is this form, is this a record of

14     the incident?

15          Q.     I was just asking if that refreshed your

16     memory?

17          A.     Well, no, I don't recall seeing him.  I

18     remember twisting my ankle.

19          Q.     I'll show you this page from the medical

20     records, does that refresh your memory as to

21     whether you were seen by Dr. Osafo after you

22     twisted your ankle playing basketball?

23          A.     I'm sorry, I can't really read that.

24          Q.     Okay.  You remember twisting your ankle

1    playing basketball, right?

2        A.    I do.

3        Q.    Do you remember if you were seen by a

4    doctor after that incident?

5        A.    I can't recall.

6        Q.    Fair to say if you don't recall, you

7    don't have any objection with how Dr. Osafo

8    treated you on that date if in fact he did?

9        A.    No, I think it's fair to say that I saw

10   him if there's a record of it, I just don't recall

11   it.

12       Q.    You think he probably saw you for your

13   twisted ankle?

14       A.    Yes, sir, it's fair to say that.

15       Q.    Okay.  And you don't have any objection

16   with how he evaluated and treated you on that date

17   for your twisted ankle?

18       A.    I can't say that I don't have any

19   objection at this time, I'm not really familiar

20   with --

21       Q.    Nothing about it in your complaint,

22   right?

23       A.    No, there's nothing in the complaint

24   about it, no, sir.

1          Q.     Nothing in this case dealing with that

2     issue?

3          A.     With my ankle, no, sir, not at this

4     time.

5          Q.     I don't have any additional questions at

6     this time.

7               MR. SMITH:   None.

8     BY MR. WALTER:

9          Q.     We will give the two exhibits to our

10    court reporter, and I need to get a photocopy of

11    this one.   And this concludes the deposition,

12    except for we have to do that part that we talked

13    about earlier, deciding whether or not you want to

14    review the transcript or waive.

15         A.     I do want to review the transcript.

16         Q.     We will make arrangements then to have

17    the transcript here for you to sit and review and

18    you'll be able to go through and make any changes

19    that you have on this form that's called an errata

20    sheet and then you'll need to send that form to

21    the court reporter.

22         A.     Do we have -- is there a --

23         Q.     Or you can send it to me and I'll get it

24    to her, either way.

89

1          A.    Is there like a time frame I'm working

2     with here?

3          Q.    There is a time frame, but because it's

4     going to come to me instead of you, I'm not going

5     to hold you to that time frame, I'm sure that

6     Mr. Smith is not going to either, so we will get

7     it to you.

8               Now, if it sits here for more than 30

9     days -- 30 days I believe is correct from the date

10    that she sends the letter if she were sending it

11    to you directly; for example, if you were

12    purchasing a copy, you'd have 30 days after that

13    to get your errata sheet back.  She's sending it

14    to me, though, and then I've got to get it over

15    here so there's going to be a little bit of time

16    delay, so within 30 days after I notify you that

17    it's here and available for you to review, you

18    need to get in during that time frame, okay?

19         A.    Okay.

20         Q.    And you'll need to set up a time to come

21    in because they may not have a conference room

22    available.

23         A.    So I'm clear, the errata sheet, is that

24    what you called it, is what I have to sign to say

1          that I want to review the transcript?

2              Q.     No, you're saying that now.

3              A.     Okay.

4              Q.     The errata sleet is where you make any

5          changes.

6              A.     Okay.

7              Q.     And, in fact, if I file a motion for

8          summary judgment within the deadline of the 15th,

9          I'll probably just give you a copy of it anyway

10         then and you can make any changes that you have at

11         that time.

12             A.     Alright.

13             Q.     And that will save you from maybe having

14         to come in.   I typically attach a copy of the

15         transcript to the motion for summary judgment and

16         you get a copy at that point anyway.   That

17         concludes the deposition, thank you.

18             A.     Thank you.

19                    (WHEREUPON, the witness was excused.)

20                    (The deposition concluded at 11:50 a.m.)

21

22

23

24

91

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

ANDRE HUNTER, R01100,          )
                               )
            Plaintiff,         )
                               )
vs.                            )    No. 07-3062-HAB-BGC
                               )
DR. BEN AWADA, DR. GRACIELA    )
GRAMMER, DR. SETH OSAFA,       )
DR. WILLARD ELYEA, BARBARA     )
HURT, ROGER WALKER, TERRI      )
ANDERSON, SHERRY BENTON,       )
KAREN HARPER, DONALD HULICK,   )
WEXFORD HEALTH SOURCES,        )
INC., and KEVIN KIRKBRIDE,     )
                               )
            Defendants.        )


        This is to certify that I have read the
transcript of my deposition taken by Mary Pat
Murray, CSR, in the above-entitled cause, and that
the foregoing transcript taken on January 22,
2008, accurately states the questions asked and
the answers given by me, with the exception of the
corrections noted, if any, on the attached errata
sheet(s).




                      _____
                      ANDRE HUNTER


Subscribed and Sworn before
me the        day of
                    , 2007,

                    , Notary Public


Area Wide Reporting
301 West White Street
Champaign, Illinois 61820
(217)356-5119

92

1        STATE OF ILLINOIS    )
                              ) SS
2        COUNTY OF CHAMPAIGN )

3                  I, MARY PAT MURRAY, CSR, doing business
         in the County of Champaign and State of Illinois,
4        do hereby certify that ANDRE HUNTER, the deponent
         herein, was by me first duly sworn to tell the
5        truth, the whole truth and nothing but the truth,
         in the aforementioned cause of action.
6                  That the foregoing deposition was taken
         on behalf of the Defendants at Heyl, Royster,
7        Voelker & Allen, 102 East Main Street, Urbana,
         Illinois on January 22, 2008
8                  That said deposition was taken down in
         stenograph notes and afterwards reduced to
9        typewriting under my instruction; that the
         deposition is a true record of the testimony given
10       by the deponent; and that it was agreed by and
         between the witness and attorneys that said
11       signature on said deposition would not be waived.
                   I do further certify that I am a
12       disinterested person in this cause of action; that
         I am not a relative, or otherwise interested in
13       the event of this action, and am not in the employ
         of the attorneys for either party.

14

15                          _Mary Pat Murray_

16                       _____
                          MARY PAT MURRAY, CSR
17

18

19

20

21

22

23

24

91

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE CENTRAL DISTRICT OF ILLINOIS

ANDRE HUNTER, RO1100,          )
                               )
              Plaintiff,        )
                               )
vs.                            )   No. 07-3062-HAB-BGC
                               )
DR. BEN AWADA, DR. GRACIELA    )
GRAMMER, DR. SETH OSAFA,       )
DR. WILLARD ELYEA, BARBARA     )
HURT, ROGER WALKER, TERRI      )
ANDERSON, SHERRY BENTON,       )
KAREN HARPER, DONALD HULICK,   )
WEXFORD HEALTH SOURCES,        )
INC., and KEVIN KIRKBRIDE,     )
                               )
              Defendants.       )


              This is to certify that I have read the
transcript of my deposition taken by Mary Pat
Murray, CSR, in the above-entitled cause, and that
the foregoing transcript taken on January 22,
2008, accurately states the questions asked and
the answers given by me, with the exception of the
corrections noted, if any, on the attached errata
sheet(s).




                              _____
                              ANDRE HUNTER


Subscribed and Sworn before
me the          day of
                    , 2007,

                    , Notary Public


Area Wide Reporting
301 West White Street
Champaign, Illinois 61820
(217)356-5119.

ERRATA SHEET

Following are the changes I wish to make to my testimony:


PAGE    LINE

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____

_____    _____ CHANGE_____

_____    _____ REASON_____



**Illinois**
Department of
**Corrections**

Rod R. Blagojevich
*Governor*

Roger E. Walker Jr.
*Director*

District 2 Deputy Director / Sheridan Correctional Center / 4017 E. 2603 Road / Sheridan, IL 60551 / Telephone: (815) 496-2181 / TDD: (800) 526-0844

March 15, 2006

Andre Hunter, R01100
Illinois River Correctional Center
P.O. Box 1900
Canton, IL  61520

Dear Mr. Hunter:

Your March 6, 2006 letter concerning dental care at Illinois River Correctional Center has been reviewed.

The Illinois Department of Corrections does not approve placement of a "permanent prosthesis". Dental crowns fall into this category. The Department provides only for removal dental prosthetics as determined clinically necessary by the dentist. Therefore, your only recourse is to have the tooth extracted.

Your grievance was deemed not of an emergency nature per Warden Hulick on January 9, 2006 and it would seem the handling of your grievance was in accordance with established guidelines being within the 60 day period.

I trust this addresses your concerns.

Sincerely,

Barbara A. Hurt, Deputy Director
District #2

cc:    Warden Hulick, Illinois River CC
       Masterfile – R01100
       File

EXHIBIT

*Hunter #7*

ILLINOIS DEPARTMENT OF CORRECTIONS

**Medical Services Refusal**

IL RIVER CORRECTIONAL   Center

☐ **Employee**

☑ **Offender**

Date: 11 / 28 / 05
Time: 10:00   ☐ a.m.  ☑ p.m.

Patient Information:

Hunter   Andre   ID#: R01100
Last Name        First Name      MI

☑ **Refusal of Services**

I refuse to authorize the performance upon myself or _____
                                                    Name of Patient

of the following treatment   Ex# 19
                             State nature and extent of treatment.

☐ **Discharge Demand**

I further demand DISCHARGE of myself or _____
                                        Name of Patient

from _____, against the advise of Dr. _____
      Name of Medical Facility                              Name of Doctor

Dr. AWADA _____ has explained the risks to me, possible complications and probable
    Name of Doctor

consequences of refusing treatment or demanding discharge from this medical facility or both.

I hereby release the Attending Physician, the   IRCC _____, the Facility, and
                                                Name of Medical Facility

the Department of Corrections from all liability for damages or any injuries including to my health caused by or arising out of this

refusal whether foreseen or unforeseen.

I certify that I have read and fully understand the above REFUSAL OF TREATMENT OR DISCHARGE DEMAND FROM

MEDICAL FACILITIES RELEASE OR BOTH, that the explanations therein referred to were made, and that all blanks or statements

requiring insertion or completion were filled in and inapplicable paragraphs, if any, were stricken before I signed.

ANDRÉ HUNTER        Andre Hit        11, 28, 05
Print Name of Patient    Signature of Patient    Date

When patient is a Minor or Incompetent to give consent:

DEFENDANT'S
EXHIBIT
ALL-STATE LEGAL®
GRAMMAR
B

DEFENDANT'S
EXHIBIT
ALL-STATE LEGAL®
AWADA
B

_____        _____        _____
Print Name of Person Authorized to Consent    Signature of Person Authorized to consent    Date

X Harold R        X Har R        11 28 05
Print Name of Witness    Signature of Witness    Date

**EXHIBIT**

Distribution:   Patient's Medical Record or File

DOC 0083 (Eff. 9/2002)
(Replaces DC 7128-A)

Printed on Recycled Paper

Hunter 9