**E-FILED**
Friday, 08 February, 2008  03:46:22 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| ANDRE HUNTER, R-01100, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.    07-3062 |
| | ) | |
| DR. BEN AWADA, DR. GRACIELA | ) | |
| GRAMMAR, DR. SETH OSAFA, DR. | ) | |
| WILLARD ELYEA, BARBARA HURT, | ) | |
| ROGER WALKER, TERRI ANDERSON, | ) | |
| SHERRY BENTON, KAREN HARPER, | ) | |
| DONALD HULICK, WEXFORD | ) | |
| HEALTH SOURCES INC., and | ) | |
| KEVIN KIRKBRIDE | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, DR. WILLARD ELYEA, ROGER WALKER, TERRI

ANDERSON, SHERRY BENTON, DONALD HULICK, BARBARA HURT, and KEVIN

KIRKBRIDE, by and through their attorney, Lisa Madigan, Attorney General of the State

of Illinois, and hereby submit their Memorandum of Law in Support of their Motion for

Summary Judgment and state as follows:

**INTRODUCTION**

Plaintiff is currently on mandatory supervised release.  Plaintiff filed this lawsuit

pursuant to 42 U.S.C. §1983 alleging that the Defendants violated his Eighth Amendment

rights by denying Plaintiff adequate medical care while incarcerated at Illinois River

1

Correctional Center.  Specifically, Plaintiff claims that Defendants failed to provide dental care by providing him with a crown for his tooth rather than extraction.

## MATERIAL FACTS CLAIMED TO BE UNDISPUTED

1.    Plaintiff, Andre Hunter, is a resident of the State of Illinois and at all relevant times Plaintiff, Andre Hunter, was an inmate incarcerated within the Illinois Department of Corrections.  Specifically, Plaintiff was incarcerated from 2000-2007.  (Plaintiff's Complaint, p. 1, ¶ 3).

2.    Plaintiff's Complaint has to do with his request for a crown for his number 19 tooth and the denial to provide Plaintiff with his desired course of treatment.  (Defendants' Exhibit A, Hunter Deposition, 76:16-77:1).

3.    Plaintiff did not give consent to have his #19 tooth extracted on November 28, 2005, after extraction was the recommended course of treatment. (Defendants' Exhibit A, Hunter Deposition, 80:5-9).

4.    Plaintiff opted for fillings on his #19 tooth rather than proceed with an extraction.  (Plaintiff's Complaint, pp. 3-5).

5.    The release Plaintiff signed on November 28, 2005, states "Dr. Awada has explained the risks to me, possible complications and probably consequences of refusing treatment or demanding discharge from this medical facility or both.  I hereby release the Attending Physician, the IRCC, the Facility, and the Department of Corrections from all liability for damages or any injuries including to my health caused by or arising out of this refusal whether foreseen or unforeseen."  (Defendants' Exhibit A, Hunter Deposition, Exhibit 2).

2

6.      Plaintiff was seen by the dentist on numerous occasions in regards to his #19 tooth.  (Defendants' Exhibit A, Hunter Deposition, 70:17-24).

7.      Defendant Hulick was Warden of Illinois River Correctional Center from December 1, 2003 through February 11, 2005.  (Defendants' Exhibit B, Hulick Affidavit, ¶ 1).

8.      As Warden, Defendant Hulick's duties included, in part, determining if a grievance should be handled on an emergency basis.  In addition, after the Grievance Officer responds to the grievance it is Defendant Hulick's responsibility to give a response. However, due to the pressing issues of being a Warden, this responsibility can be delegated.  (Defendants' Exhibit B, Hulick Affidavit ¶ 2).

9.      On or about January 3, 2006, Plaintiff wrote a grievance regarding his claim that he needed to have a crown for his #19 tooth and that he has not received adequate medical treatment.  In that grievance, Plaintiff claimed that his tooth was extremely thin and cracked.  (Plaintiff's Complaint, Exhibit C; Defendants' Exhibit B, Hulick Affidavit ¶ 3).

10.     Defendant Hulick deemed the grievance not an emergency on January 9, 2006.  Defendant Hulick recommended that the grievance be submitted in the normal manner.  (Plaintiff's Complaint, Exhibit C; Defendants' Exhibit B, Hulick Affidavit ¶ 3).

11.     On March 7, 2006, Kevin Kirkbride, Grievance Officer, responded to Plaintiff's grievance.  In his response, Defendant Kirkbride contacted Dr. Ben Awada.  Dr. Awada stated that "The Offender has been seen several times to restore his fillings due to fractures.  The offender was advised that a crown was needed but couls [sic] not be done in the Department of Corrections per A.D. 04.03.102, 8b.  The offender has also been seen several times for abscesses around the tooth due to lack of good contact (large filling) and

3

furcation problems (gum problems) which promoted the recommendation of extraction. The offender refused the tooth removal. The only treatment remains the extraction of the tooth since DOC will not allow a crown per A.D.". (Defendants' Exhibit C, Kirkbride Affidavit ¶ 5, Attachment).

12.    On March 8, 2006, Warden Hulick's designee concurred with the decision. (Defendants' Exhibit B, Hulick Affidavit, ¶ 4).

13.    On April 3, 2006, Sherry Benton, Administrative Review Board Chairperson, responded to Plaintiff's grievance appeal. Defendant Benton reviewed the grievance response and determined that appropriate medical personnel was contacted concerning the grievance. Based on the medical opinion, Defendant Benton denied Plaintiff's appeal and Roger Walker through his designee Terri Anderson concurred. (Defendants' Exhibit D, Benton Affidavit, ¶ 7).

14.    Plaintiff also submitted a letter on March 6, 2006, to Deputy Director Barbara Hurt concerning his dental care. Defendant Hurt responded to his letter on March 15, 2006 explaining that the Department of Corrections does not approve placement of a crown. Defendant Hurt informed the Plaintiff that extraction may be his only recourse. (Defendants' Exhibit A, Hunter Deposition, Exhibit 1).

15.    Plaintiff wrote Dr. Elyea concerning his dental care. Defendant Elyea responded to the Plaintiff informing him that he had reviewed his records with a dental consultant and that his treatment was within the reasonable and acceptable standards. Furthermore, Dr. Elyea stated in his letter that "[the Plaintiff's] anatomical findings preclude any treatment other than extraction." (Plaintiff's Complaint, Exhibit F; Defendant Elyea's Responses to Interrogatories).

4

16.     Because Defendants Hulick, Kirkbride, Hurt, Benton, Walker, and Anderson are not physicians, final medical judgment is always with the designated physician. Defendants Hulick, Kirkbride, Hurt, Benton, Walker, and Anderson do not have medical training or a medical education. (Defendants' Exhibit B, Hulick Affidavit, ¶ 5; Defendants' Exhibit C, Kirkbride Affidavit ¶ 6; Defendants' Exhibit D, Benton Affidavit, ¶ 8).

17.     Defendants Hulick, Kirkbride, Hurt, Benton, Walker, and Anderson cannot make medical decisions for an inmate nor can Defendants Hulick, Kirkbride, Hurt, Benton, Walker, and Anderson change the course of treatment that an inmate is receiving as prescribed by the doctor or dentist. Defendants can only have someone review the medical records or contact someone in health care and determine if Plaintiff has access to the health care and that his medical issues have been addressed. (Defendants' Exhibit B, Hulick Affidavit, ¶ 5; Defendants' Exhibit C, Kirkbride Affidavit ¶ 6; Defendants' Exhibit D, Benton Affidavit, ¶ 8).

18.     Plaintiff has named Defendants Kirkbride, Hulick, Benton, Walker, and Anderson in this suit because they denied his grievance or did not deem the grievance an emergency. (Defendants' Exhibit A, Hunter Deposition, 75:19-76:10).

19.     Plaintiff entered the Illinois Department of Corrections about two years after he underwent a root canal surgery. (Defendants' Exhibit A, Hunter Deposition, 68:8-10).

## APPLICABLE LAW AND ARGUMENT

### I.     STANDARD FOR SUMMARY JUDGMENT

Summary Judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of

5

material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the suit, under the

governing law, will properly preclude the entry of summary judgment.  Anderson v. Liberty

Lobby, 477 U.S. 242, 248 (1986).  In making this determination, the Court is to draw

inferences from the record in the light most favorable to the non-moving party.  The Court

is not required, however, to draw every conceivable inference; rather, it may draw only

those that are reasonable.  DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326,

333 (7th Cir. 1986).

The Seventh Circuit clarified the standard further in Collins v. Associated

Pathologists, Ltd., 844 F.2d 473 (7th Cir. 1988), cert. denied, 488 U.S. 852 (1988):

> The existence of a triable issue is no longer
> sufficient to survive a motion for summary
> judgment . . . the test for summary judgment is
> whether sufficient evidence exists in the pre-trial
> record to allow the non-moving party to survive
> a motion for directed verdict.  Id. at 476.

The United States Supreme Court in Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

established that a party moving for summary judgment can prevail just by showing that the

other party has no evidence on an issue which the party has the burden of proof.  Brazinski

v. Amoco Petroleum Additives Co., 6 F.3d 1176, 1183 (7th Cir. 1993).  Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party,

there is no "genuine" issue for trial.  Mechnig v. Sears Roebuck & Co., 864 F.2d 1359 (7th

Cir. 1988).  The plaintiff must come forward with evidence that would reasonably permit the

finder of fact to find in plaintiff's favor on a material question; otherwise, the Court must

enter summary judgment against the plaintiff.  Waldridge v. American Hoechst Corp., 24

6

F.3d 918, 920 (7th Cir. 1994); International Union of Operating Engineers v. Associated

General Contractors, 845 F.2d 704, 708 (7th Cir. 1988).

## II.    DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL NEEDS.

Deliberate indifference to a serious medical need of an inmate violates that inmate's

Eighth Amendment rights when it amounts to unnecessary and wanton infliction of pain.

Estelle v. Gamble, 97 S.Ct. 285, 291, 429 U.S. 97, 104 (1976).  To be deliberately

indifferent, a state official must know of and disregard an excessive risk to an inmate's

health or safety.  Farmer v. Brennan, 114 S.Ct. 1970, 1979, 511 U.S. 825, 837 (1994).

This indifference can be manifested by medical staff failing to provide medical care, or by

other correctional staff interfering with such care.    Estelle at S.Ct. 291, U.S. 104.

Allegations that a physician has been negligent in diagnosing or treating an inmate do not

constitute an Eighth Amendment violation.    Id. at S.Ct. 292 and U.S. 106.    Further,

defendants in a suit brought pursuant to 42 U.S.C. 1983 can only be held liable for their

own individual wrongdoing.  Duckworth v. Franzen, 780 F.2d 645, 650 (7th Cir. 1985).  An

individual satisfies this personal responsibility requirement if he fails to act with a deliberate

or reckless disregard of the plaintiff's constitutional rights, or if the conduct causing the

constitutional deprivation occurs at his direction or with his knowledge and consent.

Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982).

The Eighth Amendment does not provide that an inmate is entitled to demand

specific care, nor does it entitle him to the best care that is available.  Forbes v. Edgar, 112

F.3d 262, 267 (7th Cir. 1997).  In addition, inmates do not have a right to any particular type

of treatment.  Meriwhether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987).  Prisoner's

7

dissatisfaction with doctor's prescribed course of treatment does not give rise to constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate prisoner's condition. <u>Snipes v. Detella</u>, 95 F.3d 586, 590.

Plaintiff has failed to allege that the defendants were deliberately indifferent to Plaintiff's health.  It is not a constitutional violation by the defendants that Plaintiff did not like the dental care he received or the policy of the Department of Corrections to not do crown work.  Further, Plaintiff was offered extractions or in the alternative, fillings for his #19 tooth.  (Undisputed Fact Nos. 3, 4).  However, Plaintiff refused extractions for several months opting for fillings before he finally chose extraction.  (Undisputed Fact Nos 3, 4). Defendants had no authority, much less a constitutional duty, to order medical professionals to give Plaintiff a crown for his #19 tooth, and their failure to do so does not give rise to a constitutional violation.

Defendant Kirkbride followed his duties by investigating Plaintiff's complaints in his grievance and responding to him with a response from the resident dentist.  (Undisputed Fact No. 11).  Thus, he satisfied his constitutional duty to Plaintiff.  Accordingly, Defendant Kirkbride is entitled to summary judgment on Plaintiff's claim of deliberate indifference to his medical needs.

Defendants Benton and Anderson received Plaintiff's appeal to his grievance. (Undisputed Fact No. 13).  They reviewed the material, and they found that Plaintiff's grievance was correctly handled at the institution level.  Defendant Anderson acted as Defendant Walker's designee.  Accordingly, Defendants Benton, Anderson, and Walker

are entitled to summary judgment on Plaintiff's claim of deliberate indifference to his medical needs.

Plaintiff wrote a grievance on or about January 3, 2006 regarding his #19 tooth and his desire to get a crown as treatment. (Undisputed Fact No. 9). Defendant Hulick responded on January 9, 2006, and deemed Plaintiff's grievance as not an emergency and that the Plaintiff should proceed in the normal procedure. (Undisputed Fact No. 10). Plaintiff followed the procedure set forth by the Department of Corrections. On March 7, 2006, Defendant Kirkbride responded to Plaintiff's grievance. (Undisputed Fact No. 11). Defendant Kirkbride contacted the appropriate medical personnel, and he provided their response to the Plaintiff. (Undisputed Fact No. 11). After Plaintiff's grievance was denied, Plaintiff appealed the decision to the Administrative Review Board. The Administrative Review Board upheld the institution's decision. (Undisputed Fact No. 13).

Plaintiff also wrote letters Deputy Director Hurt and Dr. Elyea in an effort to obtain a crown for his #19 tooth. Defendant Hurt responded to Plaintiff's letter on March 15, 2006. In her letter, Defendant Hurt explained to Plaintiff that the Illinois Department of Corrections does not provide crowns. (Undisputed Fact No. 14). Plaintiff also wrote a letter to Dr. Elyea concerning his dental care. Dr. Elyea responded to Plaintiff's letter after reviewing his dental record with both the health care administrator and a dental consultant. (Undisputed Fact No. 15). Dr. Elyea determined with the dental consultant that Plaintiff had been seen several times by the dentist at Illinois River Correctional Center, and that extraction was the treatment of choice. (Undisputed Fact No. 15).

Defendants Hulick, Kirkbride, Hurt, Benton, Walker, Elyea, and Anderson do not have any training or background in the dental field. (Undisputed Fact Nos. 15, 16).

9

Defendants Hulick, Kirkbride, Hurt, Benton, Walker, Elyea, and Anderson cannot make decisions concerning dental care for the Plaintiff nor can Defendants Hulick, Kirkbride, Hurt, Benton, Walker, Elyea, and Anderson  change the course of dental treatment for Plaintiff.  (Undisputed Fact Nos. 15, 17).  Defendants Hulick, Kirkbride, Hurt, Benton, Walker, Elyea, and Anderson are not qualified to assess the dental condition of Plaintiff, nor are they qualified to treat the Plaintiff in terms of his dental treatment.  Defendants Hulick, Kirkbride, Hurt, Benton, Walker, Elyea, and Anderson relied on the fact that the dentists were treating Plaintiff.  Police officers with no training, beyond CPR and first aid, have been found to have acted reasonably in not questioning a licensed physician's determinations that treatment was necessary.  Allen v. Rockford, 349 F.3d 1015, 1020, (7th Cir. 2003) citing Cf. Brownell v. Figel, 950 F.2d 1285, 1291 (7th Cir. 1991) ("explaining that it would be unrealistic to expect police officers to second-guess a physician's medical diagnosis.").  Similarly, with the case at hand, Defendants chose not to question the treatment and diagnosis of the dentists who determined the course of treatment Plaintiff was to receive.  Therefore, Defendants Hulick, Kirkbride, Hurt, Benton, Walker, Elyea, and Anderson are entitled to summary judgment regarding the Eighth Amendment claim.

## III.   PLAINTIFF DOES NOT HAVE A RIGHT TO CHOOSE THE COURSE OF TREATMENT

The Eighth Amendment does not provide that an inmate is entitled to demand specific care, nor does it entitle him to the best care that is available.  Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997).  In addition, inmates do not have a right to any particular type of treatment.  Meriwhether v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987).  A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to

10

constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate prisoner's condition. <u>Snipes v. Detella</u>, 95 F.3d 586, 590. Plaintiff claims that he was not receiving adequate dental care for his #19 tooth.

Plaintiff's Complaint has to do with a request for a crown or "permanent prosthesis." (Undisputed Fact No. 2). Plaintiff entered IDOC two years after he received a root canal surgery. (Undisputed Fact No. 19). While Plaintiff was housed at Illinois River Correctional Center, he began having problems with his #19 tooth. (Undisputed Fact No. 3). Plaintiff was seen several times concerning his #19 tooth. (Undisputed Fact No. 6). Plaintiff refused the dentist's November 28, 2005 prescribed treatment of extraction opting instead to have his tooth filled. (Undisputed Fact Nos. 3, 4). Plaintiff admits that he wanted a crown and refused to have his tooth extracted. In addition, Plaintiff admitted that he received treatment for his #19 tooth. Plaintiff was receiving adequate treatment, but it appears that Plaintiff did not like the course of treatment that he received. Since Plaintiff is not entitled to a certain course of treatment his claims should be dismissed.

Further, Plaintiff's claim for damages against Defendants results from their adherence to the IDOC policy of not performing crown work for inmates. By suing Defendants for their adherence to an IDOC policy, Plaintiff is suing these Defendants in their official capacity, because his suit is really against IDOC. The state, state agencies, and state officials acting in their official capacities are not "persons" who may be sued for damages under §1983. <u>Omosegbon v. Wells</u>, 335 F.3d 668, 672-73 (7th Cir. 2003). This is because the Eleventh Amendment bars suits for money damages against a state, its officials acting in their official capacities, and its agencies. <u>Wynn v. Southward</u>, 251 F.3d

588, 592 (7ᵗʰ Cir. 2001).  Accordingly, Plaintiff's claim against Defendants is barred by sovereign immunity.

## IV.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Defendants are entitled to qualified immunity due to being sued in their individual capacities.  In order to defeat a claim of qualified immunity, a plaintiff must prove the defendant(s) violated a constitutional right clearly established at the time of the alleged misconduct.  McGrath v. Gillis, 44 F.3d 567, 670 (7th Cir. 1995).  Plaintiff has the burden of establishing the existence of a clearly established constitutional right.  Id. at 570 (citing Rakovich v. Wade, 850 F.2d 1180, 1209 (7ᵗʰ Cir. 1988)).  Clearly established rights must be proven through closely analogous cases.  Id. at 570.  Therefore, through qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

Plaintiff failed to show that Defendants had any notice of a clearly established constitutional right which they allegedly violated.  At all times relevant herein, Defendants acted in good faith in the performance of their official duties and without violating Plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known.  In this case, Plaintiff had extensive access to dental care and medical care for his #19 tooth.  Plaintiff's dissatisfaction with the medical and dental care he received does not lead to the legal conclusion that Defendants were deliberately indifferent to his medical needs to the point of a constitutional violation.  Furthermore, Defendants were entitled to rely upon the medical expertise of the Plaintiff's dentist and treating physicians.

12

Thus, Defendants are not in violation of Plaintiff's constitutional right against cruel and unusual punishment. Defendants know of no other case law that would have put them on notice that their alleged conduct in providing Plaintiff access to medical and dental care would have violated Plaintiff's constitutional rights. Furthermore, the existing law with respect to Plaintiff's medical claims states that a prison official is not deliberately indifferent to an inmate's serious medical needs if he or she provides a doctor and does not interfere with the doctor's care or fail to follow the doctor's orders. The law further states a prison official may rely on the diagnosis of a doctor in determining if a serious medical need exists and what action needs to be taken to treat the need. As such, Defendants are entitled to qualified immunity.

WHEREFORE, for the above and foregoing reasons, Defendants respectfully pray that this Honorable Court enter summary judgment in their favor and provide such further relief as this Court deems necessary and proper.

Respectfully submitted,

WILLARD ELYEA, ROGER WALKER, TERRI ANDERSON, SHERRY BENTON, DONALD HULICK, BARBARA HURT, and KEVIN KIRKBRIDE,

Defendants,

LISA MADIGAN, Attorney General of the State of Illinois,

Attorney for Defendants,

BY: s/ Jacob H. Smith
Jacob H. Smith, #6290790
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
Telephone: (217) 782-9014
Facsimile:  (217) 524-5091
E-Mail: jsmith@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2008, I electronically filed Defendants' Memorandum of Law in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

David M. Walter
dwalter@hrva.com

Theresa Powell
tpowell@hrva.com

and I hereby certify that on February 8, 2008, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

Andre Hunter
c/o Cynthia Exum
2125 B Melrose Drive
Champaign, Illinois 61821

Respectfully Submitted,
 s/ Jacob H. Smith
Jacob H. Smith, #6290790
Assistant Attorney General
Attorney for the Defendants
500 South Second Street
Springfield, Illinois  62706
Phone:  (217) 782-9014
Fax:      (217) 524-5091
E-Mail:  jsmith@atg.state.il.us

**E-FILED**
Friday, 08 February, 2008  03:47:27 PM
Clerk, U.S. District Court, ILCD

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
 2
        ANDRE HUNTER, RO1100,        )
 3                                   )
                   Plaintiff,        )
 4                                   )
        vs.                          )   No. 07-3062-HAB-BGC
 5                                   )
        DR. BEN AWADA, DR. GRACIELA  )
 6      GRAMMER, DR. SETH OSAFA,     )
        DR. WILLARD ELYEA, BARBARA   )
 7      HURT, ROGER WALKER, TERRI    )
        ANDERSON, SHERRY BENTON,     )
 8      KAREN HARPER, DONALD HULICK, )
        WEXFORD HEALTH SOURCES,      )
 9      INC., and KEVIN KIRKBRIDE,   )
                                     )
10                 Defendants.       )

11                      DEPOSITION

12           The deposition of ANDRE HUNTER, a citizen of
        the State of Illinois, a witness of lawful age;
13      produced, sworn and examined upon his corporeal
        oath, on January 22, 2008, at Heyl, Royster,
14      Voelker & Allen, 102 East Main Street, Urbana,
        Illinois, before Mary Pat Murray, Certified
15      Shorthand Reporter, CSR License No. 084-002063, as
        a witness in a certain suit and matter now pending
16      and undetermined in the United States District
        Court for the Central District of Illinois.

17
             APPEARANCES:
18
                 HEYL, ROYSTER, VOELKER & ALLEN
19               National City Center, Suite 575
                 1 N. Old Capitol Plaza
20               Springfield, Illinois 62705
                 BY:  Mr. David M. Walter
21               Appearing for the Defendants
                  Ben Awada, D.D.S., Graciela
22                Grammer, D.D.S., Seth Osafo, M.D.,
                  Karen Harper, and Wexford Health
23                Sources, Inc.

24
```

COPY



**EXHIBIT**

A

2

```
 1          APPEARANCES CONTINUED:

 2               LISA MADIGAN
                 ILLINOIS ATTORNEY GENERAL
 3               500 South Second Street
                 Springfield, Illinois 62706
 4               BY:  Mr. Jacob Smith
                 Assistant Attorney General
 5               Appearing for the Defendants
                  Willard Elyea, M.D. Barbara Hurt,
 6                Roger Walker, Terri Anderson,
                  Sherry Benton, Donald Hulick
 7                and Kevin Kirkbride


 8          *******************************

 9                    I N D E X

10

11   ANDRE HUNTER                          PAGE

12   Examination by MR. WALTER...................   3
     Examination by MR. SMITH....................  64
13   Further Examination by MR. WALTER...........  78

14               E X H I B I T S

15                                        PAGE

16   Hunter Exhibit No. 1........................  74
     Hunter Exhibit No. 2........................  80
17

18

19

20

21

22

23

24
```

3

1                    (Commencing at 10:15 a.m.)

2                              ANDRE HUNTER,

3          the deponent herein, called as a witness, after

4          having been first duly sworn, was examined and

5          testified as follows:

6                              EXAMINATION

7          BY MR. WALTER:

8               Q.    Would you please state your name for the

9          record?

10              A.    Andre Hunter.

11              Q.    Would you spell your first name, please?

12              A.    A-N-D-R-E.

13              Q.    And spell your last name.

14              A.    H-U-N-T-E-R.

15              Q.    Have you ever been deposed before,

16         Mr. Hunter?

17              A.    I have not.

18              Q.    Since you've never been deposed before,

19         I'm going to go through with you a little bit of

20         information about the process so you kind of

21         understand some of the ground rules that will make

22         the court reporter's job easier and make the

23         transcript easier to read.

24                    First of all, you understand that your

4

1    testimony's important today and it could have the
2    same force and effect as if we were at a trial
3    with a judge and jury present?
4         A.    I understand it's important.
5         Q.    You understand it's important to answer
6    truthfully and accurately today?
7         A.    I understand that.
8         Q.    We'll ask that you answer verbally and
9    avoid gestures such as nodding your head or
10   shaking your head because that's difficult for the
11   court reporter to take down, okay?
12        A.    I'll try to remember that.
13        Q.    Also, if you would, please answer with
14   words and avoid phrases such as uh-huh or huh-uh
15   because sometimes it's difficult to interpret that
16   so, if you would, just use words whenever you
17   answer, okay?
18        A.    I'll try my best.
19        Q.    If I ask you a question and you don't
20   understand, and sometimes I ask questions that
21   just don't come out right, don't make any sense,
22   so if I ask a question you don't understand, ask
23   me to clarify, okay?
24        A.    Yes.

5

1          Q.    And you're a little bit soft spoken so,

2     if you would, speak up just a little bit so that

3     the court reporter can hear you.

4          A.    Yes, sir.

5          Q.    One other thing, I don't think it will

6     be a problem with you, but she is taking down all

7     of your testimony, if we're both talking at the

8     same time it's difficult for her to take down the

9     testimony, so if you would wait until I finish the

10    question and then answer and I, likewise, will try

11    to wait until you've finished answering before I

12    start in on my next question so we're not both

13    talking at the same time, okay?

14         A.    Yes, sir.

15         Q.    At the end of the deposition process

16    you'll have an opportunity to review the

17    transcript and make any changes or corrections

18    that you'd like.  Now, you can't change your

19    testimony, you know, you can't say one thing today

20    and then when you change it, change your testimony

21    to something completely different.  But what

22    you're looking for is any errors.  If you use a

23    doctor's name, for example, and it gets taken down

24    wrong, spelled wrong, those kinds of things, you

6

1      can make those sorts of changes.  So at the end of

2      the deposition we'll give you an opportunity to

3      decide whether or not you want to reserve

4      signature, which means that you want to look

5      through the transcript, or if you want to waive

6      signature, which just means that you trust the

7      court reporter to take it down correctly, but it

8      is important because you can't change your

9      testimony that you testify truthfully and

10     accurately today, okay?

11          A.    One question, you said at the end of the

12     deposition if I reserve signature, that means I

13     want to go over the transcript?

14          Q.    Uh-huh.

15          A.    And that would happen immediately after

16     the deposition or would I have to wait to get one

17     in the mail?

18          Q.    Actually the way it would work, she's

19     got to take this back and then she'll prepare a

20     typewritten transcript based on the shorthand that

21     she's taking down today.  It will probably be a

22     couple weeks before the transcript is ready.  When

23     the transcript is ready, we can make it available

24     to you here for you to sit and review it if you

1      want to review it, but you won't get a free copy,

2      you can purchase a copy from the court reporter,

3      just like Mr. Smith and I will have to purchase a

4      copy from the court reporter, but in light of your

5      financial situation we'll make arrangements for

6      you to be able to sit and look through it and fill

7      out the errata sheet if you so desire.

8          A.    What would be the cost of the

9      transcript, depending on the number of pages?

10         Q.    Yeah, exactly, it's based on the number

11     of pages.  They're usual $150 and more, I mean,

12     they can go 600-plus dollars.  I don't know how

13     long this one's going to take, so I can't tell you

14     how much it's going to cost, okay?

15         A.    Alright, I understand.

16         Q.    Now, is there anything that would

17     prevent you from testifying truthfully and

18     accurately today, such as a loved one's recently

19     died, that you're taking psychotropic medications,

20     that you're ill, anything along those lines that

21     would prevent you from testifying truthfully and

22     accurately today?

23         A.    I haven't had any close family members

24     die recently.  I'm a little ill, I'm a little

8

1    sick, but I don't believe it would affect my

2    testimony.

3        Q.    Okay.   Just feeling a little under the

4    weather today?

5        A.    I am, yeah.

6        Q.    Okay.   But you think you can testify

7    truthfully and accurately today?

8        A.    Yeah, I don't think that me being ill

9    would force me to, you know, lie.

10       Q.    And you can remember the events that

11   occurred that you've alleged in your complaint?

12       A.    It happened sometime ago, but to the

13   best of my knowledge.   That's why I was asking

14   about the documents, I should have asked about

15   bringing in the complaint so I didn't cite that,

16   but I'm sure you have copies.

17       Q.    Yeah, I've got a copy of your complaint

18   so if you need to refer to that to refresh your

19   memory, that would be fine.   I've also got a copy

20   of the medical records that you can look at if you

21   need to refresh your memory.

22       A.    Yeah, well, I may need to do that but,

23   you know, I do believe that those facts are true,

24   everything I stated in the complaint.

1          Q.    So you don't believe you'll have any

2    trouble testifying truthfully and accurately

3    today?

4          A.    I don't believe so.

5          Q.    Okay.  If at any time because you're not

6    feeling well you start to feel like you can't

7    continue, please let us know, okay?

8          A.    I will.

9          Q.    If you need to take a break, feel free

10   to ask to take a break.

11         A.    I will.

12         Q.    We've got restrooms here in the

13   building, there's coffee and water here today,

14   okay?

15         A.    Yes, sir.

16         Q.    Now, I represent Dr. Awada, Dr. Osafo,

17   Dr. Grammer, Karen Harper, and Wexford Health

18   Services, Incorporated, and you filed a complaint

19   in the federal court against those individuals, as

20   well as some individuals who are represented by

21   Mr. Smith, correct?

22         A.    Yes, sir.

23         Q.    Your complaint is relatively detailed,

24   correct?

10

1      A.    Yes, sir.

2      Q.    And you filed that back in October of

3  2006 it looks like, is that right -- I'm sorry, is

4  that when you sent it to the court?

5      A.    I can't remember the exact date that I

6  filed.

7      Q.    Well, take a look at it.

8              (Document tendered.)

9      A.    I thought it was around April.

10     Q.    Well, April is the date that's stamped

11 on the top with the court, right?

12     A.    Right.

13     Q.    April of 2007?

14     A.    Correct.

15     Q.    What date did you write this complaint

16 though?

17     A.    It wasn't one day, it took me months.

18     Q.    Do you have a date at the end of the

19 complaint?

20     A.    I think that was -- I must have finished

21 it around October I think.  I believe, let me see.

22     Q.    Yeah, look and see.

23     A.    October 30th.

24     Q.    So you would have actually finished

1    drafting this on October 30th, 2006?

2        A.    Yes, sir.

3        Q.    And then you didn't file it for several

4    months until April of 2007; is that right?

5        A.    Yes, sir.

6        Q.    Why did you wait to file it, do you

7    know?

8        A.    I'm not a -- I was trying to make myself

9    familiar with the civil procedure as far as the

10   steps in filing and things I would have to do

11   after filing and things like that, and when I

12   finished the complaint I didn't feel like I was

13   verse enough with civil procedure to file at that

14   time.

15       Q.    So you did some research?

16       A.    I knew upon filing there's a certain

17   time -- there's a time frame you're working with,

18   so I wanted to be prepared before I filed it.

19       Q.    Okay.  Now, this complaint is

20   typewritten, correct?

21       A.    Yes, sir.

22       Q.    Did you type that yourself?

23       A.    Yes, sir.

24       Q.    Did you have anyone help you when you

1    prepared this?

2         A.    You mean help type?

3         Q.    No, just help you in terms of how to put

4    it together.

5         A.    Well, I had -- there are -- in the

6    prison law library, there are -- I don't know what

7    you'd call them.  They call them clerks.

8         Q.    Okay.

9         A.    And their job is to help people, to

10   assist them when they, you know, file proceedings

11   with the court.  But most of the help I got was

12   like direction as to what book to find and I

13   purchased some books about how to write these.

14        Q.    What books did you purchase?

15        A.    The names of the books, I don't want to

16   lie, I can't think of the names offhand.

17        Q.    Can you tell me what they were about, I

18   mean, try to give me some description of the

19   books?

20        A.    Tell the prisoners what their civil

21   right are and helping a prisoner to figure out if

22   his civil rights have been violated and to, you

23   know, make him clear so that's he's not, you know,

24   just filing a -- what do you call it? -- frivolous

13

1    lawsuit, to make sure that, you know, his rights

2    really have been violated and to give him like

3    a -- like direction as to procedure, you know, how

4    you file and those types of things.

5        Q.    Now, I notice you have here with you

6    today a copy of the Federal Rules of Civil

7    Procedure 2006-2007 edition it looks like; is that

8    right?

9        A.    Yes, sir, it's an educational file.

10        Q.    Okay.  Did you have that one when you

11    were in prison?

12        A.    No, sir.

13        Q.    Okay.  Is that your copy or did you get

14    it from the school?

15        A.    I actually borrowed it from someone.

16        Q.    Okay.  And you would not have had that

17    then when you were preparing your complaint in

18    this case?

19        A.    No, sir.

20        Q.    Did you have a copy of the Federal Rules

21    of Civil Procedure?

22        A.    No, sir.

23        Q.    Did you have access to one in the

24    library?

14

1        A.    I don't believe I did, but I can't

2    recall, I don't remember.

3        Q.    You mentioned earlier that you waited to

4    file your complaint as you familiarized yourself

5    with the Federal Rules of Civil Procedure, do you

6    recall that?

7        A.    (Witness nodded.)

8        Q.    You've got to answer out loud.

9        A.    Yes, I'm sorry, yes.

10        Q.    How did you do that, how did you go

11    about familiarizing yourself with the rules?

12        A.    Well, they have -- there's documents and

13    they have like versions that aren't really like

14    the complete Federal Rules of Procedure, but they

15    have like excerpts, and I found as many documents

16    as I could find with those and looked at, you

17    know, how I felt they were stated to get an

18    understanding.

19        Q.    So you would go to the law library and

20    you would consult with the law clerks, they'd tell

21    you different books that you might want to look

22    at?

23        A.    Yes, sir.

24        Q.    You'd go look at those books then?

15

1       A.    Yes, sir.

2       Q.    And then based on that you drafted a

3  complaint?

4       A.    Yes, sir.

5       Q.    And then you filed it in federal court?

6       A.    Yes, sir.

7       Q.    Now, you have some college education,

8  correct?

9       A.    Yes, sir.

10      Q.    How many years of college education do

11  you have?

12      A.    About -- perhaps three.

13      Q.    Okay.  And you were attending the

14  University of Illinois prior to your

15  incarceration?

16      A.    Only for a couple weeks, yes, I was.

17      Q.    But you had been admitted and were

18  attending classes?

19      A.    Yes, sir.

20      Q.    Where did you go to high school?

21      A.    Centennial High School in Champaign,

22  Illinois.

23      Q.    And you graduated from high school?

24      A.    Yes, sir.

1      Q.    What was your grade point average?

2      A.    I can't recall.

3      Q.    Anyway, good enough to get into the

4  University of Illinois?

5      A.    I think my ACT score helped me a bit.

6      Q.    You had a pretty high ACT score?

7      A.    It was high for the time, yeah, 29.  I

8  don't know what the standards are now.

9      Q.    Have you ever filed any other lawsuits

10  besides this one, Mr. Hunter?

11      A.    No, sir.

12      Q.    Now, in this lawsuit you've also engaged

13  in some litigation activities, correct?

14      A.    When you say litigation activities, what

15  do you mean?

16      Q.    Yeah, I'll explain what I mean by that.

17  You've been able to draft up written discovery

18  requests?

19      A.    Yes, sir.

20      Q.    And you served those on the defendants?

21      A.    Yes, sir.

22      Q.    You served interrogatories on the

23  defendants?

24      A.    Yes, sir.

1        Q.    You served requests for production on

2    the defendants?

3        A.    Yes, sir.

4        Q.    You filed motions in the court?

5        A.    Yes, sir.

6        Q.    I'm including a motion for a protective

7    order?

8        A.    Actually, the motion was to order a

9    deposition by telephone, it was interpreted as a

10    protective order by Judge Baker, but yes.

11        Q.    The motion was related to where your

12    deposition would be held, correct?

13        A.    Yes, sir.

14        Q.    You had concerns that if you were

15    required to go to Springfield about costs?

16            Let me rephrase that question, it didn't

17    come out very well, did it?  You had concerns

18    about cost if you were required to go to

19    Springfield?

20        A.    My concern was about getting there and I

21    didn't think that the cost would allow me to get

22    there.

23        Q.    And so you filed a motion asking that

24    you be allowed to testify by telephone, correct?

18

1      A.    Yes, sir.

2      Q.    And then you called the Court and

3  expressed concern that the deposition was set for

4  later that day and the Court had not yet ruled on

5  your motion?

6      A.    Yes, sir.

7      Q.    Judge Baker then directed defense

8  counsel to come to Champaign to take your

9  deposition, correct?

10     A.    Yes, sir.

11     Q.    And you were successful in your motion,

12  you didn't have to go to Springfield?

13     A.    No, sir, I did not.

14     Q.    Now, did you ever look --  prior to you

15  calling the Court, did you ever look to see how

16  much it would cost to take a bus from Champaign to

17  Springfield?

18     A.    When I talked to you, you suggested I

19  get on the Greyhound website to look at it, I did

20  look.

21     Q.    And what was the cost to go from

22  Champaign to Springfield?

23     A.    For a nonrefundable ticket it was $38,

24  and for a regular ticket it was $67, and the bus I

19

1       would have taken would have been leaving Champaign

2       at 9:15, arrive in Springfield around 11:15, and

3       the bus coming home would have been leaving

4       Springfield I believe at right around 6:00 and it

5       would have been getting to Champaign a little

6       after 9:00.

7              Q.    Now, did you not have the $38 to go to

8       Springfield?

9              A.    No, sir, I didn't at the time.

10             Q.    Are you working currently, Andre?

11             A.    I'm not.

12             Q.    When did you get released from prison?

13             A.    August 31st.

14             Q.    Of this year -- I'm sorry, 2007?

15             A.    Yes, sir.

16             Q.    Have you worked at any time since August

17      of 2007 and the present?

18             A.    Yes, sir, I have.

19             Q.    And where did you work?

20             A.    At Haynes Construction.

21             Q.    What kind of construction do they do?

22             A.    Residential construction.

23             Q.    Were you a -- what were your job

24      responsibilities at Haynes Construction?

1        A.    They were -- I mean, they varied

2    immensely.  Getting the job, I didn't have any

3    experience in the field, so a lot of the work I

4    did was -- I forget the term.  I guess you could

5    say grunt work, I mean, moving things, hauling

6    things up, just assistance, general assistance.

7        Q.    Did your skills develop as you worked

8    there?

9        A.    Somewhat.

10        Q.    How long did you work for Haynes

11    Construction?

12        A.    About three months.

13        Q.    How many hours a week were you working?

14        A.    In between 10 and 40, sometimes weather

15    wouldn't permit you to work and my boss sometimes

16    would tell me that he didn't have, you know, work

17    for me that particular day.

18        Q.    Were you salaried or hourly wage?

19        A.    Hourly.

20        Q.    What was your hourly wage at Haynes

21    Construction?

22        A.    $10 an hour.

23        Q.    And who was your boss there at Haynes

24    Construction?

21

1           A.     His name was Jeff Haynes.

2           Q.     Okay.   That's here in Champaign, Haynes

3     Construction?

4           A.     It is.

5           Q.     Do you know the phone number for Haynes

6     construction?

7           A.     Off the top of my head I don't.   You can

8     look in the phonebook and find it.

9           Q.     Okay.

10          A.     May I ask why that's of importance to

11    this case?

12          Q.     Well, I really don't have to tell you

13    why, but I'll explain to you if you're objecting,

14    I'll interpret your statement as an objection to

15    relevance. Basically what we do in the deposition

16    process is we ask questions that lead to relevant

17    evidence or information that's likely to lead to

18    relevant evidence and so that type of information

19    may lead to relevant evidence, Mr. Haynes may have

20    information that can assist us in this case, so

21    that's why I'm exploring that area.

22                 Now, have you worked any other jobs

23    besides the one for Haynes Construction?

24          A.     No, sir.

22

1     Q.    You're currently going to school?

2     A.    I am.

3     Q.    When did you start going to school?

4     A.    January 14th, 2008.

5     Q.    And where are you attending school?

6     A.    Parkland College, Champaign, Illinois.

7     Q.    That's Parkland?

8     A.    Parkland, P-A-R-K-L-A-N-D.

9     Q.    Okay.  And what are you studying there?

10    A.    I'm doing a curriculum that will enable

11    me to transfer to the engineering program at the

12    U of I, and there's transfer requirements, some

13    humanities and some natural sciences, I forget

14    what they call them, but for the most part the

15    core is science classes; chemistry, physics and

16    calculus.

17    Q.    How many hours do you attend at Parkland

18    per week?

19    A.    I'm a 12-hour student at Parkland.

20    Q.    Is that considered full-time or

21    part-time?

22    A.    It is considered full-time.

23    Q.    Now, when was your last day working for

24    Haynes Construction?

23

1     A.    I can't remember off the top of my head,

2     it was in December.

3     Q.    Was it before Christmas or after

4     Christmas?

5     A.    It may have been a day after Christmas.

6     Q.    Okay.  So have you worked anywhere since

7     that last day at Haynes and when you started

8     school on January 14th?

9     A.    No, sir.

10    Q.    You don't have any part-time jobs?

11    A.    No, sir, I'm currently looking.

12    Q.    Where do you currently live?

13    A.    2125-B Melrose Drive, Champaign,

14    Illinois.

15    Q.    Do you rent at that location or how do

16    you pay for where you live or are you just living

17    with someone else?

18    A.    I live with my mother, but I do -- when

19    I have it I help with the rent and bills because

20    it's more expensive than she can afford.

21    Q.    Does she work?

22    A.    She does, she works part-time.

23    Q.    How are you paying for school, Andre?

24    A.    Federal student aid, and I also secured

1     a loan to help because with the work situation, a

2     student loan to help with living expenses and

3     buying books and things and paying for rent until

4     I can find a job.

5          Q.    Are you looking for a job?

6          A.    Yes, sir.

7          Q.    Now, do you own a car?

8          A.    No, sir.

9          Q.    Do you have a driver's license?

10         A.    I do.

11         Q.    Does your mother have a car?

12         A.    She does.

13         Q.    Does she require her car for work?

14         A.    Does she require her car for work, sir?

15         Q.    Yeah.

16         A.    I don't understand.

17         Q.    Well, does she work here in Champaign?

18         A.    She does.

19         Q.    Does her job require her to use her

20     personal car to travel?

21         A.    I'm sorry, yes, sir, it does.

22         Q.    Does she have to have a car then every

23     day when she's working?

24         A.    For the most part, yes, sir.

1       Q.   Do you have any other family members

2   that have automobiles?

3       A.   In...?

4       Q.   In the Champaign area?

5       A.   No, sir.

6       Q.   Now, I notice you're wearing a Carhart

7   jacket today, where did you get that at, did you

8   get that after you got out of prison?

9       A.   Yes, sir.

10      Q.   Do you have a cell phone?

11      A.   Yes, sir.

12      Q.   And do you have a monthly bill for your

13   cell phone?

14      A.   I do.

15      Q.   How much does that run per month?

16      A.   About $65.

17      Q.   Do you have any other monthly bills

18   besides the cell phone bill and the money that you

19   pay your mother to help with rent?

20      A.   Well, it's not just rent I help with, I

21   help with the phone bill, and I give her money for

22   gas and groceries, I buy groceries.

23      Q.   Does she sometimes take you places?

24      A.   Sometimes, yes, it's that or the bus.

26

1      Q.    Are you currently on parole?

2      A.    Yes, sir.

3      Q.    Do you have to report to the parole

4    agent then if you leave Champaign County?

5      A.    Yes, sir.

6      Q.    And have you left Champaign County since

7    you were released from prison in August of 2007?

8      A.    No, sir.

9      Q.    So if we talk to your parole agent, he

10   would be able to verify that you haven't left

11   Champaign County?

12     A.    Yes, sir, he would.

13     Q.    Have you seen any dentists since you've

14   been released from prison?

15     A.    No, sir.

16     Q.    Have you been treated by any doctors

17   since you've been released from prison?

18     A.    I don't believe so, no, sir.  I don't

19   have any insurance.

20     Q.    Have you gone to the emergency room?

21     A.    No, sir.

22     Q.    Prompt Care?

23     A.    What is Prompt Care?

24     Q.    Kind of like the emergency room, there's

1    some clinics that have Prompt Care which is for

2    people that don't have an acute injury but have an

3    injury that requires immediate attention?

4        A.    No, I haven't been there.

5        Q.    Have you sought any kind of medical help

6    since you've been out?

7        A.    I believe there's a toll-free line that

8    you can call to ask about illnesses, I think I

9    called that a couple times, I can't remember the

10   number, my mother suggested it.

11       Q.    Did you call that number?

12       A.    I called it before.

13       Q.    And when was that?

14       A.    Maybe two months ago.

15       Q.    Where did you locate the number?

16       A.    My mother gave it to me.

17       Q.    Now, you previously provided us with a

18   phone number, is that your mother's phone number?

19       A.    It is.

20       Q.    When you called this 800 number, what

21   did you discuss with them?

22       A.    I can't recall that particular ailment.

23   I believe I was -- I had flu-like symptoms I

24   think, I can't remember exactly what it was.

1    Q.    It didn't have anything to do with your

2    tooth #19 which has been extracted?

3    A.    No, sir, it didn't.

4    Q.    Did it have anything to do with this

5    lawsuit at all?

6    A.    No, sir.

7    Q.    Okay.  Have you been seen by any medical

8    personnel or talked to any medical personnel about

9    any condition related to this lawsuit since you've

10    been released?

11    A.    I don't believe so, sir.

12    Q.    Okay.  Now, as I understand your claim

13    against my defendants, Dr. Awada, Dr. Osafo, Karen

14    Harper, Dr. Grammer, and Wexford Health Sources,

15    Incorporated, they all concern the tooth #19; is

16    that accurate?

17    A.    Yes, sir.

18    Q.    And the time frame of your allegations

19    is from sometime in 2000 through October 30,

20    2006; is that right?

21    A.    I believe so, that's about right.

22    Q.    Now, in June of 2006, Dr. Awada

23    extracted the tooth; is that correct?

24    A.    I believe that's the date.  It's in the

1    complaint.

2        Q.    But it was Dr. Awada that extracted the

3    tooth, correct?

4        A.    Yes, sir.

5        Q.    Now, in your complaint you have a lot of

6    detail with respect to Dr. Awada, Dr. Osafo -- I'm

7    sorry, Dr. Grammer and Dr. Awada and then there's

8    some detail with respect to Dr. Osafo and Karen

9    Harper, you typed that up yourself, correct?

10       A.    Yes, sir.

11       Q.    And you typed that up in October of

12   2006, when your memory of the events was fresher

13   than it is today?

14       A.    What do you mean by that?

15       Q.    Well, it was closer in time to the

16   events than we are today, correct?

17       A.    I believe that's reasonable to assume

18   that.  I didn't just sit down and type the

19   complaint entirely from memory on October 30th, I

20   had a draft that I had written and I typed, you

21   know, on that date.

22       Q.    Do you still have a copy of that draft?

23       A.    I may, sir, I have to look in my

24   documents, I may have a copy of the draft -- the

1    written draft?

2         Q.    Yeah.

3         A.    I may have a copy.

4         Q.    Okay.  As far as the information,

5    though, is the information in the complaint

6    accurate?

7         A.    To the best of my knowledge.

8         Q.    Is there anything in the complaint to

9    your knowledge that is inaccurate?

10        A.    Not to my knowledge, sir.

11        Q.    You knew that this was going to be filed

12   in federal court, this complaint?

13        A.    Yes, sir.

14        Q.    And so you knew it was important for

15   your statements to be accurate, correct?

16        A.    Yes, sir.

17        Q.    Did you do a signed -- I don't remember,

18   a signed statement as to the -- actually, yeah, it

19   looks like you did.  In fact, you wrote that

20   pursuant to 28 USC Section 1746, I declare and

21   verify under penalty of perjury under the laws of

22   the United States of America that the above-stated

23   facts are true to the best of my knowledge, with

24   respect to the facts you had alleged in your

1      complaint, correct?

2          A.    Yes, sir, I signed that.

3          Q.    And you swore under oath under penalty

4      of perjury that those facts were correct?

5          A.    To the best of my knowledge, yes, sir.

6          Q.    And as you sit here today, there's

7      nothing that you can think of in that complaint

8      that is inaccurate?

9          A.    Not that I can think of, no, sir.

10         Q.    Now, I think I understand from your

11     complaint your claims against Dr. Awada and

12     Dr. Grammer, is there anything else that is not in

13     your complaint about your claims against those two

14     individuals?

15         A.    Not that I can think of at this moment.

16         Q.    Is there anything that would refresh

17     your memory as to, you know, what your claim is

18     about them?

19         A.    What do you mean is there anything that

20     would refresh my memory about the claim?

21         Q.    Well, you said you don't know at this

22     moment if there's anything else, is there anything

23     that would prompt you to say, oh yeah, you know

24     what, I omitted this date whenever I saw

1    Dr. Awada?

2        A.    Not anything I can think of right now.

3        Q.    But are there any documents that you

4    could look at that would help you recall what it

5    is you allege Dr. Awada did that was wrong?

6        A.    I mean, are you asking if there's

7    documents that would make me remember something

8    new that's not included in the complaint that he

9    did wrong?

10       Q.    These are your claims against Dr. Awada,

11   right, what's in your complaint?

12       A.    Yes, sir.

13       Q.    Okay.  You don't have anything else that

14   you're claiming Dr. Awada did wrong other than

15   what you have in your complaint?

16       A.    Not at this time, no, sir.

17       Q.    Okay.  And the same with Dr. Grammer,

18   right?

19       A.    Not at this time, no, sir.

20       Q.    There's nothing else other than what

21   you've alleged in your complaint?

22       A.    Not at this time, no, sir.

23       Q.    Now, can you tell me -- and feel free to

24   refresh your memory by looking at your complaint

1      if you'd like to -- what is it that Dr. Osafo did,

2      what's your claim against Dr. Osafo?

3          A.    That he was guilty of deliberate

4      indifference, that he knew what was going on with

5      my condition and did nothing to prevent it.

6          Q.    Did you ever actually see Dr. Osafo?

7          A.    Concerning my tooth or just concerning

8      health care period?

9          Q.    Well, let's start with concerning your

10     tooth, did you ever see Dr. Osafo concerning your

11     tooth?

12         A.    I can't recall if I ever spoke to him

13     personally about the #19 tooth.

14         Q.    Did you see him for any other

15     conditions, medical conditions?

16         A.    I had seen Dr. Osafo a number of times

17     over the years for other conditions.

18         Q.    Did he treat you for those conditions?

19         A.    Yes, sir, he pulled out a toenail one

20     time and I believe there was some other things.

21         Q.    So your claims are not related to the

22     other times that he treated you for medical

23     conditions, are they?

24         A.    Not in the complaint, no, sir.

1        Q.    Your claim against Dr. Osafo in the

2    complaint is that he was deliberately indifferent

3    to your #19 tooth?

4        A.    The condition of it, yes, sir, he did

5    nothing to help, yes, sir.

6        Q.    But you don't recall whether you

7    actually saw Dr. Osafo with respect to your #19

8    tooth?

9        A.    I can't recall if I ever spoke to him

10   and told him that my #19 tooth was hurting me, no,

11   sir.

12       Q.    Did you ever write Dr. Osafo about your

13   #19 tooth?

14       A.    I don't believe I did.

15       Q.    It looks like from your complaint your

16   claim against Dr. Osafo is based upon a statement

17   that Dr. Elyea had made that he had discussed your

18   case with Dr. Osafo, is that what your claim's

19   about?

20       A.    Well, I think -- I don't know about the

21   statement to which you refer, but I believe he

22   said in a letter that he spoke with --

23       Q.    Who's he, you said I believe he said,

24   and I'm not sure who he is?

1       A.    Elyea said in a letter he spoke with

2    a -- I can't recall the title he used, but I

3    thought that the title he used was Dr. Osafo at

4    the time.

5       Q.    Why do you believe that Dr. Osafo was

6    aware of your #19 tooth condition?

7       A.    Because of his title at the Illinois

8    River Health Care Unit.

9       Q.    Because he was the medical director?

10      A.    His title and his job, yes, sir, his

11   duties.

12      Q.    And what are his duties or what were his

13   duties from 2000 through 2006, as you understand

14   them?

15      A.    I can't recall, I mean, exactly what his

16   duties are.  I mean, I have the actual terms at

17   home but I can't recall off the top of my head.

18      Q.    So your claim is that because

19   Dr. Osafo's duties and title made him a supervisor

20   you felt he was deliberately indifferent to your

21   tooth; is that right?

22      A.    My claim is that I feel that because of

23   his duties he was -- he knew of my condition and

24   he did nothing to prevent it or help in any way, I

1    believe that makes him deliberately indifferent.

2        Q.    But you have no reason to believe that

3    he knew other than the fact that he was the

4    medical director and because of his duties as

5    medical director?

6        A.    Aside from his duties, I can't think of

7    any reason why I would have that he would know

8    about it.

9        Q.    You don't remember whether you ever

10    talked to him?

11        A.    I don't recall ever talking to him and

12    telling him that my #19 tooth hurt me.

13        Q.    You didn't ever write him either, did

14    you?

15        A.    I don't remember writing him, sir.

16        Q.    Okay.  Did anybody tell you that they

17    talked to Dr. Osafo other than that one

18    correspondence from Dr. Elyea that you interpreted

19    that way?

20        A.    I can't recall if anybody ever told me

21    they spoke with him, sir.

22        Q.    Is there anything that would refresh

23    your memory as to whether anyone spoke to you

24    about Dr. Osafo?

37

1          A.    I don't know if there's anything that

2    would refresh my memory or not.

3          Q.    Did you have a log of events, a calendar

4    or something that you wrote on and made notes on?

5          A.    Well, I had papers I used to write on

6    about what happened like in the health care upon

7    certain visits.

8          Q.    And do you still have those papers?

9          A.    I may have them, I have to check my

10   documents.

11         Q.    Now, we previously gave you some

12   requests to produce and those aren't things you

13   provided to us in response to those, correct?

14         A.    I provided you with -- I think the

15   answers to most of your questions in the request

16   for production were in the complaint I believe.

17         Q.    Will you send me copies of those pages

18   if you find them?

19         A.    If I find them, yes, sir.

20         Q.    And then earlier you mentioned a draft

21   of your complaint, will you also send me a copy of

22   that if you find it?

23         A.    The handwritten?

24         Q.    Right.

1        A.    If I have it, yes, sir.   I mean, I don't

2    believe I do, I threw away a lot of things, but I

3    will look for it, sir.

4        Q.    Okay, good, fair enough.   Now, Karen

5    Harper, what is it that Karen Harper did that you

6    allege wronged you?

7        A.    Karen Harper also knew the condition of

8    my #19 tooth and she did nothing to prevent it.

9        Q.    What was her position?

10        A.    She was a -- I believe her title was

11    dental assistant.

12        Q.    When did you see Karen Harper?

13        A.    I saw her on numerous occasions in the

14    dental department.

15        Q.    Do you remember what dates you saw her

16    on?

17        A.    I can't recall off the top of my head,

18    sir.

19        Q.    Do you have those dates in your

20    complaint?

21        A.    The dates I saw her?

22        Q.    Yeah.

23        A.    There may be dates in the -- in one of

24    the exhibits, the dates I saw her.   I don't know

39

1    that I included all the dates that I saw her in

2    the complaint.

3        Q.    If we wanted to find out what dates you

4    saw Karen Harper, how would we go about doing

5    that?

6        A.    There were some dates I believe in the

7    medical records, I mean, in one of the exhibits,

8    the times I saw her.

9        Q.    So if we wanted to know what dates Karen

10   Harper saw you, we'd want to look at the medical

11   record; is that correct?

12       A.    You can ask Karen Harper, that's another

13   way.

14       Q.    You personally don't remember when you

15   saw her?

16       A.    I can't recall, I mean, just off the top

17   of my head right now specific days that I saw her,

18   but I do remember occurrences, instances of seeing

19   her and speaking with her.

20       Q.    And is there something about those

21   instances whenever you saw her that you claim she

22   should have done something differently on?

23       A.    I'm not -- I'm not entirely sure that

24   her job title would have enabled her to do

40

1      something, but I don't know that it stopped her,

2      so that's why she was included because I didn't

3      know.  If she was able to help, she didn't.

4          Q.    You weren't sure if she would be able to

5      or not but you included her just to make sure that

6      she was in there if she was able; is that right?

7          A.    If there's a chance that she could have

8      done something, then she was wrong for not doing

9      something and that's why she's in there.

10          Q.    But you don't know if she was actually

11      able to do something or not?

12          A.    I don't know if it was in her power.

13          Q.    Now, Wexford Health Sources,

14      Incorporated employs these four individuals or did

15      employ these four individuals at the time, and

16      that's your claim against them, right?

17          A.    They employed Grammer, Harper, Osafo and

18      Awada, is that what you're saying?

19          Q.    Yeah, isn't that basically your claim

20      against them, that because they were their

21      employer, they were deliberately indifferent?

22          A.    I believe that's who employed them and

23      yes, sir.

24          Q.    Now --

1      A.    Actually, are you asking me why I

2    believe Wexford was deliberately indifferent?

3      Q.    Yeah, I mean, other than the fact that

4    they employed these individuals, what did Wexford

5    do?

6      A.    Well, Wexford -- I believe that the

7    contract that Wexford has with the state and the

8    policy that they get together and discuss and

9    uphold, I believe there's a policy that prevents

10   someone from getting a particular type of

11   treatment that would help them and prevent pain,

12   and Wexford had a hand in that policy I believe,

13   and I let them know that, you know, there's a pain

14   there and there's a treatment, and they still

15   refused to give that treatment, I believe that

16   makes them deliberately indifferent.

17     Q.    You understand that Wexford has a

18   contract with the Illinois Department of

19   Corrections to provide specific types of medical

20   care, dental care --

21     A.    I do understand that.

22     Q.    -- (continuing) to inmates within the

23   Illinois Department of Corrections?

24     A.    I do understand that.

1       Q.    Do you know whether Wexford Health

2    Sources' contract requires them to provide crowns

3    on teeth?

4       A.    Do I know if they require them to

5    provide that?

6       Q.    Yeah.

7       A.    Well now if -- I think that the terms

8    perhaps in my case may be subject to

9    interpretation, and they don't speak -- I don't

10   believe they speak -- they say the actual word

11   crown, but they talk about certain types of

12   treatment and they talk about restorative care in

13   that contract.

14      Q.    Whenever you worked for the carpentry

15   firm, they would have contracts with homeowners to

16   build houses, right?

17      A.    I don't know about what my boss did, he

18   had all the paperwork, I just worked.

19      Q.    You mention in your complaint that you

20   had a root canal in 1998, do you recall that?

21      A.    I can't recall the exact date.

22      Q.    Now, who performed that root canal?

23      A.    I can't recall the doctor's name.

24      Q.    And did they put a cap or a crown on

43

1       your tooth after the root canal?

2               A.    No, sir.

3               Q.    Where was that root canal performed?

4               A.    It was in Champaign, I can't recall the

5       address, sir.

6               Q.    Do you remember where it was at?

7               A.    I'm sorry, you asked me where it was, I

8       said I didn't recall.

9               Q.    Right, you said you couldn't recall the

10      address, but do you know where it's at, I mean,

11      could you drive there?

12              A.    No, sir, I don't believe I could.

13              Q.    Have you lived in Champaign your whole

14      life?

15              A.    No, sir.

16              Q.    How many years have you lived in

17      Champaign?

18              A.    If I had to say, I'd say about 12 maybe.

19              Q.    If we divided Champaign into four

20      quadrants, can you tell me which quadrant of

21      Champaign the dental office was that you went to,

22      was it in the northeast quadrant, northwest

23      quadrant, southeast quadrant, southwest quadrant?

24              A.    I couldn't tell you that, sir.

1     Q.   Could you tell me what it was near?

2     A.   I'm sorry, sir, I can't, I went there

3  one time, you know.

4     Q.   Who paid for the root canal?

5     A.   I believe DCFS paid for it, Department

6  of Children and Family Services.

7     Q.   And did they make arrangements for you

8  to go to the dentist that day?

9     A.   The arrangements were made, it was a

10  combination between DCFS and the caseworker and

11  the foster parents.

12     Q.   Who was your foster parent at that time?

13     A.   I believe it was Lisa Sanders.

14     Q.   Does she live here in Champaign?

15     A.   I don't know, sir.

16     Q.   Did she live in Champaign at the time?

17     A.   Yes, sir, she did.

18     Q.   Do you remember who your caseworker was?

19     A.   I don't off the top of my head, sir.

20     Q.   Was it the Champaign DCFS office that

21  you dealt with?

22     A.   Are there other offices, is there an

23  Urbana DCFS office?

24     Q.   I don't know, I'm just asking, do you

1      know where the office was that you went to?

2          A.    I believe the name of the place that I

3      dealt with was CHASI, Children's Home and Aid

4      Society, I believe I had some dealings with

5      Cunningham Children's Home.

6          Q.    Between 1998, whenever you had the root

7      canal performed, and the year 2000, when you were

8      enrolled at the University of Illinois, did you

9      see any dentists?

10         A.    I can't recall, sir.

11         Q.    Is it possible that you did and you

12     don't remember?

13         A.    I may have seen a dentist.

14         Q.    Did anyone tell you that you needed to

15     have a cap or a crown put on your tooth #19?

16         A.    No, sir.

17         Q.    Did the doctor who saw you in 1998 tell

18     you that you needed to have a cap or a crown put

19     on your tooth #19?

20         A.    I can't recall, sir.

21         Q.    And the root canal in 1998 was on tooth

22     #19, correct?

23         A.    Yes, sir.

24         Q.    In 1998, when you had the root canal

46

1    performed, you were, what, 16?

2        A.    I believe I was, sir.  And, I'm sorry,

3    I'll state for the record again that I believe the

4    root canal was performed around 1998, but I can't

5    recall the exact date, but you keep on saying 1998

6    like it's certain, but I'm not exactly certain.

7        Q.    Was it possibly before 1998?

8        A.    I don't believe there's a chance it

9    was -- it could have been before, it may have been

10   after, I can't really recall, sir.

11       Q.    Were you still in high school whenever

12   you had the root canal performed?

13       A.    Yes, sir.

14       Q.    Did you work any jobs while you were in

15   high school?

16       A.    Yes, sir.

17       Q.    Where did you work?

18       A.    Country Fair Cinemas, it's not in

19   business anymore, it's not there.

20       Q.    You say cinemas, a movie theater?

21       A.    Yes, sir.  Where else did I work?  I

22   worked at a fast food restaurant, Arby's, I worked

23   there.  I detasseled corn for about four days --

24   or I may have been in eighth grade when that

47

1    happened, I don't know if I was in high school

2    yet.  I think I might have been in high school, I

3    might have been in between freshman and sophomore

4    year, I can't recall.  But the theater, I remember

5    working there when I was in high school, and

6    Arby's, I remember working there when I was in

7    high school.

8         Q.    Now, did you take the summer off between

9    graduating from high school and starting college?

10        A.    As far as work?

11        Q.    Well, I mean, you didn't go to summer

12   school, did you, right out of high school?

13        A.    No, sir.

14        Q.    So you had a few months off; is that

15   right?

16        A.    Yes, sir.

17        Q.    Between high school and college?

18        A.    Yes, sir.

19        Q.    Did you work during that summer?

20        A.    I believe I worked at Arby's during the

21   summer, but I can't recall.

22        Q.    At any time when you were working during

23   that summer between high school and college did

24   you go see a dentist?

1           A.    I can't recall, sir.

2           Q.    It's fair to say you didn't have any

3     crowns or caps installed during that summer when

4     you were working at Arby's between high school and

5     college?

6           A.    I can say I didn't have any crowns or

7     caps installed on #19 tooth during that span.

8           Q.    Did you have any crowns or caps

9     installed on any other tooth during that span?

10          A.    I don't believe so.

11          Q.    And in the fall of 2000, you started at

12    University of Illinois; is that right?

13          A.    August of 2000, yes, sir.

14          Q.    And you attended for a couple of weeks

15    prior to your arrest?

16          A.    About two weeks, yes, sir.

17          Q.    Did you go to the health department at

18    the University of Illinois during that two-week

19    time period?

20          A.    I can't recall.

21          Q.    Do you remember whether or not you had

22    any sort of medical services as part of being a

23    student at the University of Illinois?

24          A.    I can't recall.  I believe they have a

49

1        center called McKinley Health Center I believe.

2        I'm not familiar with who can or can't go, if you

3        you have to pay for insurance or if it's part of

4        your tuition, I'm not familiar with that.

5             Q.    Were you a full-time student during that

6        two-week period of time?

7             A.    Yes, sir.

8             Q.    What was your major?

9             A.    Well, I intended on majoring in I

10       believe electrical engineering at the time, it was

11       some sort of engineer.

12            Q.    Fair to say that you didn't get any

13       dental care for yourself during the two weeks that

14       you were enrolled as a student at the University

15       of Illinois?

16            A.    I think it's fair to say that, yes, sir.

17            Q.    Fair to say you didn't receive any

18       medical care during the two weeks that you were

19       enrolled as a student at the University of

20       Illinois?

21            A.    From the University or just period?

22            Q.    Just period.

23            A.    I can't really recall.  I want to say

24       no.  I can't recall.

50

1        Q.    Is it fair to say you didn't receive any

2    medical care with respect to your #19 tooth during

3    the two weeks you were enrolled at the University

4    Illinois?

5        A.    I think that's fair to say, sir.

6        Q.    Okay.  Now I want to ask you just

7    briefly about your criminal history.  Again, for

8    the same reasons as I previously stated, we can

9    explore areas that are not only relevant but that

10   may lead to relevant evidence.  I'm aware of one

11   felony conviction for armed robbery, do you have

12   any other felony convictions?

13       A.    I don't believe so.

14       Q.    And you're currently on parole for that

15   armed robbery conviction?

16       A.    Yes, sir.

17       Q.    And you were convicted in what year?

18       A.    I believe it was 2000.  So am I to

19   understand that you believe that my criminal

20   history could lead you to relevant facts about the

21   civil suit that I filed?

22       Q.    It might, and I'll ask you a few more

23   questions and maybe it will be a little more

24   clear, okay?  You were convicted right across the

1       street here at Champaign County Courthouse,

2       correct?

3            A.    I believe so, yes, sir.

4            Q.    Did you actually testify and go through

5       a trial or was there some sort of a settlement or

6       a plea, rather, made?

7            A.    There was a guilty plea made.

8            Q.    So you didn't actually have a trial?

9            A.    No, sir, not by jury, no, sir.

10           Q.    Did you have a witness statement that

11      you made?  After you made your plea at sentencing

12      did you make a statement to the Court?

13           A.    I can't recall.

14           Q.    Now, in the last ten years -- we talked

15      about felonies, in the last ten years have you had

16      any convictions for something that was not a

17      felony but involved dishonesty, fraud or the like,

18      writing bad checks, that kind of thing?

19           A.    Not that I can recall, sir.

20           Q.    Besides this one conviction, do you have

21      any other convictions?

22           A.    I don't believe so.

23           Q.    Have you ever testified in court?

24           A.    Not that I can recall.  Is that criminal

52

1       court or court period?

2           Q.    Just any court, and I realize that

3       perhaps in some juvenile proceedings or something

4       you may have testified, so that would include

5       that.  I don't need to know the details, I just

6       want to know whether or not you've ever testified

7       in court.

8           A.    There were times when I had to go before

9       a judge for DCFS hearings, and I can't recall if I

10      was ever asked anything under oath in those

11      proceedings.

12          Q.    Okay.  You were young at the time?

13          A.    I was young, yes, sir.

14          Q.    Do you have any medical training?

15          A.    Medical training?

16          Q.    Yeah.

17          A.    As far as...?

18          Q.    CPR, have you ever been trained in CPR?

19          A.    I took a class in high school, they

20      taught us CPR.

21          Q.    Beyond learning CPR, do you have any

22      medical training; for example, are you an

23      emergency medical technician, a nurse, anything

24      like that?

53

1          A.    No, sir, I'm not.

2          Q.    Is it fair to say the only medical

3    training you have is in CPR?

4          A.    Yes, sir.

5          Q.    Do you have any dental training?

6          A.    I've never been instructed, no, sir, as

7    far as teeth are concerned.

8          Q.    Now, you said you get federal aid to go

9    to school, right?

10          A.    Yes, sir.

11          Q.    How much do you get per semester in

12    federal aid?

13          A.    It depends.  I believe -- it depends on

14    the college you go to first off, and they have a

15    term, what they call the -- I can't recall what

16    the exact term is, it's something similar to cost

17    of education, and the college will determine --

18    they'll get with the government and determine what

19    is an appropriate amount to give you to cover, you

20    know, your education, and you can get up to that

21    amount or less.

22          Q.    How much -- you go to Parkland, right,

23    how much do you get per semester, I mean, do they

24    give you a check for the semester or how does that

1    work?

2        A.    Well, what happens is you get -- you get

3    your federal student aid which goes to Parkland

4    and any loan money that you have goes to the

5    school as well and they take out your tuition and

6    your cost for books and they issue a refund check.

7        Q.    And how much did you get in refund for

8    this semester?

9        A.    I haven't received a refund check yet,

10   sir.

11       Q.    And you don't know what that will be yet

12   because you haven't received it?

13       A.    Correct.

14       Q.    This is your first semester back to

15   school?

16       A.    Yes, sir -- well, I mean, since -- I

17   went to school when I was in prison, Illinois

18   Central College, but this is my first semester

19   going to school out here since 2000.

20       Q.    How were you damaged by Dr. Awada's

21   action or inactions?

22       A.    I believe that's in the complaint.

23       Q.    Nothing to add other than what you've

24   already stated in the complaint?

1          A.    Nothing I can recall right now, sir.

2          Q.    What about Dr. Osafo, how were you

3    damaged by Dr. Osafo's action?

4          A.    I believe that's in the complaint as

5    well, sir.

6          Q.    You don't have anything to add in terms

7    of how you were damaged?

8          A.    Not that I can recall right now, sir.

9          Q.    Is there anything that would refresh

10   your memory as to how you were damaged by

11   Dr. Osafo's actions?

12         A.    Not that I can think of right now.

13         Q.    What about Karen Harper, how were you

14   damaged by Karen Harper's actions or inactions?

15         A.    I believe that's in the complaint as

16   well, sir.

17         Q.    And, again, you don't have anything to

18   add in terms of how you claim to have been

19   damaged?

20         A.    Not at this time, sir.

21         Q.    Is there anything that would refresh

22   your memory as to how you were damaged by Karen

23   Harper?

24         A.    Not anything I can think of at this

1        time, sir.

2            Q.    What about Dr. Grammer, how were you

3        damaged by Dr. Grammer's action or inactions?

4            A.    I believe that's in the complaint, sir.

5            Q.    You don't have anything to add?

6            A.    Not at this time, sir.

7            Q.    Anything that would refresh your memory?

8            A.    Not that I can think of at this time,

9        sir.

10           Q.    And what about Wexford Health Sources,

11       Incorporated, how were you damaged by its action

12       or inaction?

13           A.    I believe that's in the complaint, sir.

14           Q.    Nothing to add with respect to how you

15       claim to have been damaged?

16           A.    Not at this time, sir.

17           Q.    Have you consulted with any dentists

18       about being an expert witness for you in this

19       case?

20           A.    No, sir, I have not.

21           Q.    Fair to say that you don't have any

22       expert witness in this case at this time?

23           A.    Not at this time, sir.  Well, can you

24       please define expert witness for me?

57

1        Q.    Well, it would be a dentist or doctor,

2    someone who has expertise --

3        A.    In the particular field?

4        Q.    -- (continuing) relevant to this case?

5        A.    Oh, okay.  Not at this time, sir, I

6    don't believe I have an expert witness.

7        Q.    Besides yourself, who are your witnesses

8    in this case that you're aware of at this time,

9    people who you think you may call as witnesses in

10   this case?

11       A.    I can't think of any witnesses at this

12   time, sir.

13       Q.    Is there anything that would refresh

14   your memory as to people who you think you would

15   call as a witness?

16       A.    I can't think of anything that would

17   refresh my memory at this time, sir.

18       Q.    Would looking at your complaint and the

19   exhibits attached to the complaint help you out

20   and refresh your memory?

21       A.    I don't believe so at this time, sir.

22       Q.    Would looking at any of the files you

23   have back home help you out and refresh your

24   memory?

1        A.    I couldn't say at this time.

2        Q.    I think we've covered this briefly, but

3   with respect to Dr. Awada, have you written down

4   the various times you met with Dr. Awada in your

5   complaint or are there other times that you've met

6   with Dr. Awada?

7        A.    I believe that the majority of the times

8   I saw him with respect to my #19 tooth, I believe

9   the majority of those are in the complaint.

10       Q.    And if they're not in the complaint,

11  they'd be in your medical records?

12       A.    I believe they would be, I can't say for

13  sure though, sir.

14       Q.    Same with Dr. Osafo and the times --

15  well, you didn't meet with Dr. Osafo.  We talked

16  about Karen Harper.  Dr. Grammer, you've listed

17  times that you met with her in your complaint,

18  right?

19       A.    I believe I did, sir.

20       Q.    Is that all the times you met with

21  Dr. Grammer?

22       A.    I can't recall, sir, there may have been

23  other times I saw her.

24       Q.    And would those other times be in the

1    medical records?

2        A.    I believe they would be, but I can't say

3    for certain because I didn't take those records.

4        Q.    Is there anything that would refresh

5    your memory beyond looking at the complaint and

6    looking at the medical records as to when you saw

7    Dr. Grammer?

8        A.    I can't say at this time if there's

9    anything that would refresh my memory, there may

10   be something else.

11       Q.    What kinds of things do you think there

12   are that might help you remember when you met with

13   Dr. Grammer?

14       A.    I can't think of anything at this time,

15   but there may be something.

16       Q.    But to the best of your knowledge, all

17   the contacts with Dr. Grammer are either in the

18   complaint or in the medical records?

19       A.    I believe that's fair to say at this

20   time, sir.

21       Q.    Now, let's talk a little bit about the

22   grievances that you filed, attached to your

23   complaint there are two grievances, both dated

24   January 3rd, 2006, does that sound right?

1          A.     I believe the date is on those, yeah.

2          Q.     Do you want to look at them?

3          A.     To see the date?

4          Q.     Yeah, just look at them and kind of

5     refresh your memory about them.  Take a look, I

6     think that's the first one.

7          A.     Yeah, the 3rd, they're both dated the

8     3rd.

9          Q.     Are those the only two grievances that

10    you filed with respect to your allegations in the

11    complaint?

12         A.     I believe so, sir, with respect to --

13    yes, I believe so.

14         Q.     You mention in your complaint 2000, did

15    you file any grievance back in the year 2000?

16         A.     Related to #19 tooth?

17         Q.     Yeah.

18         A.     No, sir, I don't believe I did.

19         Q.     Okay.  So the first time you would have

20    filed a grievance would have been in January of

21    '06?

22         A.     I believe --

23         Q.     About your #19 tooth?

24         A.     I believe so, sir.

1          Q.    I'm sorry, I started talking while you

2    were still answering, let me ask the question

3    again just so I make sure we get it clear for the

4    record.   The only grievances that you would have

5    filed with respect to your #19 tooth began in

6    January of 2006?

7          A.    I believe that's correct, sir.

8          Q.    Is it also correct that the only

9    grievances you filed about Dr. Awada would have

10   been in January of 2006?

11         A.    I can't recall if that's the case.   I

12   had filed other grievances while I was

13   incarcerated but I can't recall if there was

14   anything else dealing with Awada.   I don't believe

15   there was anything else concerning my #19 tooth,

16   but I can't say if there's anything else. I

17   believe there's records in the prison though,

18   so...

19         Q.    Do you remember whether you filed any

20   other grievances besides these two dated January

21   3rd, 2006 that dealt with Dr. Osafo?

22         A.    I can't recall.   I believe the prison

23   would have a record of it though.

24         Q.    What about Karen Harper, are there any

62

1     grievances other than these two dated January 3rd,

2     2006 that deal with Karen Harper?

3          A.    I can't recall.

4          Q.    Dr. Grammer, are there any grievances

5     besides the two dated January 3rd, 2006 that

6     concern Dr. Grammer?

7          A.    I can't recall at this time.

8          Q.    And what about with Wexford Health

9     Sources, Incorporated, are there any grievances

10    other than the two dated January 3rd, 2006 that

11    deal with Wexford Health Source, Incorporated?

12         A.    I can't recall, I don't believe so at

13    this time.

14         Q.    Is there anything other than the

15    prison's grievance records that would refresh your

16    memory as to grievances that you filed?

17         A.    I could look through my documents at

18    home, I don't believe there's anything there but I

19    can look again.

20         Q.    Yeah, if you find any other grievances,

21    you'll send those to me as well, right?

22         A.    Do you have to request them or do you

23    want me --

24         Q.    Well, I've already sent you a request

1    for production, I believe they'd be responsive to

2    those requests, so I'd just ask that you send me a

3    copy if you would.

4         A.    That's fine.

5         Q.    Now, do you remember whether you

6    actually mentioned Dr. Awada, Dr. Osafo, Karen

7    Harper, Dr. Grammer, or Wexford Health Sources in

8    either of these two grievances dated January 3rd,

9    2006?

10        A.    I believe I mentioned Dr. Awada, I can't

11   recall.  I think you have it there, don't you?

12        Q.    But if we wanted to see what grievances

13   you filed about these individuals, we'd need to

14   look either at the two that you have attached to

15   your complaint or the prison's grievance records,

16   correct?

17        A.    Yes, sir.

18        Q.    Okay.  You don't have any independent

19   recollection of grievances that you filed about

20   these individuals?

21        A.    Not at this time, sir.

22        Q.    I don't have any additional questions at

23   this time, I'll let Mr. Smith ask some questions,

24   and then if something occurs to me after he's done

64

1        I may have a few more questions for you.

2            A.    Yes, sir.

3                          EXAMINATION

4        BY MR. SMITH:

5            Q.    Mr. Hunter, my name is Jacob Smith, I

6        represent the remaining defendants in this case.

7        A couple of things to clarify, talking about

8        education background, you said you went to

9        Illinois Central College?

10           A.    While I was incarcerated, yes, sir.

11           Q.    That's while you were incarcerated.  You

12       said you had about three years of college credit,

13       is that what you said?

14           A.    I believe so.  I mean, I went like off

15       and on over a number of years, over more than

16       three years, but I was just trying to give you

17       a -- like a number of semesters.  I can't recall

18       exactly, I have transcripts though, and I can give

19       you a copy of those if you'd like them.

20           Q.    That's okay.  When did you graduate high

21       school?

22           A.    In the year 2000.

23           Q.    You started U of I in the fall of 2000?

24           A.    Yes, sir.

1        Q.    Were you going to live on campus or live

2     off campus?

3        A.    I was in a dorm, living in a dorm.

4        Q.    Which one?

5        A.    I believe it was Oglesby Hall, it's at

6     the corner of Lincoln and Kirby, I believe.

7        Q.    On Florida Avenue?

8        A.    Yes, I believe that's where Kirby turns

9     into Florida over at Lincoln.

10        Q.    And you were sentenced to how many

11     years?

12        A.    15.

13        Q.    Which institution did you go to first?

14        A.    I left Champaign County and went to

15     Joliet Correctional Center, which I believe was

16     the processing point at that time.

17        Q.    Where did you go from there?

18        A.    I went from Joliet Correctional Center

19     to Illinois River Correctional Center.

20        Q.    Were you there the rest of the time?

21        A.    Yes, sir.

22        Q.    And that's where this incident arises

23     out of?

24        A.    Illinois River Correctional Center, yes,

66

1    sir.

2        Q.    When is your MSR sentence over?

3        A.    MSR, supervisory release, I believe

4    that's in 2010.

5        Q.    Mr. Walter talked you a little bit about

6    your root canal you had prior to being

7    incarcerated and I want to try to get a little

8    more if you can, did you have a regular dentist

9    you went to at all while you lived in Champaign?

10       A.    I don't believe so.  There may have been

11   a dentist I saw on more than one occasion, but I

12   wouldn't -- I don't believe there's any that I

13   would say were regular dentists of mine.

14       Q.    So you lived in Champaign for about 12

15   years, is that from now working backwards?

16       A.    No, sir, I was -- I don't consider

17   living in Canton living in Champaign so...

18       Q.    So from 2000, so you moved here in about

19   '88, is that what you'd said?

20       A.    Around '88, yes, sir, I believe so.

21       Q.    So between 1988 and 2000, about how many

22   times would you see a dentist, can you give an

23   estimate at all?

24       A.    No, sir, I don't know that I can give an

67

1    accurate estimate at all.

2        Q.    Did you ever see the same dentist more

3    than once?

4        A.    I believe I did.

5        Q.    What's his name?

6        A.    I can't recall his name.

7        Q.    Do you remember where his office is?

8        A.    I'm sorry, I can't recall, it was years

9    ago.

10       Q.    It was in Champaign, it wasn't in

11   Urbana?

12       A.    I believe it was in Champaign.

13       Q.    Would it be on the south side of town

14   like south of Neil or would it have been north of

15   Neil?

16       A.    I want to say it was --

17       Q.    Or not Neil, but Springfield Avenue,

18   that's east-west, would it have been north of

19   Springfield or south of Springfield?

20       A.    North is this direction?

21       Q.    Yeah.

22       A.    I believe it was north of Springfield.

23   I can't think of anything by the office though, it

24   was many years ago.

1      Q.    And you haven't been to a dentist since

2    you've been released; is that correct?

3      A.    That is correct.

4      Q.    Do you remember going to see -- I know

5    you've answered this question, but just to make

6    sure, did you see a dentist prior to having the

7    root canal?

8      A.    I believe I had seen a dentist before

9    having the root canal around 1998, I believe I had

10   seen a dentist before then.

11     Q.    Do you know why you got the root canal?

12     A.    I believe there was -- I can't recall

13   the exact reason why you get a root canal, I

14   believe it has something to do with the root

15   perhaps going bad or something so they take it out

16   and hence the name.

17     Q.    Did you ever smoke?

18     A.    I did smoke.

19     Q.    About how much?

20     A.    Maybe at the most I would say six or

21   seven cigarettes a day.

22     Q.    How long did you do that?

23     A.    For -- off and on for about -- I would

24   say off and on for about two years perhaps.

1          Q.     So you only smoked for two years?

2          A.     Well, I had smoked before then but not

3    anywhere close to six, seven cigarettes a day.   I

4    think I smoked regularly off and on for about two

5    years.

6          Q.     Did you ever have chewing tobacco or

7    anything like that?

8          A.     About four times.

9          Q.     Do you drink coffee pretty regularly

10   too?

11         A.     Did I or do I?

12         Q.     Either one.

13         A.     I drink about four cups a week now, I

14   used to drink about five cups a week.

15         Q.     Prior to when you were in high school,

16   and you said you thought you had seen a dentist,

17   you can't really remember for sure, did someone

18   have dental insurance or did you have dental

19   insurance?

20         A.     I believe any time I got medical care I

21   believe it was paid for through DCFS somehow.   I

22   know it was paid by someone because I received

23   medical care but I can't recall how it was paid

24   for.

1          Q.    Is that in terms of like getting

2     fillings or did you have fillings done?

3          A.    I've had fillings done.

4          Q.    About how many?

5          A.    Do you mean prior to incarceration or

6     during?

7          Q.    Yeah, prior to incarceration?

8          A.    Prior to incarceration, perhaps -- I can

9     count if you have a mirror, maybe four or five.

10         Q.    Turning your attention to Illinois

11    River, were you seen by a dentist at Illinois

12    River?

13         A.    Was I seen by a dentist at Illinois

14    River, yes, sir, I was.

15         Q.    About how many times if you had to

16    guess?

17         A.    I'm not real comfortable making a guess

18    because I don't want to be --

19         Q.    Was it more than five?

20         A.    Yes sir.

21         Q.    Was it more than 10?

22         A.    Yes, sir.

23         Q.    Was it more than 15?

24         A.    I can't recall.

1    Q.    Did you see the same dentist every time?

2    A.    No, sir, I don't believe I saw the same

3    dentist every time at Illinois River.  But when

4    you go in, in the office there's -- whenever

5    there's two dentists there, sometimes they confer

6    with each other about the problem that you have

7    sometimes, so there's a chance I could have gone

8    in to see one dentist and the other dentist had

9    knowledge of what was going on, while I didn't see

10    them personally, they knew about my condition.

11    Q.    How do you know that?

12    A.    How do I know that?

13    Q.    Yeah, could you hear them confer?

14    A.    Yes, sir, I've heard them confer before.

15    Q.    What were the dentists' names that you

16    saw while in Illinois River?

17    A.    I saw Dr. Grammer, I saw Dr. Awada, and

18    if there were any other dentists I can't recall

19    their names, but I can't say I didn't see any

20    other dentists.

21    Q.    Do you remember, if there were any other

22    ones that you saw, what they looked like, if you

23    can't remember their names?

24    A.    Well, I remember there being more, more

1    faces in the dental department than just Grammer

2    and Awada, but I can't recall names.

3        Q.    So just to kind of go through each of

4    these defendants, kind of get a better idea why

5    each of those are included in your lawsuit, start

6    with Kevin Kirkbride, who's Kevin Kirkbride?

7        A.    Kevin was a grievance officer at

8    Illinois River Correctional Center.

9        Q.    What did he do to be named in this suit?

10       A.    He denied the grievance that I filed

11   concerning my #19 tooth.

12       Q.    Did he respond to your grievance?

13       A.    I believe he responded to it, yes.

14       Q.    Do you know if Mr. Kirkbride is a dental

15   professional?

16       A.    What constitutes a dental professional?

17       Q.    Do you think that Mr. Kirkbride is

18   comfortable making dental assessments?

19       A.    I don't know that he is.  I can't say if

20   he is or not.  He may have mentioned it, is there

21   an exhibit to the complaint, his response?

22            (Document tendered.)

23       A.    Thank you.  Mr. Kirkbride, I don't

24   believe he mentioned anywhere where he feels

73

1    comfortable about making dental assessments.

2         Q.    While you're looking there, does he

3    state in his response that he asked a dental

4    professional what their response would have been

5    to your grievance?

6         A.    Does Dr. Awada constitute a dental

7    professional?

8         Q.    Since you said he was a dentist, I would

9    say yes.

10         A.    Well, he asked Dr. Awada about my

11    grievance.

12         Q.    So is it safe to assume that he relied

13    on Dr. Awada's testimony in responding to your

14    grievance?

15         A.    It says here he based his decision upon

16    total review of all available information and a

17    compliance check of the procedural due process

18    safeguards outlined in departmental rule 504.

19         Q.    Okay.  What about Barbara Hurt, why is

20    she in the lawsuit?

21         A.    I believe she was the deputy director

22    for my -- the district that Illinois River was

23    located in at the time.

24         Q.    So what exactly did she do?

1          A.    She knew about my condition and didn't

2     take any steps to give me the treatment that I was

3     requesting.

4          Q.    How did she know about the steps?

5          A.    She received notification by mail I

6     believe.

7          Q.    Did she respond to it?

8          A.    She sent me one letter.

9          Q.    What did she say in the letter?

10         A.    I can't recall exactly, I believe it's

11    an exhibit.  Would you like me to find the exhibit

12    and read the letter?

13         Q.    Sure.

14              MR. WALTERS:  Here it is, I was going to

15    make it an exhibit, so let's go ahead and mark it.

16    I'm going to mark this for identification purposes

17    as Hunter Exhibit No. 1.

18              (WHEREUPON, Hunter Exhibit No. 1 was

19    marked for identification.)

20         A.    Is this the same letter?

21    BY MR. SMITH:

22         Q.    Yes.

23         A.    Can I ask why you marked this an exhibit

24    here, is this for the deposition hearing?

75

1          MR. WALTER:  Yeah, it will be attached

2     to your deposition transcript, I'm going to ask

3     you some questions about it when Mr. Smith is done

4     so since he's going to ask you about it, I figure

5     we may as well mark it now and stick it in the

6     record.

7          A.    Okay.

8     BY MR. SMITH:

9          Q.    So this is the response to your letter?

10         A.    This is the only response I received

11    from Miss Hurt, yes, sir.

12         Q.    And what did you learn from her letter?

13         A.    Miss Hurt said the Illinois Department

14    of Corrections does not approve placement of a

15    permanent prosthesis, she believes that dental

16    crowns fall into this category, and at the end she

17    says my only recourse is to have the tooth

18    extracted.  Do you want me to continue reading?

19         Q.    No, that's fine.  And Terri Anderson and

20    Sherry Benton, are they in it as far as the

21    grievance procedure as well, is that why they're

22    named in the lawsuit?

23         A.    I believe they work for the

24    Administrative Review Board and that's who my

76

1    grievance went in front of.

2         Q.    So you sued them because they upheld the

3    denial of your grievance?

4         A.    That's why they're in there, yes, sir.

5         Q.    Same with Roger walker?

6         A.    Yes, sir.

7         Q.    Why is Donald Hulick in this lawsuit?

8         A.    Donald Hulick did not deem that my

9    grievance was of an emergency nature and he also

10   agreed with the denial.

11        Q.    And Dr. Elyea, why is he in this

12   lawsuit?

13        A.    I can't recall his exact title, he is --

14   or he was at the time agency medical director and

15   he knew of my condition.

16        Q.    Spell that out a little clearer for me,

17   what are you talking about, what were the things

18   that he did in order to constitute being in this

19   lawsuit?

20        A.    Dr. Elyea knew of my condition and did

21   nothing to -- he took no steps, took no action to

22   get me into treatment that I needed.

23        Q.    And what treatment did you think you

24   needed?

77

1          A.    A crown on my #19 tooth.

2          Q.    Do you know if any inmates get crowns?

3          A.    I don't.

4          Q.    And their response is they would give

5     you fillings, is that what you said in your

6     complaint?

7          A.    I don't recall what section that is.  I

8     believe that they said that my course of action

9     was extraction or another filling, I believe those

10    were the choices I was given.

11         Q.    Do you know why you didn't get a crown

12    after you got the root canal?

13         A.    I don't.

14         Q.    When did it start hurting?

15         A.    I believe it was early on in the

16    sentence as I was doing time.  I think it's in the

17    complaint though, I think I mentioned that.

18         Q.    Feel free to look at your complaint to

19    tell me the incident.

20         A.    Would you like me to find it?

21         Q.    Sure.

22              MR. WALTER:  While you're looking for

23    that, let's take a short break.

24              (WHEREUPON, a break was taken and the

78

1    deposition resumed as follows:)

2        A.    Okay.   In the complaint, number 24, it

3    says on 7/20/2001, Plaintiff told Dr. Grammer that

4    #19 tooth bothers him sometimes.   Upon examination

5    Dr. Grammer noted that plaintiff had root canal

6    treatment on #19 tooth and scheduled an operation

7    to replace deteriorated filling.

8                MR. SMITH:   That's all I have right now.

9                    FURTHER EXAMINATION

10   BY MR. WALTER:

11       Q.    You're no longer incarcerated, right?

12       A.    No, sir.

13       Q.    You can go see any dentist that you

14   want?

15       A.    Well, I can't pay any dentist.

16       Q.    The Department of Corrections doesn't

17   determine whether you can go see a dentist, right?

18       A.    If I had the money, are you asking if

19   they would prevent me from going to a dentist?

20       Q.    Right.

21       A.    I don't believe they would.

22       Q.    For example, if you wanted to

23   discontinue your cellular phone service and save

24   the $65 per month that you pay for cellular phone

79

1     services, you can take that money and apply it

2     towards a dentist, right?

3         A.    I could, yes, sir.  May I ask you

4     something, that's assuming I would have $65 a

5     month to save had the phone got cut off, but go

6     ahead.

7         Q.    Okay.  You probably entered into a

8     contract with your phone company, right, so it

9     wouldn't necessarily be that easy to discontinue

10    your phone service, is that what you're saying?

11        A.    What I'm saying, it can't be

12    discontinued and I really wouldn't have a choice

13    if I don't have the money to pay for it.

14        Q.    But currently you're able to pay for

15    your phone service each month, right?

16        A.    Well, at this point.  I paid for it last

17    month, so next month we'll see.

18        Q.    Do you have like a two-year agreement

19    with the phone company?

20        A.    I believe it's a two-year contract.

21        Q.    Now, going back to Illinois River

22    Correctional Center, Dr. Awada recommended that

23    your tooth be extracted prior to him ultimately

24    extracting it in 2006?

80

```
 1          A.    Did he recommend it?

 2          Q.    Yes.

 3          A.    I believe that was his recommended

 4    course of action.

 5          Q.    And, in fact, in November of 2005, he

 6    recommended that your tooth be extracted and you

 7    signed a refusal of services form refusing to

 8    allow the extraction, do you recall that?

 9          A.    I do recall signing the refusal, I do.

10          Q.    And in that refusal you released

11    Dr. Awada, the Illinois River Correctional Center,

12    the facility, and the Department of Corrections

13    for all liability for damages or any injuries

14    including to your health caused by or arising out

15    of your refusal to allow the extraction, do you

16    recall that?

17          A.    Do I recall that part of the refusal?

18          Q.    Yes.

19          A.    I can't recall that part, but if it says

20    it on there.

21          Q.    I'm going to show what you I'll mark for

22    identification purposes as Hunter Exhibit No. 2.

23                (WHEREUPON, Hunter Exhibit No. 2 was

24    marked for identification.)
```

81

1      A.    Do you mind if I look through this

2      complaint right now?

3      Q.    Yeah, I do actually because I'd like to

4      ask you my questions and then I'll gave it back to

5      Mr. Smith, at that point if you want to look

6      through your complaint to deal with whatever

7      questions he has, that's fine.

8      A.    All I'm saying is if the answers to some

9      of your questions lie in here, is it okay if I

10     cite them from this?

11     Q.    Yeah, if I ask you a question and you

12     need to look at your complaint, that's fine.

13     A.    Okay.

14     Q.    But right now I'm going to have you look

15     at this and see if this refreshes your

16     recollection as to what you stated in your refusal

17     that you signed.

18     A.    Okay.

19     Q.    That's a refusal dated November the

20     28th, 2005?

21     A.    Yes, sir.

22     Q.    And that's your signature down at the

23     bottom, correct?

24     A.    Yes, sir, it is.

1        Q.    And in that statement you released the

2    doctor and the facility and all those other people

3    I mentioned, correct?

4        A.    Yes, sir.  I was required to sign this,

5    I didn't have a choice.

6        Q.    Who required you to sign it?

7        A.    I believe Miss Harper told me either I

8    sign this or they take disciplinary action and

9    arrive at what they call disciplinary referral, so

10    those were my two choices.

11        Q.    You did refuse to have the extraction,

12    correct?

13        A.    I refused the extraction, yes.

14        Q.    You told them that you didn't want it

15    done?

16        A.    I didn't want the extraction done at

17    that time, no, sir.

18        Q.    You also refused treatment in May of

19    2006, correct?

20        A.    I signed this refusal, yes, sir, I was

21    forced to sign that as well.

22        Q.    And in May of 2006, you refused the

23    treatment that Dr. Awada had recommended?

24        A.    May I ask what was the treatment he

1    recommended in May of 2006?

2         Q.    Well, that's what I'm asking you, I

3    wasn't there.

4         A.    Oh, I'm sorry.  Well, I can't recall the

5    exact circumstances surrounding the signing of

6    this refusal -- is this a refusal?  Okay, I can't

7    recall the circumstances surrounding that, but I

8    know that I was told either I sign it or they

9    would take disciplinary action against me.

10        Q.    But you did refuse services on that

11   date, correct, prior to being asked to sign the

12   form?

13        A.    I can't recall the exact circumstances

14   surrounding me signing this, sir, at this time.

15        Q.    Did you refuse services in May of 2006?

16        A.    I'm sorry, let me think about what went

17   on this day, I'm going to try to remember exactly

18   what went on.

19        Q.    Okay.

20        A.    Can I look in the complaint this time?

21        Q.    Sure.

22        A.    Okay, this particular day I believe I

23   had an appointment to go see the dentist, and I

24   believe I was late for the appointment and the

1    dentist refused to see me, and the officer made

2    me -- he forced me to sign this refusal.  He gave

3    me a choice between this refusal or disciplinary

4    report and that was it.

5         Q.    So even though you signed the refusal,

6    your testimony today is that you did not actually

7    refuse services on May the 10th of 2006?

8         A.    My testimony is that I did not refuse

9    services on that day, yes, sir, I was forced to

10   sign this.

11        Q.    And that's your signature on the form

12   though, correct?

13        A.    It is.

14        Q.    Do you remember who the officer was that

15   forced you to sign this form allegedly?

16        A.    If the incident I'm recalling is

17   correct, I believe his name was Hand, Officer

18   Hand.

19        Q.    What did Officer Hand look like?

20        A.    I think he had glasses, I believe his

21   hair was reddish maybe.

22        Q.    How old was he approximately?

23        A.    Maybe around in between 40 and 50.

24        Q.    And you're six foot, what, how tall are

1    you?

2        A.    I'm six-foot-five.

3        Q.    Was he taller than you or shorter than

4    you?

5        A.    He was shorter than me.

6        Q.    Approximately where would he have come

7    to, on your shoulders or higher than that?

8        A.    I can't recall.  I was -- I didn't have

9    too many opportunities to stand next to him so I

10   wouldn't know.

11       Q.    How much would you guess he weighed if

12   you had to make an estimate?

13       A.    Maybe 200 pounds, maybe more.

14       Q.    Was he muscular or was he obese?

15       A.    I wouldn't say -- he had a stomach that

16   was pretty large but the rest of his body I

17   wouldn't say was obese.

18       Q.    Did he have any facial hair, beard,

19   mustache?

20       A.    I can't recall if he had a beard.

21       Q.    Now, on June the 12th of 2006, you did

22   consent for Dr. Awada to extract your tooth #19,

23   correct?

24       A.    I believe that's the day he extracted

1      it, yes, sir.

2          Q.    And you signed a form authorizing him to

3      extract your tooth?

4          A.    Yes, sir.

5          Q.    Earlier we talked a little bit about

6      Dr. Osafo, was one of the times that he saw you

7      after you had twisted your ankle playing

8      basketball?

9          A.    I can't recall.

10         Q.    I'm going to show you this page from the

11     medical records and see if that refreshes your

12     memory.

13         A.    What is this form, is this a record of

14     the incident?

15         Q.    I was just asking if that refreshed your

16     memory?

17         A.    Well, no, I don't recall seeing him.  I

18     remember twisting my ankle.

19         Q.    I'll show you this page from the medical

20     records, does that refresh your memory as to

21     whether you were seen by Dr. Osafo after you

22     twisted your ankle playing basketball?

23         A.    I'm sorry, I can't really read that.

24         Q.    Okay.  You remember twisting your ankle

87

1      playing basketball, right?

2          A.    I do.

3          Q.    Do you remember if you were seen by a

4      doctor after that incident?

5          A.    I can't recall.

6          Q.    Fair to say if you don't recall, you

7      don't have any objection with how Dr. Osafo

8      treated you on that date if in fact he did?

9          A.    No, I think it's fair to say that I saw

10     him if there's a record of it, I just don't recall

11     it.

12         Q.    You think he probably saw you for your

13     twisted ankle?

14         A.    Yes, sir, it's fair to say that.

15         Q.    Okay.  And you don't have any objection

16     with how he evaluated and treated you on that date

17     for your twisted ankle?

18         A.    I can't say that I don't have any

19     objection at this time, I'm not really familiar

20     with --

21         Q.    Nothing about it in your complaint,

22     right?

23         A.    No, there's nothing in the complaint

24     about it, no, sir.

88

1      Q.    Nothing in this case dealing with that

2  issue?

3      A.    With my ankle, no, sir, not at this

4  time.

5      Q.    I don't have any additional questions at

6  this time.

7           MR. SMITH:  None.

8  BY MR. WALTER:

9      Q.    We will give the two exhibits to our

10  court reporter, and I need to get a photocopy of

11  this one.  And this concludes the deposition,

12  except for we have to do that part that we talked

13  about earlier, deciding whether or not you want to

14  review the transcript or waive.

15      A.    I do want to review the transcript.

16      Q.    We will make arrangements then to have

17  the transcript here for you to sit and review and

18  you'll be able to go through and make any changes

19  that you have on this form that's called an errata

20  sheet and then you'll need to send that form to

21  the court reporter.

22      A.    Do we have -- is there a --

23      Q.    Or you can send it to me and I'll get it

24  to her, either way.

1        A.    Is there like a time frame I'm working

2    with here?

3        Q.    There is a time frame, but because it's

4    going to come to me instead of you, I'm not going

5    to hold you to that time frame, I'm sure that

6    Mr. Smith is not going to either, so we will get

7    it to you.

8            Now, if it sits here for more than 30

9    days -- 30 days I believe is correct from the date

10   that she sends the letter if she were sending it

11   to you directly; for example, if you were

12   purchasing a copy, you'd have 30 days after that

13   to get your errata sheet back.  She's sending it

14   to me, though, and then I've got to get it over

15   here so there's going to be a little bit of time

16   delay, so within 30 days after I notify you that

17   it's here and available for you to review, you

18   need to get in during that time frame, okay?

19       A.    Okay.

20       Q.    And you'll need to set up a time to come

21   in because they may not have a conference room

22   available.

23       A.    So I'm clear, the errata sheet, is that

24   what you called it, is what I have to sign to say

90

1    that I want to review the transcript?

2         Q.    No, you're saying that now.

3         A.    Okay.

4         Q.    The errata sleet is where you make any

5    changes.

6         A.    Okay.

7         Q.    And, in fact, if I file a motion for

8    summary judgment within the deadline of the 15th,

9    I'll probably just give you a copy of it anyway

10   then and you can make any changes that you have at

11   that time.

12        A.    Alright.

13        Q.    And that will save you from maybe having

14   to come in.  I typically attach a copy of the

15   transcript to the motion for summary judgment and

16   you get a copy at that point anyway.  That

17   concludes the deposition, thank you.

18        A.    Thank you.

19             (WHEREUPON, the witness was excused.)

20             (The deposition concluded at 11:50 a.m.)

21

22

23

24

91

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
 2
      ANDRE HUNTER, RO1100,          )
 3                                   )
                    Plaintiff,       )
 4                                   )
      vs.                            )   No. 07-3062-HAB-BGC
 5                                   )
      DR. BEN AWADA, DR. GRACIELA    )
 6    GRAMMER, DR. SETH OSAFA,       )
      DR. WILLARD ELYEA, BARBARA     )
 7    HURT, ROGER WALKER, TERRI      )
      ANDERSON, SHERRY BENTON,       )
 8    KAREN HARPER, DONALD HULICK,   )
      WEXFORD HEALTH SOURCES,        )
 9    INC., and KEVIN KIRKBRIDE,     )
                                     )
10                  Defendants.      )

11
                    This is to certify that I have read the
12    transcript of my deposition taken by Mary Pat
      Murray, CSR, in the above-entitled cause, and that
13    the foregoing transcript taken on January 22,
      2008, accurately states the questions asked and
14    the answers given by me, with the exception of the
      corrections noted, if any, on the attached errata
15    sheet(s).

16

17                              _____
                                ANDRE HUNTER
18

19    Subscribed and Sworn before
      me the        day of
20                        , 2007,

21                            , Notary Public

22
      Area Wide Reporting
23    301 West White Street
      Champaign, Illinois 61820
24    (217)356-5119
```

92

```
1        STATE OF ILLINOIS    )
                              ) SS
2        COUNTY OF CHAMPAIGN )

3                 I, MARY PAT MURRAY, CSR, doing business
         in the County of Champaign and State of Illinois,
4        do hereby certify that ANDRE HUNTER, the deponent
         herein, was by me first duly sworn to tell the
5        truth, the whole truth and nothing but the truth,
         in the aforementioned cause of action.
6                 That the foregoing deposition was taken
         on behalf of the Defendants at Heyl, Royster,
7        Voelker & Allen, 102 East Main Street, Urbana,
         Illinois on January 22, 2008
8                 That said deposition was taken down in
         stenograph notes and afterwards reduced to
9        typewriting under my instruction; that the
         deposition is a true record of the testimony given
10       by the deponent; and that it was agreed by and
         between the witness and attorneys that said
11       signature on said deposition would not be waived.
                  I do further certify that I am a
12       disinterested person in this cause of action; that
         I am not a relative, or otherwise interested in
13       the event of this action, and am not in the employ
         of the attorneys for either party.

14

15

16                          s/Mary Pat Murray

17                     _____
                       MARY PAT MURRAY, CSR

18

19

20

21

22

23

24
```

# Illinois
## Department of
# Corrections

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

District 2 Deputy Director / Sheridan Correctional Center / 4017 E. 2603 Road / Sheridan, IL 60551 / Telephone: (815) 496-2181 / TDD: (800) 526-0844

March 15, 2006

Andre Hunter, R01100
Illinois River Correctional Center
P.O. Box 1900
Canton, IL 61520

Dear Mr. Hunter:

Your March 6, 2006 letter concerning dental care at Illinois River Correctional Center has been reviewed.

The Illinois Department of Corrections does not approve placement of a "permanent prosthesis". Dental crowns fall into this category. The Department provides only for removal dental prosthetics as determined clinically necessary by the dentist. Therefore, your only recourse is to have the tooth extracted.

Your grievance was deemed not of an emergency nature per Warden Hulick on January 9, 2006 and it would seem the handling of your grievance was in accordance with established guidelines being within the 60 day period.

I trust this addresses your concerns.

Sincerely,

s/Barbara A. Hurt

Barbara A. Hurt, Deputy Director
District #2

cc:   Warden Hulick, Illinois River CC
      Masterfile – R01100
      File



EXHIBIT

Hunter #7

ILLINOIS DEPARTMENT OF CORRECTIONS

**Medical Services Refusal**

<u>IL RIVER CORRECTIONAL</u>  Center

☐ **Employee**
☒ **Offender**

Date: 11 , 28 , 05
Time: 10 : 00                ☐ a.m.
                             ☒ p.m.

| Patient Information: | | |
|---|---|---|
| Hunter | Andre | ID#: R01100 |
| Last Name | First Name | MI |

---

☒ **Refusal of Services**

I refuse to authorize the performance upon ~~myself~~ or _____
                                                          Name of Patient

of the following treatment ___ Ext #19 _____
                                          State nature and extent of treatment.

☐ **Discharge Demand**

I further demand DISCHARGE of myself or _____
                                                    Name of Patient

from _____, against the advise of Dr. _____
          Name of Medical Facility                                    Name of Doctor

---

Dr. ___ Awada _____ has explained the risks to me, possible complications and probable
        Name of Doctor

consequences of refusing treatment or demanding discharge from this medical facility or both.

I hereby release the Attending Physician, the ___ IRCC _____, the Facility, and
                                                        Name of Medical Facility

the Department of Corrections from all liability for damages or any injuries including to my health caused by or arising out of this

refusal whether foreseen or unforeseen.

---

I certify that I have read and fully understand the above REFUSAL OF TREATMENT OR DISCHARGE DEMAND FROM

MEDICAL FACILITIES RELEASE OR BOTH, that the explanations therein referred to were made, and that all blanks or statements

requiring insertion or completion were filled in and inapplicable paragraphs, if any, were stricken before I signed.

ANDRÉ HUNTER                    s/Andre Hunter                    11 , 28 , 05
Print Name of Patient              Signature of Patient                  Date

When patient is a Minor or Incompetent to give consent:

DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
GRAMMAR
B

DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
AWADA
B

_____          _____          _____
Print Name of Person Authorized to Consent    Signature of Person Authorized to consent           Date

X Harper                         s/K. Harper                      11 28 05
Print Name of Witness              Signature of Witness                  Date

EXHIBIT
Hunter 2

Distribution:   Patient's Medical Record or File

Printed on Recycled Paper

DOC 0083 (Eff. 9/2002)
(Replaces DC 7128-A)

E-FILED
Friday, 08 February, 2008  03:52:38 PM
Clerk, U.S. District Court, ILCD

STATE OF ILLINOIS          )          *Hunter v. Awada, et al.*
                           )          USDC-CD Ill. No. 07-3062
COUNTY OF RANDOLPH )

## AFFIDAVIT

I, Donald Hulick, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.    I began my employment with the Illinois Department of Corrections on January 19, 1988.  From August 1, 2005 – March 31, 2006, I was the warden of Illinois River Correctional Center.  Currently, I am the warden of Menard Correctional Center.

2.    As Warden, my duties included, in part, determining if a grievance should be handled on an emergency basis.  In addition, after the Grievance Officer responds to the grievance it is my responsibility to give a response.  However, due to the pressing issues of being a Warden, this responsibility can be delegated.

3.    It appears that Plaintiff wrote a grievance on or about January 3, 2006 regarding his claim that he had a serious medical need and that he has not received adequate medical treatment, specifically his dental care.  In that grievance, Plaintiff claimed that he required a crown for his #19 tooth.  I deemed the grievance not an emergency on January 9, 2006.  I recommended that the grievance be submitted in the normal manner to the counselor.

4.    It appears that Plaintiff submitted this same grievance to the counselor. On March 8, 2006, my designee concurred with the grievance counselor's denial of Plaintiff's grievance.

5.    I am not a medical professional.  The course of treatment for inmates is left to designated physicians, and I do not intervene in the course of treatment that an inmate is receiving from this physician.

FURTHER AFFIANT SAYETH NOT.

s/Donald Hulick
_____
Donald Hulick

SUBSCRIBED and SWORN
Before me this 8th day of February 2008.

s/Cynthia L. Gimber
_____
Notary Public

Official Seal
Cynthia L Gimber
Notary Public State of Illinois
My Commission Expires 06/10/2011

EXHIBIT

B

STATE OF ILLINOIS          )     *Hunter v. Awada, et al.*
                           )     USDC-CD Ill. No. 07-3062
COUNTY OF FULTON           )

## AFFIDAVIT

I, KEVIN KIRKBRIDE, having first been duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.      I am currently employed at Illinois River Correctional Center.  My duties include among other things serving as a grievance officer.

2.      I have read the complaint of Andre Hunter, and am familiar with its contents.

3.      At all times relevant to the Plaintiff's Complaint, I was serving as a grievance officer at Illinois River Correctional Center.

4.      If an inmate made me aware of a medical issue he was having, I would have advised him to fill out a request slip for sick call.

5.      On March 7, 2006, I responded to a grievance filed by Plaintiff regarding his dental care.  The attached response is a true and accurate copy of my response to Plaintiff's grievance.  (See attachment 1).  My response was based upon a total review of all available information.

6.      I am not a medical professional.  I did not make the determination as to the proper treatment for Plaintiff's medical care.  All decisions regarding the proper medical care provided to Plaintiff were made by Plaintiff's treating physicians.  I do not have the authority or training to override the decisions made by doctors.  I had no reason to believe the decisions made by Plaintiff's doctors regarding Plaintiff's medical care were improper, and I did not prevent Plaintiff from receiving medical care.

I have read the foregoing paragraphs and they are true and correct to the best of my knowledge and belief.

**FURTHER AFFIANT SAYETH NOT.**

_____
                                    Kevin Kirkbride

SUBSCRIBED and SWORN
Before me this _____ day of February 2008.


_____
Notary Public

EXHIBIT
C

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

1B23

| Grievance Officer's Report | | |
|---|---|---|

**Date Received:** 1/10/06          **Date of Review:** 3/7/06          **Grievance #:** 06-0062/0140

**Committed Person:** Andre Hunter      1B23          **ID#:** R01100

**Nature of Grievance:** Medical Treatment: The offender grieves lack of dental treatment.

**Facts Reviewed:** The complaint and grievance fact sheet was reviewed.

Offender alleges that he has a problem tooth that causes enough pain to affect his eating habits. The offender claims a root canal was done leaving the tooth thin and cracked and causes it to have to be repeatedly filled. The offender claims that this has caused him to get abscesses around the tooth that cause severe pain making it difficult to eat solid food. The offender states he has visited the dentist several times and has been told that a crown is needed but IRCC will not do what is needed and has advised extraction. The offender claims that denial of the needed crown is a violation of his 8th amendment rights to medical care. The offender also grieves getting copies of his medical record that are not legible.

Dr. Awada responds: The offender has been seen several times to restore his fillings due to fractures The offender was advised that a crown was needed but couls not be done in the Department of Corrections per A.D. 04.03.102, 8b. The offender has also been seen several times for abscesses around the tooth due to lack of good contact (large filling) and furcation problems (gum problems) which promoted the recommendation of extraction. The offender refused the tooth removal. The only treatment remains the extraction of the tooth since DOC will not allow a crown per A.D..

Based upon a total review of all available information and a compliance check of the procedural due process safeguards outlined in Department Rule 504, this Grievance Officer is reasonably satisfied that staff misconduct cannot be substantiated and recommends that the offender's grievance be denied.

**Recommendation:** Grievance Denied

Kevin N. Kirkbride, CLAS II                    s/Kevin N. Kirkbride
Print Grievance Officer's Name                    Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response | | |
|---|---|---|

**Date Received:** March 8, 2006          ☑ I concur    ☐ I do not concur    ☐ Remand

**Comments:**

s/Donald Hulick
Chief Administrative Officer's Signature                    March 8, 2006
                                                            Date

| Committed Person's Appeal To The Director | | |
|---|---|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

s/Andre Hunter                    R-01100          3-14-06
Committed Person's Signature          ID#          Date

STATE OF ILLINOIS       )         **Hunter v. Awada, et al.,**
                       )         **USDC-CDIL 07-3062**
                       )    **ss.**
COUNTY OF SANGAMON    )

## AFFIDAVIT

I, Sherry Benton, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.  I am a Chairperson with the Office of Inmate Issues for the Illinois Department of Corrections ("the Department") and have held this position since June 15, 2003.

2.  Inmates incarcerated within the Department may file grievances in accordance with Department Rule 504F: Grievance Procedures for Committed Persons. Generally, an inmate must first attempt to resolve grievances through his counselor. If the grieved issued remains unresolved after such informal efforts, or for example, involves a disciplinary proceeding, the inmate may submit a written grievance on a grievance form to the facility Grievance Officer designated by the Chief Administrative Officer ("CAO"). The Grievance Officer may personally interview the inmate and/or other witnesses as deemed appropriate and obtain relevant documents to determine the merits of the inmate's grievance. Upon completion of such investigation the Grievance officer's conclusions and if appropriate, recommended relief is forwarded to the CAO. The CAO, or CAO's designee's, decision is then submitted to the grieving inmate.

3.  If, after receiving the CAO's decision the inmate feels the issue is unresolved, he may appeal in writing to the Director of the Department by submitting the Grievance officer's report and CAO's decision. The ARB, as the Director's



**EXHIBIT**

D

designee, reviews the appeal and first determines whether the inmate's grievance can be handled without the necessity of a hearing. If so, the inmate is so advised. Other matters are scheduled for an ARB hearing involving an interview of the grieving inmate, examining relevant documents and at the ARB's discretion, calling witnesses. The ARB submits a written report of its findings and recommendations to the Director or Director's designee who then reviews the report and makes a final determination on the grievance. A copy of the ARB's report and the Director's final decision is sent to the inmate who filed the grievance. The originals of these documents are maintained in the ARB's files. Department Rule 504F: Grievance Procedures for Committed Persons provides no further means for review beyond this step.

4.    Certain issues may be grieved directly to the ARB, rather than first through a counselor or grievance officer. These issues include:

a.    Decisions involving the involuntary administration of psychotropic medication;

b.    Decisions regarding protective custody placement, including continued placement in or release from protective custody;

c.    Decisions regarding disciplinary proceedings which were made at a facility other than the facility where the inmate is currently assigned; and

d.    Other issues except personal property issues which pertain to ta facility other than the facility where the inmate is currently assigned.

These grievances are then handled in accordance with the procedures described in paragraph 3 above.

5. An inmate may request a grievance be handled on an emergency basis by forwarding the grievance directly to the CAO rather than to a counselor or grievance officer. If the CAO determines that there is a substantial risk of imminent personal injury or other serious irreparable ham to the inmate, the grievance may be handled on an emergency basis. An inmate may appeal the CAO's decision in such a situation to the ARB. The appeal is then handled in accordance with the procedure described in paragraph 3 above.

6. The grievance procedure may not be utilized for complaints regarding decision which are outside the Department's authority such as parole decisions, clemency, or orders regarding the length of sentences or decisions which have been reviewed by the Director.

7. On April 3, 2006, I responded to Andre Hunter's grievance concerning his dental care. I reviewed the grievance as well as the documents denying the grievance and upheld the institution's decision to deny Mr. Hunter's grievance. Terri Anderson, acting as Roger Walker's designee, concurred with this decision.

8. I am not a medical professional. I did not make the determination as to the proper treatment for Plaintiff's medical care. All decisions regarding the proper medical care provided to Plaintiff were made by Plaintiff's treating physicians. I do not have the authority or training to override the decisions made by doctors. I had no reason to believe the decisions made by Plaintiff's doctors regarding Plaintiff's medical care were improper, and I did not prevent Plaintiff from receiving medical care

**FURTHER AFFIANT SAYETH NOT.**

s/Sherry Benton
_____
Sherry Benton

SUBSCRIBED and SWORN
Before me this 8th day of February 2008.

s/Margaret E. Baugher
_____
Notary Public

OFFICIAL SEAL
MARGARET E. BAUGHER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-8-2011

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

ANDRE HUNTER, R-01100,                    )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )     No.    07-3062
                                          )
DR. BEN AWADA, DR. GRACIELA               )
GRAMMAR, DR. SETH OSAFA, DR.              )
WILLARD ELYEA, BARBARA HURT,              )
ROGER WALKER, TERRI ANDERSON,)
SHERRY BENTON, KAREN HARPER,              )
DONALD HULICK, WEXFORD                    )
HEALTH SOURCES INC., and                  )
KEVIN KIRKBRIDE                           )
                                          )
            Defendants.                   )

## DEFENDANT ELYEA'S ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

NOW COMES the Defendant, DR. WILLARD ELYEA, by and through his attorney,

Lisa Madigan, Attorney General of the State of Illinois, and answers Plaintiff's First Set of

Interrogatories as follows:

14.    Please define the duties of Medical Director of the I.D.O.C.

ANSWER:  The Medical Director of the Illinois Department of Corrections (the

"Department") is responsible for the following: (a) Promulgating and articulating community

health care standards within the Department and planning and developing health care policy;

(b) Supervising the Office of Health Services Administration; (c) Monitoring the provision of

health services in adult and juvenile facilities; (d) Providing an evaluation and review of

clinical performance and credential's of medical directors, physicians, and other health care

providers as appropriate.  Conducting the Annual Governing Body review of the health care

providers. Making recommendations regarding the hiring and firing of health care personnel;

(e) Providing liaison service to the health care community including the Illinois Department

**EXHIBIT**

**E**

of Public Health, Cermak Hospital, University of Illinois Hospital, and other hospitals; (f) Monitoring of health services contracts and assisting in the negotiations of health services contracts; (g) Providing assistance to the Office of the Attorney General and Agency legal staff regarding health care related legal matters and testimony when required; (h) Reviewing and monitoring health care budget requests when requested, including making recommendations to the Director regarding said budget and appearing at the appropriations committee as necessary; (i) Supervising clinical medical decisions; (j) Providing direction for in-service health care training programs and providing oversight to subordinate staff's direction to the facility's health care unit administrators; (k) Communicating on a regular basis with the Director, Assistant Director, Bureau Chief of Operations, Chief of Program Services, and other Chiefs, Deputy Directors, wardens and superintendents within the Bureau of Operations. Collaborating with the Chief of Mental Health Services and the Department's Chief Dietician; (l) Providing assistance to the Capital Projects Division regarding the construction of health care facilities within new prison construction and remodeling construction. Reviewing health care facilities and equipment and recommending changes when appropriate.

15.    Is it part of your duty as medical director of the I.D.O.C. to ensure that the contracted health care provider(s) is/are providing adequate medical care to inmates as contractually agreed? If not, explain.

ANSWER: Defendant Elyea states that as medical director he works with the contracted health care providers in promulgating community standards, and that he works closely to ensure that the physicians in each facility are qualified. Defendant Elyea states

2

that he may review medical files to see whether treatment is within reasonable and acceptable standards.

16.     Is it part of your duty, as Medical Director of the I.D.O.C., to monitor the performance of each institutions health care unit and ensure they are in accordance with American Medical Association (AMA) and American Correctional Association (ACA) audit standards? If not, explain.

ANSWER: Defendant objects to this question as vague. The AMA does not set standards. In addition no ACA audits were performed while Defendant was medical director.

17.     As Medical Director of I.D.O.C. is it part of your duty to advise Wexford and/or dental department on grievances concerning medical issues filed by inmates? If so, were you aware of the medical condition of the plaintiff prior to plaintiff contacting you via certified mail? If so, when did you become aware and what did you advise?

ANSWER: Defendant Elyea states that he did not advise on grievances, and that is not part of his duties. Defendant Elyea does not recall being aware of Plaintiff's medical condition until just prior to his response to Plaintiff dated April 5, 2006. Defendant Elyea doesn't recall receiving certified mail from Plaintiff. After reviewing Plaintiff's medical file, Defendant Elyea advised to the Plaintiff that extraction was the treatment of choice, as he wrote in the letter to Plaintiff dated April 5, 2006.

18.     When you became aware of plaintiff's medical condition what action did you take to ensure he was receiving adequate medical attention? Explain.

ANSWER: Defendant Elyea states that according to the letter that was sent to the Plaintiff dated April 5, 2006 by Defendant Elyea, he reviewed Plaintiff's dental records. In

3

addition, Defendant Elyea states that he reviewed Plaintiff's records with a dental consultant.

19.    Is it possible for someone who has had root canal treatment and repeated fillings on the same tooth to experience the symptoms described by the plaintiff in paragraphs 20-22 of plaintiff's complaint? If not, explain why it is not possible?

ANSWER: Defendant Elyea objects to this question as vague, overbroad, and calls for speculation. Not withstanding said objection, Defendant states there are many reasons for the symptoms described, and this defendant cannot determine whether the descibed symptoms were real, and if so, from what cause.

20.    Is it possible for someone who was given a filing that does not fit right to experience symptoms described by plaintiff in paragraph 23 of plaintiff's complaint? If not, explain.

ANSWER: Defendant Elyea refers Plaintiff to his response on #19.

Respectfully submitted,

DR. WILLARD ELYEA,

Defendant,

LISA MADIGAN, Attorney General
State of Illinois,

Jacob H. Smith, #6290790
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-9014

Attorney for Defendant,

By    s/Jacob H. Smith

Jacob H. Smith
Assistant Attorney General

Of Counsel.

4

## CERTIFICATE OF SERVICE

    Jacob H. Smith, Assistant Attorney General, hereby certifies that he has served a copy of the foregoing Response to Plaintiff's First Set of Interrogatories upon:

    Andre Hunter
    2125 B Melrose Drive
    Champaign, IL 61820

    Theresa M. Powell
    Heyl, Royster, Voelker & Allen
    P.O. Box 1687
    Springfield, IL 62705-1687

by causing a copy of same, in a correctly addressed prepaid envelope, to be deposited in the United States Mail in Springfield, Illinois on ___October 9___, 2007.

                           s/Jacob H. Smith
               By: _____
                      Jacob H. Smith, #6290790
                      Assistant Attorney General
                      500 South Second Street
                      Springfield, Illinois 62706
                      Phone:  (217) 782-9014
                      Fax: (217) 524-5091
                      jsmith@atg.state.il.us

STATE OF ILLINOIS                )                *Hunter v. Awada, et al.*
                                 )                USDC-CD Ill. No. 06-3062
                                 ) ss.
COUNTY OF _Cook_                 )


## **ATTESTATION**

WILLARD ELYEA, being first duly sworn on oath, deposes and states that he is a

Defendant in the above-captioned matter, that he has read the forgoing document, and

the admissions made herein are true, correct and complete to the best of his knowledge

and belief.


                                    s/Willard Elyea, M.D.
                              _____
                                    WILLARD ELYEA, M.D.



Subscribed and sworn to before me

this _9th_ day of _October_, 2007.


Notary Public


> **OFFICIAL SEAL**
> **LINDA K SCHMIDT**
> Notary Public – State of Illinois
> My Commission Expires Sept 21, 2010

    s/Linda K. Schmidt